Kenneth **BAKER,** Arthur **Bartniczak, Hanson Bratton, Patrick Jordan, Frank Krzesowik, Elbert McVay and Robert Scally, Plaintiffs in Civ. No. 5–71937,**

**and**

**Hanson Bratton, Gale Bogenn, William Shell, Patrick Jordan, Charles Mahoney, Individually and on behalf of all others similarly situated and the Detroit Police Lieutenants & Sergeants Association, Plaintiffs in Civ. No. 5–72264,**

**v.**

**CITY OF DETROIT, a Municipal Corporation; Philip G. Tannian, Chief of Police; Coleman A. Young, Mayor, City of Detroit; and the Board of Police Commissioners, City of Detroit, Defendants,**

**and**

**Guardians of Michigan, David L. Simmons, Arnold D. Payne, James E. Crawford, Clinton Donaldson, Willie Johnson, Kenneth M. Johnson and Alfred Brooks, Intervening Defendants.**

Civ. Nos. 5–71937, 5–72264.

United States District Court, E. D. Michigan, S. D.

Oct. 1, 1979.

---

12. By stipulation, trial on the issue of liability was severed from trial on the issue of damages.

See also, D.C., 483 F.Supp. 919.

James P. Hoffa, Murray J. Chodak, Hoffa, Chodak & Robiner, Detroit, Mich., for plaintiffs in No. 5–71937.

K. Preston Oade, Jr., Bernard A. Friedman, Robert S. Harrison, Marc G. Whitefield, Lippit, Harrison, Perlove, Friedman & Zack, Southfield, Mich., for plaintiffs in No. 5–72264.

Jack Greenberg, James M. Nabrit, III, O. Peter Sherwood, Napoleon B. Williams, Lowell Johnston, Beth J. Lief, New York City, Barry L. Goldstein, Washington, D. C., James R. Andary, Sp. Asst. Corp. Counsel for the City of Detroit, George Matish, Anna Diggs-Taylor, Nancy McCaughan, James Zeman, Denise Page Hood, Law Dept., City of Detroit, Detroit, Mich., for defendants.

Warren J. Bennia, New York City, for intervening defendants.

## MEMORANDUM OPINION

KEITH, Circuit Judge, Sitting by Designation.

### INDEX

Introduction

I. Procedural History

A. Statement of the Case

B. Summary of the Legal Claims.

II. The History of Past Discrimination in the Detroit Police Department

A. Hiring Practices

1. 1943—The First Detroit Race Riot
2. Employment Practices 1944–53
3. Employment Practices 1954–60
4. Employment Practices 1960–67
5. The Department's Relations with the Black Community
6. The 1967 Riot
7. The Detroit Police Department 1967–68
8. 1967–1974 Employment Practices of the Detroit Police Department
 (a) 1967–1971 Employment Practices
 (b) 1971–1974 Employment Practices

B. Promotional Practices

1. The Racial Make-up of the Department's Supervisory Ranks 1967–1974
2. Promotional Lines of Progression
3. The Promotional Process
 (a) Minimum Eligibility Requirements to Sit for the Examination
 (b) The Components of the Promotional Model
 (1) Service Ratings
 (2) Promotional Ratings
 (3) Seniority
 (4) The Written Promotional Examination
 (5) Veterans Preference and College Credits
 (c) Additional Eligibility Requirements for Promotion
 (d) The Mechanics of the Promotional System

4. Discrimination within the Promotional Model

III. Defendant's Past Discrimination Model—An Analysis

A. Relevant Labor Market

B. Defendant's Expert's Analysis

IV. 1974—The Adoption of Affirmative Action and Subsequent Occurrences

A. The Board of Police Commissioners and the Adoption of Affirmative Action

B. The Promotional Model 1974—Present; An Overview

1. Immediate Background
2. Efforts to Improve the Promotional Model
 (a) Oral Boards
 (b) The Written Examination
 (c) Eligibility for Promotion

V. The Matter of Relative Qualifications

A. The Written Exam

B. Service Ratings

C. Confirmation Service Ratings and Officer Candidate School Scores

D. Summary

VI. The Legal Standard for Voluntary Affirmative Action

A. The Legal Claims

B. The Title VII and § 1981 Claim

1. The *Weber* Decision
2. *Weber* and the Detroit Affirmative Action Plan
3. The City's Past Violation of Title VII

C. The Constitutional Claim

1. The Board of Police Commissioners' Findings of Past Discrimination
2. Intentional Past Discrimination
3. Summary
4. Was the City's Affirmative Action Plan Reasonable?

D. State Law Claims

VII. The City's Operational Needs Defense

A. The Black Community and Racial Discrimination by the Police Department

B. Prevailing Attitudes in the Police Department

VIII. Conclusion

## INTRODUCTION

This case presents a host of issues regarding affirmative action and the broader question of race relations in the City of Detroit and throughout the United States. It brings into focus the tension which exists when the expectations of whites are affected by programs designed to aid minorities.

The controversy in this case can be simply summarized. In 1974, the City of Detroit commenced an affirmative action program regarding promotions in the Detroit Police Department. This program resulted in the preferential promotion of black officers. White officers considered themselves aggrieved by the program and brought this lawsuit. There exist three basic job levels [1] in the Detroit Police Department: patrolman, sergeant and lieutenant. The particular controversy in this case concerns the promotion of officers from the rank of sergeant to the rank of lieutenant.[2]

The ordinary procedure which the Detroit Police Department uses to make promotions can be simply summarized. The candidate takes a written examination and, upon attaining a minimum score of 70, the officer's name is placed on a promotion eligibility list. The officer's rank on such a list is determined by a number of factors, including exam score, length of service in Department, ratings by superior officers, and level of college education. Although the relative weights of these factors have been shifted over the years, the general procedure has remained that after each factor has been assessed, an overall rating is given to each officer desiring promotion. The candidates for promotion are than ranked numerically from 1 to 500 or however many officers there are on the list. Ordinarily, the officers (in this case sergeants) are promoted to the higher rank (in this case lieutenant) strictly in rank order, depending on how many openings are available. Thus, if the Department needed 12 lieutenants, it would promote the top 12 sergeants on the list.

The City's affirmative action program added a simple wrinkle to the ordinary promotion procedure—it ensured that equal numbers of black and white officers would be promoted. Thus, instead of promoting in order of rank on the eligibility list, the City promoted the top white officers and the top black officers in equal numbers as needed to fill the available openings at the lieutenant's level. The problem cited by plaintiffs is that almost all of the black officers ranked lower on the list. By promoting these lower-ranking black officers, the City effectively by-passed an equal number of white officers who ranked higher on the list and who would otherwise have been promoted. Thus, if the City needed 22 lieutenants, instead of taking the top 22 sergeants on the promotion list, it would take the top 11 white sergeants and the top 11 black sergeants. White sergeants with numbers 12–22 on the promotion list would be passed over for promotion, assuming that there were no black sergeants in this range.

The by-passed white sergeants were understandably upset. They had followed the procedures for promotion set out by the City and had ranked near the top of the promotions list. They considered it grossly unfair for the City to by-pass them. In

---

1. There do exist other ranks such as Commander and Chief of Police, but very few persons occupy them.

2. A closely related lawsuit was decided in February of 1978 by another U.S. district judge of the Eastern District of Michigan, the late Fred W. Kaess. *DPOA v. Young*, 446 F.Supp. 979 (E.D.Mich.1978). That case concerned the affirmative action program regarding promotions from the rank of patrolman to the rank of sergeant. It is currently awaiting decision on appeal to the U.S. Court of Appeals for the Sixth Circuit.

addition, the black officers who were promoted ahead of the by-passed white officers had ranked lower on the list, and thus, in the minds of the white officers, were less qualified. Feeling that they had been illegally discriminated against, the white sergeants brought this lawsuit. Although the legal issues are varied and complex, the plaintiffs' claim can be simply and accurately summarized—it should be illegal for the City to promote blacks over whites solely because of race, especially when the whites ranked higher on the list and were thus, presumably, better qualified.

Plaintiffs position has facial appeal. On the face of it, racial discrimination against whites should not be tolerated by the law any more than racial discrimination against blacks. Why should lower-ranking blacks get promotions over higher-ranking whites? The City's response to these concerns raised by plaintiffs also has much appeal: 1) The City has been guilty of extensive past discrimination against blacks; 2) black officers at all ranks are desperately needed in a predominantly black city because of the need for citizen-police cooperation and related reasons; and 3) the black officers promoted were as qualified as the white officers passed over by them because the ranking on the promotional list was essentially meaningless.

These are the issues presented in this lengthy litigation. They are not easy to resolve and there is no result which can satisfy both sides. The parties and the people of the City deserve a full explanation of this Court's views. Because of the significant and difficult nature of this case, this Court shall try to write as clear and concise an opinion as possible; understandable by lawyer and layman alike. The Court sets forth hereinbelow its findings of fact and conclusions of law, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

**3.** The present Chief of Police, William L. Hart, replaced Mr. Tannian in September of 1976.

**4.** The allegations concerning sex discrimination were later dropped.

# I. PROCEDURAL HISTORY

## A. Statement of the Case

This consolidated action challenges the method of promotions of black male police officers from the rank of sergeant to the rank of lieutenant within the Detroit Police Department (Department) made pursuant to a voluntary affirmative action program which the governing body of the Department, the Board of Police Commissioners, promulgated in July, 1974. Named as defendants in this lawsuit are the City of Detroit; Coleman A. Young, Mayor of the City of Detroit; the Detroit Board of Police Commissioners and its individual members; and Philip G. Tannian, Chief of Police[3] (City defendants).

Case Number 5–71937 was commenced in this Court on October 7, 1975, by Kenneth A. Baker and six other individuals (the *Baker* plaintiffs). Each claims that he was denied promotion from the rank of sergeant to lieutenant off of the 1973 eligibility register solely on the basis of his race and sex,[4] in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, Title VII of the Civil Rights Act of 1964, as amended March 24, 1972, 42 U.S.C. § 2000e *et seq.* and § 706(f)(1) and (3), 42 U.S.C. §§ 1981, 1983, and 1985(3), the Constitution of the United States and the Constitution and laws of the State of Michigan, and the Charter of the City of Detroit.

Case Number 5–72264 was brought as a class action in Wayne County Circuit Court on November 3, 1975. The named plaintiffs are Hanson Bratton, four other individual white male sergeants, and the Detroit Lieutenants and Sergeants Association (the *Bratton* plaintiffs), who challenged the same affirmative action program under attack by the *Baker* plaintiffs. However these claims are limited to promotions that were made off of the 1974 and subsequent eligibility registers.[5] Both sets of plaintiffs

**5.** The Lieutenant and Sergeant's Association, (*Bratton* plaintiffs) did not oppose the first set of affirmative action promotions made on September 23, 1974, from the eligible register for the December 16, 1973, lieutenant's exam. Ac-

sought promotion, back pay, actual and punitive damages and an injunction against continued operation of the affirmative action program.

On motion of the City defendants, the *Bratton* action was removed to the United States District Court for the Eastern District of Michigan on November 26, 1975. While still in state court, the *Bratton* plaintiffs sought and obtained a temporary restraining order and an order to show cause why a preliminary injunction should not be issued enjoining the promotion of black male officers from the rank of sergeant to lieutenant pursuant to the affirmative action program. City defendants moved to dissolve the temporary restraining order issued by the state court. After a hearing, this court dissolved the temporary restraining order on November 26, 1975.

The *Baker* plaintiffs petitioned for a preliminary injunction restraining the Department from making promotions to the rank of lieutenant pursuant to the affirmative action program. The preliminary injunction motion was denied after a hearing by this Court on October 24, 1975.

The *Bratton* plaintiffs moved for leave to amend their original complaint on February 7, 1977. This Court granted the motion by order dated March 9, 1977. The defendants filed their answer to the amended complaint and affirmative defenses on May 24, 1977.

On August 26, 1976, this Court certified the *Bratton* action as a class action pursuant to Rule 23(b)(2) of Federal Rules of Civil Procedure. On September 19, 1977, the Court amended its class action order and defined the class as:

> "All past, present and future qualified white male police sergeants who since November 1974 have been or will be denied because of their race to be timely promoted to the rank of lieutenant."

Plaintiffs moved on April 7, 1978, to recuse this Court. After referring the motion to the Magistrate and a hearing, this Court denied the motion by memorandum opinion and order dated June 29, 1978.

On May 18, 1978, the Guardians of Michigan, a voluntary association of black police officers, and seven named individuals, moved to intervene as parties defendant in these actions (Intervenors). By order dated July 6, 1978, the court granted intervention allowing the Guardians, et al., to proceed as party defendants.

By order dated May 4, 1978, this Court granted the City defendants' motion to consolidate the *Baker* and *Bratton* actions for remaining pre-trial matters and for trial. In June, 1968, the *Bratton* and *Baker* plaintiffs filed a joint motion for summary judgment on the issue of liability. After considering the recommendation of the Magistrate and hearing further oral arguments by the parties, this Court by order dated August 1, 1978, denied the motion.

In June, 1978, plaintiffs moved for trial by jury at the liability stage of the proceedings. After considering the recommendations of the Magistrate, and the pleadings of the parties, the Court by opinion and order dated August 1, 1978, rejected plaintiffs' demand for a jury trial. Plaintiffs sought a writ of mandamus on the jury issue which the Court of Appeals for the Sixth Circuit denied.[6]

Prior to trial, plaintiffs moved to compel the City to respond to certain discovery requests. After hearing oral argument, the Court granted plaintiffs' motion and requested that the *Baker* plaintiffs submit an order embodying the ruling of the Court from the bench. Thereafter, the parties entered into an agreement outlining the further discovery obligations of the City

cording to former LSA president Joseph Clark, this was because the city agreed to allow an early pension payout in return. The individual group of officers known as the *Baker* plaintiffs did file suit against this first set of promotions however.

6. Justice Thurgood Marshall of the U.S. Supreme Court denied plaintiff's request for a stay of proceedings pending Supreme Court consideration of the jury trial issue. It does not appear, however, that the plaintiffs ever petitioned the Court to review the Sixth Circuit's denial of a writ of mandamus.

defendants as well as those of the intervening defendants. By this stipulation the parties resolved all outstanding discovery matters and during the trial the Court was advised that all outstanding discovery requests had been satisfied.

By stipulation all parties agreed to bifurcate the trial proceedings into two stages, one to determine liability and another to assess damages.

On August 19, 1978, the City defendants filed a motion for partial summary judgment, seeking dismissal of all monetary claims other than back pay. This Court granted the motion by memorandum opinion and order dated September 25, 1979.

On August 22, 1978, this Court commenced trial of the liability phase of this litigation. The trial spanned five months, including 55 trial days, and was completed on January 18, 1979. Over 45 witnesses appeared at trial and the parties stipulated to the introduction of prior sworn testimony. The total trial transcript was over 6300 pages. In addition, over 230 exhibits were introduced into evidence.

All parties were ordered to submit post-trial briefs simultaneously and all sides were afforded an opportunity to submit reply briefs. On April 30, 1979, the Court heard closing arguments.

### B. Summary of the Legal Claims

Plaintiffs allege that the City's affirmative action plan discriminates against them because of their race (white) and that such discrimination violates both federal and state law. Plaintiffs claim that there should be no difference between discrimination against whites and discrimination against blacks, regardless of good intentions or the desire to remedy possible past discrimination.

Defendants deny that their actions violate any provisions of state or federal law, or of the constitutions of the State of Michigan or the United States, and contend that the law permits the Department's voluntary affirmative action efforts. They assert that the Department and its governing body, the Board of Police Commissioners (Board) had an affirmative duty, under state and federal guidelines and law, and the United States Constitution, to remedy the present effects of the Department's past employment discrimination, and to assure that the Department police the City of Detroit effectively and in a non-discriminatory fashion.

As noted in this Court's Opinion on the summary judgment issue,[7] after extensive public hearings and presentations of fact and law, the Board of Police Commissioners by resolution in July, 1974, found it necessary because of past and present discrimination in the hiring and promotional practices of the Department, and the operational needs of the Department, to institute an affirmative action promotional scheme. At intervals thereafter, the Board reviewed the continuing need for the program.

Defendants contend that the facts overwhelmingly support the defendants' determinations (1) that the Department had unlawfully discriminated against blacks in hiring and promotions; (2) that the Department's discrimination had damaging effects against not only black applicants and police officers but also against black residents of Detroit and on the Department's ability to police the City effectively; and (3) that the affirmative action promotional scheme was the only effective remedy to eradicate prior employment discrimination, to improve the Department's operational efficiency, and to repair police-citizen relations.

Plaintiffs argue that the City's defenses should be irrelevant as a matter of law and cannot justify the effect of the affirmative action program on them. Further, the plaintiffs argue that any past discrimination against black officers merely resulted from the use of facially neutral hiring criteria, such as I.Q. tests, which blacks failed much more often than whites. Plaintiffs concede that use of such discriminatory tests which are not demonstrably job-related violates Title VII of the 1964 Civil

---

7. *See* Memorandum Opinion and Order granting defendants' motion for partial summary judgment, released September 25, 1979, 483 F.Supp. 919.

Rights Act, as interpreted by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). However, Title VII did not apply to municipal employers such as the defendant until March of 1972. Plaintiffs thus contend that although past Department practices may have hurt blacks' chances for hiring or promotion, the Department did not violate the law in the past because it did not engage in past *intentional* discrimination which would amount to a Constitutional violation against black officers under *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

Finally, plaintiffs argue that even if affirmative action is in order, they should not have to pay the price for it. That is, the City should at least be ordered to pay them back wages and other compensation they would otherwise have received. The case is now ready for decision. For the reasons which follow, this Court upholds the City's affirmative action plan as permissible under law.

## II. THE HISTORY OF PAST DISCRIMINATION IN THE DETROIT POLICE DEPARTMENT

### A. Hiring Practices

The Detroit Police Department's Affirmative Action Program does not exist in a vacuum, nor did it pop up overnight just because the City thought that it would be a good thing to do. As will be discussed below, the program arose principally because the City thought it necessary to offset years of discrimination. Put another way, the City reasoned that absent discrimination, many more black officers would have risen to the rank of lieutenant. At trial, the City introduced extensive evidence regarding past discrimination against blacks in the police department—in hiring, in the ranks, and in promotions. It is a sad and sorry record and it is largely undisputed.

### 1. 1943—The First Detroit Race Riot

In June of 1943 a race riot erupted in Detroit. The riot unquestionably had many causes, e. g. tension between Southern workers who were working in Detroit factories during the war and the black community. While it cannot be said that the Detroit Police Department caused the riot, the Department's performance during the riot was disturbing. The Department was virtually all white and the few black members of the Department were strictly segregated. The Department had over three thousand officers. Yet, there were only 43 black officers in the Department and, as will be discussed below, they were treated as second-class officers. During the riot both black and white citizens were openly engaged in unlawful, riotous conduct, yet enforcement of the law was not equal.

A comprehensive report describing and analyzing the riot was prepared in 1943 by Walter White and Thurgood Marshall of the National Association for the Advancement of Colored People (NAACP). Mr. Marshall, now a Justice on the United States Supreme Court, described past discriminatory police practices in Detroit and went on to discuss the Department's role in the riot:

"In the June riots of this year, the Detroit police ran true to form. The trouble reached riot proportions because the police of Detroit once again enforced the law under an unequal hand. They used "persuasion" rather than firm action with white rioters while against Negroes they used the ultimate in force; night sticks, revolvers, riot guns, sub-machine guns, and deer guns. As a result, 25 of the 34 persons killed were Negroes. Of the 25 Negroes killed, 17 were killed by police. The excuses of the Police Department for the disproportionate number of Negroes killed is that the majority of them were killed while committing felonies; namely, the looting of stores on Hastings Street. On the other hand, the crimes of arson and felonious assault are also felonies. It is true that some Negroes were looting stores on Hastings Street and were shot while committing these crimes. It is equally true that white persons were turning over and

burning automobiles on Woodward Avenue. This is Arson. Others were beating Negroes with iron pipes, clubs, and rocks. This is felonious assault. Several Negroes were stabbed. This is assault with intent to murder.

All of these crimes are matters of record; many were committed in the presence of police officers, several on the pavement around the City Hall. Yet, the record remains, Negroes killed by police —17; white persons killed by police— none. Eighty-five percent of persons arrested were Negroes.

Evidence of tension in Detroit has been apparent for months. The Detroit Free Press sent a reporter to the police department. When Commissioner Witherspoon was asked how he was handling the situation, he told the reporter: 'We have given orders to handle it with kid gloves. The policemen have taken insults to keep trouble from breaking out. I doubt if you or I could have put up with it.' This weak-kneed policy of the police commissioner coupled with the anti-Negro attitude of many members of the force helped to make a riot inevitable."

Thurgood Marshall, "Activities of Police During the Riots June 21 and 22, 1943" in White & Marshall, *What Caused the Detroit Riot? An Analysis 29–30* (NAACP 1943) (Exhibit 217). *See also* R. Shogan & T. Craig, *The Detroit Race Riot, A Study in Violence* (1964).

In this same report, Mr. White complained of the "inadequate number" of black officers and specifically recommended "that the number of Negro officers be increased from 43 to 350 [and] that there be immediate promotions of Negro officers in uniform to positions of responsibility." White & Marshall, *supra* at 17. The City did not follow this recommendation.

2. Employment Practices 1944–53

Between 1944 and 1953, 3005 whites and 117 blacks (3.7%) were appointed to the Department. By way of illustration, annu-al black hires ranged from 4 to 28 during those years, while annual white hires ranged from 135 to 560. These hiring figures resulted in a virtually all-white Department. The Task Force on the Police Report of the President's Commission on Law Enforcement and Administration of Justice (1967) gave the stark figures for *1953*: 3,565 white patrolmen, 96 black patrolmen. The supervisory ranks were virtually barren of blacks: there were 3 black sergeants out of 347 and one black lieutenant out of 168. Overall, the department was less than 2.5% black. In contrast, the City, according to the 1950 census, was 16% non-white. Even including the metropolitan area, the non-white population was 12%.

The few blacks who were hired were strictly segregated. Most blacks were on the "patrol side" as opposed to the "investigative side." That is, most were uniform officers assigned to various precincts as opposed to being non-uniform officers assigned to various investigative bureaus.[8] Within the precinct, blacks were permitted to patrol clearly defined areas only. Scout cars were similarly segregated. Black officers were relegated to a few designated scout cars which were for blacks only. Black officers had to walk a beat for many years until a vacancy opened up in one of the black cars. Junior white officers had an easier time obtaining scout car assignments since there were far greater numbers of white-only scout cars. The only time that whites and blacks rode together in scout cars, even on temporary assignments, was when the white officer consented. In addition, white officers were occasionally assigned to ride with blacks as a form of punishment. Assignments in the station house were generally regarded as desirable. However, blacks were relegated to menial jobs which involved little contact with the general public—jobs such as locking up prisoners and performing janitorial functions.

Similar segregation took place on the "investigative side." Black investigators were teamed only with blacks and worked almost

---

**8.** These divisions have historically existed within the Department. The "police side" and the "investigations side" were distinct and had distinct lines of command.

exclusively in black areas. When they worked in a white part of town, their function was only to arrest blacks. Some investigative bureaus such as Robbery and Auto were off-limits to blacks altogether.

As indicated, above, there were only a handful of black sergeants and lieutenants. However, they were not deemed good enough to supervise whites. They were, accordingly, permitted only to oversee black patrolmen. In contrast, white officers of inferior rank would occasionally supervise superior officers who were black.

The pernicious effect of this segregation on blacks is vividly shown by "integration" of police raids on illegal late-night gambling and drinking establishments known as "blind pigs." Where these establishments were black-operated, it was impossible for white undercover officers to gain admittance to them to observe the illegal activity, make buys, and preserve evidence until other officers completed the raid. Out of necessity, black officers were used for this purpose. However, present Police Chief William L. Hart's testimony showed vividly how black officers were used only to the extent necessary. Their role in the raid ended after entry by the raiding white officers. The white officers refused to eat with the black officers and often excluded them from the normal processing of contraband. After the raid, the black officers were returned to their segregated beats. The effect of such stigmatization on black officers can only be surmised, but it was doubtless considerable.

Equally important was the pernicious effect of segregation upon the public safety. So deeply ingrained was prejudice against black officers that if a black officer assigned to a patrol car was out sick, only blacks could be used as fill-ins. If no black officer was available to fill-in, the car would not go out that day. Similarly, if a "black" patrol car was out of service, the black officers who used it would be assigned to go on foot patrol. This was so even if a "white" patrol car was lying idle. In both cases, the public was deprived of the benefit of a scout car patrol. Police dispatchers were instructed never to send black cruisers into white neighborhoods. If there was a situation of great danger—a so-called "hot run,"—the nearest patrol car would normally be immediately ordered to the scene. However, if the disturbance requiring immediate attention took place in a white neighborhood, the "no blacks allowed" rule took precedence, even if a white cruiser was more distant.

### 3. Employment Practices 1954–60

Things remained much the way they are described above throughout the 1950's. Between 1954 and 1960 the Department hired 1210 whites and 51 blacks. In December of 1960, the U.S. Commission on Civil Rights held hearings in Detroit. Mr. Arthur L. Johnson, then Executive Secretary of the Detroit Branch of the NAACP, presented forceful testimony regarding deliberate police brutality against the black community. Mr. G. Nelson Smith, Community Services Assistant, Detroit Urban League presented specific testimony regarding discrimination against blacks within the Department. Former black officers in the Department corroborated this testimony. The above testimony contrasted sharply with that of Chief of Police (then called Police Commissioner) Henry Hart who painted a rosy picture of the Police Department and its practices.

The data presented by the Chief of Police at the 1960 hearings regarding black employment was as follows: 134 out of the 4357 officers on the force were black—slightly over 3%. There were six black sergeants and no black lieutenants. In contrast to these figures, the Wayne County Sheriff's Department was nearly 30% black. This difference was unexplained, and is difficult to justify, especially given that recruits for both the Detroit Police Department and the Wayne County Sheriff's Department receive similar training.

As of December 1958, a Detroit Urban League survey of the Department (summarized in the hearings) showed that little had changed since the 1943 Riot. The Department was 3% black, black officers were

segregated in scout cars, in beats and in partner assignments. Of the 13 precincts, 5 had no blacks assigned to them while 85% of all black officers were assigned to 5 other precincts.[9]

By the time of the Civil Rights Commission Hearings in 1960, however, the Department was slowly beginning to desegregate. The first steps were taken in March, 1959 when the Department initiated a program to desegregate scout cars. This program was strongly opposed by white officers. In protest, the officers staged a so-called "blue flue" protest action by going on a ticket strike. The day after the squad car integration policy was announced, the writing of traffic summonses dropped to 10% of the number normally issued. Given the opposition by white officers, desegregation proceeded slowly. By December 1960, Chief of Police Hart was able to testify before the Commission that 24 of the Department's 118 scout car crews were integrated. In addition, some integration of precincts had been achieved.

### 4. Employment Practices 1960–67

The desegregation of the Department continued in the 1960's, but at a snail's pace. Discriminatory scout car assignments continued to be made; in some precincts scout cars remained segregated until the mid-1960's. Integration of investigative bureaus and units was not achieved until the mid-1960's. Similarly, it was the mid-1960's before blacks on the patrol side were first allowed to supervise whites, even whites of inferior ranks.[10] George Edwards, now Chief Judge of the United States Court of Appeals for the Sixth Circuit, stepped down from the Michigan Supreme Court to become Detroit Police Commissioner in 1962. As Commissioner in 1962 and 1963, Judge Edwards tried to implement changes. He

issued orders to fully integrate the Department. Subsequent Commissioners tried to do the same thing, with "less than spectacular success."[11]

The principal obstacle throughout these efforts was the stubborn resistance of white police officers. As late as 1969 massive resistance to integration was still taking place. The testimony of Deputy Chief James Bannon was particularly vivid: In 1969 he was made commanding officer of the Narcotics Bureau. He found that he needed black officers to help investigate the growing abuse of drugs in the black community. He asked for and received permission to transfer into the Narcotics Division six black officers. Upon their arrival, the black officers met with severe hostility and a campaign of harassment. In addition, they were subjected to great danger because information about their assignments was leaked to people in the drug underworld. Not wishing to be "martyrs," the men requested transfer out of the division. Bannon persuaded them to stay on, but was unable to fully resolve the conflict until he restructured the Narcotics Bureau and facilitated some transfers and retirements.

Just as there was some progress in desegregating the Department in the 1960's, so there was some progress in hiring more black officers. Between 1961 and 1966, the Department hired 1,080 white and 86 black (7.4%) police officers. In 1967, an additional 252 white and 71 black (22%) police officers were hired. Progress was slow, however. The Department was no more than 6% black in 1967. The number of blacks holding command ranks was truly miniscule. In 1967, there were 339 white and nine (9) black sergeants (2.5%), 156 white and two (2) black lieutenants (1.3%) and 62 whites and (1) one black above the rank of lieutenant.

9. It is true that then Chief of Police Herbert Hart testified before the Civil Rights Commission in 1960 that 30 out of 134 black patrolmen (over 25%) were assigned to desirable bureau assignments as opposed to only 5% for whites. An examination of the breakdown provided by the Chief reveals that no blacks were assigned to such major bureaus as Robbery, Auto, and Breaking and Entering. And, Deputy Chief

Bannon pointed out at trial that blacks who served in the Bureaus were given lowly assignments which generated low service ratings.

10. On the investigative side, blacks were supervising whites a bit earlier, in the early 1960s.

11. Testimony of Deputy Chief James Bannon, at 5091.

5. The Department's Relations with the Black Community

This Court has previously noted the harsh, stigmatizing segregation which the Department imposed upon black police officers up to the mid-1960's. It is not surprising that this same department would treat members of the black community with contempt similar to or worse than that displayed toward its own black officers. Then-NAACP General Counsel Thurgood Marshall in an excerpt quoted earlier in this opinion, *supra*, commented on unequal police practices during the 1943 riot. The evidence reveals that since at least that time, the relationship between the Department and the black community was one of mutual hatred and suspicion.

The testimony of Arthur L. Johnson of the NAACP before the Civil Rights Commission in 1960 summed up the situation quite well:

> Relations between the Negro community and the police in Detroit are not good. They are characterized by persistent conflict and tension. Negroes do not generally regard the police as being friendly and respectful. They see the police as being antagonistic and often willing instrumentalities in the racial segregation aims of the dominant white community.

> The attitude of police toward Negroes in Detroit was demonstrated in the sensational police-ticketing strike in March 1959. This act of rebellion was brought on as a part of police opposition to limited, initial plans of integrating scout cars in Detroit. The demonstrations were so widespread that for a brief period a virtual crisis was created in the police department.

> Employment discrimination, which figured in the ticketing strike, reflects basic attitudes and administration policy in the police department. The weak position of Negro personnel in the department is ringing proof of the scope and gravity of this practice.

> At absolutely no point in their experience do Negroes in Detroit see the law enforcement agency as being truly color blind . . .

If a basic police policy does not exist supporting containment, intimidation and general mistreatment of Negroes, there exist, with the same effect, very strong anti-Negro, anti-integration, and anti-civil rights practices and attitudes which dominate the Detroit Police Department's image in the Negro community.

It can be said, quite possibly without contradiction, that no responsible Negro citizen in Detroit would have difficulty relating at least one personal encounter or observation which would support the basic charges being made here.

Underlying the eruption of police brutality and the tensions between police and the Negro community are several specific and related offenses. Negroes complain of illegal and unreasonable arrests, of indiscriminate and open searching of their person on the public streets, of disrespectful and profane language, of derogatory references to their race and color, of interference with personal interracial associations, and of violent, intimidating police reactions to their protests against improper treatment. Negroes in all classes make these complaints, for the offenses are directed against Negroes as a group.

The police brutality problem is a direct result of the anti-Negro attitudes and practices and their related conflicts and tensions which permeate relations between the police and the Negro community.

Willis Ward, an assistant U.S. Attorney in Detroit, who is now a probate judge in Detroit, shared Mr. Johnson's concerns. He and concerned white citizens got together with the leaders of the black community and rapidly reached the conclusion that things were not right. He repeated these conclusions in testimony before the Civil Rights Commission:

> 1) The police department seems to be working under a program of containment of the Negro citizen by brute force, and the discouragement of lawful and moral communications and commingling of the

white and colored citizens by hazing such groups; 2) the police department considers the Negro citizen as a second class in status; 3) only a representative and token number of Negroes should be taken into the police department; and 4) the Negro police officer is tolerated by his fellow officers, but not accepted as an officer of the law.

Mr. Ward spoke those words in 1960. Yet relations between the black community and the Police Department remained poor for many years thereafter. Testimony at trial revealed that there was basis for the black community's charges of police abuse. A number of black officers, for instance, testified at trial about various incidents where they observed police misconduct and abuse towards blacks. Each indicated that the abusive practice in question was racially motivated and that they did not report the incident at the time for fear of reprisal by white officers.

One black officer violated the code of silence and paid the price. He observed a white officer brutally beating a black youth in a garage at the second precinct in September of 1965. Pursuant to the code, he covered up the incident in an initial report. Upon being pressed by the Citizens Complaint Bureau, however, the officer gave a truthful and detailed account of what had happened. Word that he had "squealed" leaked out. Retribution from white officers was swift. He was verbally abused and his car was vandalized. In addition, he alone among the officers involved was disciplined by the department for submitting the (initially) false report about the incident. The controversy was finally settled by the Michigan Civil Rights Commission, which found a violation of the officer's civil rights: "The individual acts of violation and harassment by persons believed by [the complainant] to have been fellow officers . . . appear to be clear and obvious acts of racial antagonism, stemming from his violation of the 'Blue Curtain' practice." [12]

### 6. The 1967 Riot

Antagonism between the Police Department and the black community was a root cause of the Detroit riot in 1967. The 1968 Report of the National Advisory Commission on Civil Disorders noted the "long history of conflict between the police department and citizens" in Detroit. Commission surveys found that police practices were a significant grievance in all riot-torn cities. The Commission approvingly cited a survey by the Detroit Urban League which found that police brutality headed the list of grievances which the black respondents thought had led to the riot.

The Commission's overall conclusion that "deep hostility between police and ghetto communities [was] a primary cause of the disorders" is certainly correct regarding Detroit. This court has previously commented on police practices and the 1943 riot. In 1961 Judge Edwards, then a Justice of the Michigan Supreme Court, considered Detroit as "the leading candidate in the United States for a race riot." [13] In 1965, in a prophetic article in the *Michigan Law Review,* Judge Edwards noted the continued problem of police-black community relations, which he regarded as "the major problem in law enforcement in this decade" and as "the major cause of all recent race riots." [14]

In the summer of 1966 there occurred a relatively minor disorder in the black community called the "Kercheval Incident." A crowd gathered at the scene of a police stop. Tempers flared and a white officer struck a black citizen in the eye, detaching it from its socket. Rocks and bricks began to fly. Supporting police units were summoned and the scene soon returned to normal. This incident, however, was the harbinger of things to come.

The July 1967 Detroit riot was, unsurprisingly, triggered by an encounter between

---

**12.** The author of this opinion was Julian Abele Cook, Jr., now a Federal District Judge.

**13.** Report of the National Advisory Commission on Civil Disorders 85 (Bantam Ed. 1968).

**14.** *See* Edwards, *Order and Civil Liberties: A Complex Role for the Police.* 64 Mich.L.Rev. 54–55 (1965).

black citizens and the police. The 1968 National Advisory Commission on Civil Disorders outlined what happened. The police raided a "blind pig" in a black neighborhood in which a celebration was being held to welcome home black servicemen returning from Vietnam. There were many more persons at the "blind pig" than the police had expected, and an hour went by before everyone arrested could be moved to the police station. In the meanwhile, a large crowd gathered which got too big for the police to handle. The crowd went on a rampage. For five days thereafter, Detroit experienced major racial violence. Forty-three persons died, 7200 persons were arrested, 683 structures were destroyed by fire. The police proved inadequate to deal with the violence and the city was occupied by 5000 Michigan National Guardsmen and 2700 regular army paratroopers. The horror and intensity of the violence is fully described in the "Riot" Commission's report;[15] there is no need to repeat the details here.

### 7. The Detroit Police Department 1967–68

A shaken city slowly recuperated from the riot. At the time of the riot, the city was almost 40% black. The Police Department was no more than 6% black and its command structure was virtually all white. The City was hard hit by the realization that a police department whose racial composition was so grossly disproportionate to the population it served was undesirable and unacceptable to the black community. Executive Deputy Chief of Police Bannon, who had been in the Department since 1949, testified at trial that the riot convinced people in and out of the Department, many for the first time, that the Police Department could not do its job effectively with so few black officers. Detroit's Mayor at the

time, Jerome P. Cavanaugh, reached the same conclusion: "It became obvious to me and this entire community, both black and white, that this proportion of Negro policemen (6%) was clearly unacceptable."[16] The need for more black officers at all levels of police departments in general was a key finding of both the National Advisory Commission on Civil Disorders[17] and the 1967 President's Crime Commission Report.[18]

Why was the Police Department so overwhelmingly white? A key reason is that the hiring process had been riddled with discrimination for years. The application and hiring process for a job as police officer in 1968 consisted of five stages. (The stages in the process have remained basically the same since then and were basically the same before then). An applicant first filled out a preliminary application card and was screened as to the Department's nine preliminary qualifications, such as height and weight limits, education, and vision requirements. The second step was a written examination. If the candidate passed he or she was scheduled for a physical examination. Following successful completion of the physical examination, a background investigation was initiated. The final step was for the candidate to appear before three members of the Department for an interview. This Oral Board makes the final decision whether the applicant would be offered employment as a police officer.

Discrimination in the hiring process existed at all levels. First, the Department used a written exam of several hours duration which blacks failed at a much higher rate than whites. In 1967, for example the black failure rate was twice the white failure rate. The reason for the disparity in passing rates for black and white officers is that the exam was an I.Q. test which was not job-related. In other words, it did not

---

15. *See* Report of the National Advisory Commission on Civil Disorders 84–108 (Bantam Ed. 1968).

16. Special Task Force Report on Recruiting and Hiring 3 (1968) (exhibit 8).

17. *See* Report of the National Advisory Commission on Civil Disorders 315–18 (Bantam Ed. 1968).

18. *See* The President's Comm. on Law Enforcement and Administration of Justice: *Task Force Report: The Police* 167–175 (1967) (hereinafter cited as *Task Force Report*).

measure whether a candidate would make a good police officer. It did, however, disqualify large numbers of black applicants. The Department was well aware of this fact but continued to use this test for years.[19] Second, the hiring system facilitated subjective decisionmaking which, in practice, operated to the detriment of black applicants. This was true in two respects: oral boards used to question and screen applicants, and background investigations of applicants.[20] Third, blacks were disproportionately affected by preliminary screening. Preliminary screening took place when an applicant for employment first "came through the door." If the applicant did not meet certain strict requirements,—age, education, height, weight, vision and marital status, then he would be turned down immediately. However, an investigation by the Commission on Community Relations in Detroit found that in 1959, 178 whites but only 36 blacks were permitted to progress past preliminary screening even though they failed one or more preliminary screening requirements. The Commission found that white applicants were favored.[21]

One other factor bears examination at this point—the effect of the Police Department's reputation. The testimony in this case overwhelmingly shows that the Police Department had a horrible reputation in the black community in 1967-68 and for years before that. The evidence shows that this reputation, built on years of abuse and hostility, operated to deter blacks from applying to the Police Department for employment. At the same time, the statistical evidence tended to show that blacks applied to the Police Department in numbers more than reflecting their share of the popula-

tion. The Commission on Community Relations found this to be true in 1959.[22] The Detroit Special Task Force Report on Recruiting and Hiring found that in 1967, 47% of the applicants to the Department were black while only 40% of the city's population at the time was black. Thus, despite discrimination and abuse, blacks applied to the Department in large numbers. This appears to be contradictory. An answer to this paradox is that employment with the Police Department has historically been a way in which the poor have climbed out of poverty. Blacks were foreclosed from many jobs; many of them apparently decided to apply to the Police Department despite its reputation and despite inferior working conditions for blacks within the Department. Absent discrimination, however, it is logical that many more blacks would have applied.

8. 1967–1974 Employment Practices of the Detroit Police Department

(a) 1967–1971 Employment Practices

The City did take some steps to increase the unconscionably small number of black officers. In 1968, Mayor Cavanaugh appointed a Special Task Force on Recruiting and Hiring to review Departmental practices and recommend changes in them. The Mayor's Special Task Force recognized the problems with minority recruitment and hiring and recommended a number of changes. Recommendations to improve the Department's recruitment of minorities also came from a committee of industrial psychologists known as the Vickery Committee.

A number of these Commissions' recommendations were adopted. Department

---

**19.** *See Task Force Report, supra* at 169. Other changes were made in the entry exam in years following. They will be discussed below.

**20.** *See Task Force Report, supra* at 169. Background investigators were mostly white. For example, in 1968 eight out of ten investigators were white.

**21.** The subjective, haphazard hiring system's anti-black effects are also illustrated by the Cadet Training Program. This program was for young men 18–20 who aspired to become

police officers at 21. Those who served as cadets received preferential treatment in hiring. While in theory anyone could apply, the program was not advertised and most of the cadets learned of the program through word-of-mouth referral. The result was that large numbers of cadets were sons of police officers and ninety percent of the cadets were white. This program was phased out in the early 1970's.

**22.** *See Task Force Report, supra* at 169.

standards regarding rejection for Traffic Records, Police Records, Marital Status and Credit were liberalized. Age, education, height and vision standards were loosened. Some efforts were made to increase the number of black officers involved in the recruitment and hiring process. The most important change which was made, however, was in the written exam. As indicated above, the Department prior to 1968 used multi-hour I.Q. tests which were widely known to be non-job-related and which blacks failed far more often than whites. In 1968, on recommendation of the above Commissions, the Department replaced this exam with a 12-minute Wonderlic exam which purported to measure problem-solving ability.

The parties have entered into a significant dispute regarding the Department's 1967/68–1974 minority recruitment efforts. The plaintiffs argue that beginning in 1969, the Department instituted aggressive efforts to recruit and hire large numbers of black officers. They argue from this that any pre-1968 discrimination was fully remedied and there was thus no need for the institution of the City's affirmative action program in July of 1974.

The plaintiffs overstate both the extent and the effect of the City's minority hiring efforts from 1968–1974. The plaintiffs rely heavily on the Detroit Police Department Equal Employment Opportunity Program Report (EEOP), written in November of 1975, which paints a glowing picture of the Department's efforts to recruit and hire minority officers. The EEOP Report, however, does not refer to the dates when changes in hiring practices took place. Careful examination of the facts reveals that very few changes were made between 1968 and 1971 and that changes begun in 1971 did not begin to show results until 1973–1974. This was the testimony both of Thomas G. Ferrebee who was made Commander of the Recruiting Division in 1971, and Lieutenant Clarence Broadnax, who was assigned to the Division in 1968 as a police officer and has worked there ever since.

The testimony of Commander Ferrebee and Lieutenant Broadmax shows that in 1971 things were much as they always had been at the Detroit Police Department. White applicants were favored in many preliminary screening requirements. It was common for Recruiting Division administrators to approve white applicants who did not meet arrest and military qualifications as well as other preliminary qualifications. This seldom occurred in the case of black applicants, for there were no blacks in the command structure to whom a black applicant could turn to overrule a Recruiting Division rejection. Access to the preliminary application card file was unrestricted and cards were altered, or removed and not returned. Background investigators continued to act without any accountability and delivered subjective opinions which operated to the detriment of black applicants. The Oral Boards made similar subjective anti-black judgments. Even the medical exams operated to exclude blacks. A 1971 Report of the Michigan Civil Rights Commission found that Department physicians and psychiatrists frequently rejected black applicants on the basis of information which was disclosed not through the medical examinations which they conducted, but in background investigations. Again, the problem was the same—the impact of uncontrolled discretionary decision-making by whites, in this case, white physicians.

Perhaps the most discriminatory part of the hiring process was the written examination. As indicated above, until 1968, the Department used a 2½–3 hour I.Q. test, the Otis test, which discriminated heavily against minorities. As an interim measure, the Department substituted a 12-minute Wonderlic test in 1968, on recommendation of the Vickery Commission. The Vickery Commission realized, however, that the Wonderlic test also discriminated against blacks. The Commission hoped that the test would be less discriminatory than the Otis test it replaced and reasoned that at least the ordeal for applicants and persons correcting the test would be less. However, as Commander Richard Caretti, presently

Deputy Director of Personnel and assigned to the personnel division since 1968 testified, the Wonderlic, like the Otis, screened out minorities at "a dramatically disparate rate." The following table shows the discriminatory effect of the written exam:

| Passed | 1967 | 1968 | 1969 | 1970 | 1971 |
|---|---|---|---|---|---|
| Blacks | 247 | 394 | 287 | 335 | 580 |
| Whites | 566 | 817 | 808 | 1060 | 1244 |
| Failed | | | | | |
| Blacks | 244 | 530 | 511 | 514 | 522 |
| Whites | 117 | 255 | 226 | 244 | 233 |
| Percent Failed | | | | | |
| Blacks | 49.6% | 57.4% | 64.0% | 60.5% | 47.4% |
| Whites | 17.1% | 23.8% | 21.9% | 18.7% | 15.8% |

Additional evidence which demonstrates the Department's continuing discrimination against blacks from 1968–1971 is a Staff Report by the Michigan Civil Rights Commission. The Commission staff reviewed applications for patrolman from January 1, 1969, through March 31, 1970, and concluded that there was probable cause to believe that the Department "followed and continues to follow a course of action in its personnel practices leading to the unwarranted and disproportionate exclusion of large numbers of non-white persons from its employ." Exh. 234A at 21. The Commission staff's specific findings of discriminatory practices parallel the testimony of Commander Ferrebee and Lieutenant Broadnax and are in accord with this court's findings. They are reproduced in the margin for the convenience of the reader.[23]

**23.** The claimants, black males, allege denial of employment opportunity [by the respondent Detroit Police Department] because of their race.

. Review of records relative to persons applying for employment with respondent in the period January 1, 1969 through March 31, 1970 discloses probable cause:

(1) to credit the claimant's allegations

(2) to believe that respondent has followed and continues to follow a course of action in its personnel practices leading to unwarranted and disproportionate exclusion of large numbers of non-white persons from its employ.

Practices so identifiable are as follows:

(A) Employment of a pre-employment criterion (draft classification, other than 1–Y) which eliminates disproportionate numbers of black applicants and for the job-relatedness of which respondent has no evidence.

(B) Apparent discriminatory application of that criterion to the benefit of white applicants.

(C) Employment of a pre-employment criterion (arrest and/or traffic record) which eliminates disproportionate numbers of black applicants and for the job-relatedness of which respondent has no evidence. (Cf. Section III–C, Statements # 2(b), 16, 17, 18, 19, 20).

(D) Employment of a pre-employment test which eliminates disproportionate numbers of black applicants and for the job-relatedness of which respondent has no evidence.

(E) Employment of a pre-employment criterion (non-hypertensiveness) which eliminated disproportionate numbers of black applicants (Cf.: Section III–C, Statements, # 5, 9) and for the job-relatedness of which evidence is in dispute.

(F) Employment of a pre-employment test (allegedly a "psychological questionnaire") which results in the elimination of disproportionate numbers of black applicants and for the job-relatedness of which respondent has no evidence.

(G) Employment of a pre-employment criterion (favorable U.S. military record) which eliminates disproportionate numbers of black applicants and for the job-relatedness of which respondent has no evidence.

(H) Apparent discriminatory application of that criterion to the benefit of white applicants.

(I) Employment of a condition of continuing (non-hypertensiveness) which eliminates disproportionate numbers of black employees and for job-relatedness of which evidence is in dispute. (Cf.: Section III–C, Statement # 10).

(J) Apparent discriminatory application of that criterion to the benefit of white employees.

(K) Employment of a hiring procedure which allows respondent's employees to use wide personal discretion in the treatment accorded applicants.

(L) Employment of separate job classification, subject to substantially different requirements and conditions, for males and fe-

### (b) 1971–1974 Employment Practices

Starting in 1971, with the appointment of Commander Ferrebee to head the recruiting division, matters did improve. Commander Ferrebee increased the number of black personnel in the Recruiting Division [24] and engaged in priority recruitment efforts to encourage qualified blacks to apply for a position as police officer. The Mayor's 1968 Special Task Force had recognized the need for special recruitment efforts directed to the black community because of the Department's abysmal reputation with blacks. However, from 1968 until 1971, according to Sgt. Broadnax, the Department's minority recruiting program consisted essentially of one black lieutenant who acted as public relations man. The record demonstrates that the department did make some efforts in those years, but that they were neither extensive nor successful. Starting in 1971, the Department did begin to aggressively recruit minorities, however. Department applications data shows the effects of recruiting and how massive minority application did not take place until 1974.[25]

Under Commander Ferrebee's direction, the Department sought minority applicants throughout the state, especially those at Colleges and Universities. The Department conducted what the EEOP Report (exh. 26a) termed "perhaps the most extensive advertising campaign designed to attract minorities that has been carried on anywhere in the country." The techniques employed are described in the EEOP, excerpts are reproduced in the margin.[26]

males; and for the maintenance of which respondent has no bona-fide job-related reason.

(M) Employment of a work force composed of approximately 11% black employees within a municipal corporation; the black population of which is approximately 44% with subsequent substantial impact on the rights of that population to equal law enforcement.

24. In 1971, all 5 Recruiting Division supervisors and 13 out of 19 investigators were white.

25.

| YEAR | WHITE APPLICANTS | BLACK APPLICANTS |
|------|------------------|------------------|
| 1968 | 3,022 | 3,069 |
| 1969 | 2,336 | 2,086 |
| 1970 | 3,236 | 2,516 |
| 1971 | 4,482 | 3,625 |
| 1972 | 2,935 | 3,314 |
| 1973 | 3,001 | 3,535 |
| 1974 | 36% | 64% |
| 1975 | 1,261 | 5,314 |
| 1976 | 23% | 77% |
| 1977 | 35% | 65% |

Plaintiffs have attached the validity of the Department's applicant flow data contained in exhibit 12(b) from which the above table is derived. See discussion at n. 59, infra. However, they approvingly cited the above table in their brief.

26. "The Department utilizes two Dodge vans that are contributed annually by the Chrysler Corporation for the purposes of recruiting individuals. These vans are taken into populated areas and applications are accepted from interested men and women. Besides being used in the downtown areas, the vans are often used to recruit at factories, state employment offices, and other places where qualified candidates are likely to be found.

The Department has initiated several new themes in minority recruitment. The "Being a Cop is More than Just a Gig", campaign was professionally designed program implemented by advertising consultants.

This long term project was aimed at convincing black men and women that the police service provides an excellent opportunity to make meaningful contributions to the community. Approximately $80,000 was expended on this campaign during a two-year period. An extensive recruiting campaign has also been conducted through the local mass media. The Department has advertised in daily papers as well as on radio and television programs. Particular emphasis has been directed toward minority newspapers. During 1971 through 1973, a weekly radio program on WJLB, a local station with a large black audience, was begun where radio listeners were able to call in and ask questions of department officials. Many prospective applicants took advantage of the program to have questions answered regarding recruitment procedures. Radio advertising campaigns specifically aimed at black audiences were also launched on other black radio stations. Department officials have also appeared on numerous television programs to explain recruitment procedures at every available opportunity.

The Department utilized advertising in the community in other ways in addition to those mentioned above. Recruiting posters depicting minority officers are displayed prominently in the Recruiting Section and Department offices. Many owners of business places have allowed the Department to place posters aimed at minority recruitment in storefronts. (Significant-

Commander Ferrebee also instituted efforts to minimize the adverse impact of the hiring process on blacks. Access to the preliminary application card file was restricted to Department personnel who preliminarily interviewed applicants. No longer could anyone remove cards from the files without signing for them. In addition, written guidelines were issued to Department interviewers regarding the preliminary interview procedures.

Improvements were also made in Background Investigation procedures. Investigators were forbidden to accept the withdrawal of any candidate without approval from a supervisor. In 1972, each investigator began to receive equal numbers of black and white candidates to investigate. To further increase accountability, in 1974 investigators began to work in teams. In 1974, the EEOP Report showed that rates of disqualification on the basis of background investigations for minorities and whites were about equal.

Similar improvements were made in the Oral Board procedure. In 1973, the Department arranged that all applicants be asked similar questions by Oral Boards. Every Oral Board came to contain at least one minority member.[27] In addition, an appeal process was set up. To further protect against abuse, the Department instituted a followup procedure to find out why black applicants who withdrew early from the hiring process did so and to encourage them to return.

The written examination, however, continued to be problematic. In 1971, the Department used the Wonderlic exam in combination with the Otis and also introduced the SRA Pictorial Reasoning Test. From 1971 until late 1973, the Department went to another series of I.Q. Tests identified as valid for Chicago patrolmen. This so-called "Chicago Battery" also had a severe impact on black applicants, as demonstrated by the following statistics for 1972–1973.

| Passed | 1972 | 1973 |
|---|---|---|
| Blacks | 544 | 390 |
| Whites | 1,027 | 826 |
| Failed | | |
| Blacks | 493 | 302 |
| Whites | 179 | 205 |
| Percent Failed | | |
| Blacks | 47.5% | 43.6% |
| Whites | 15.0% | 19.9% |

It was not until late 1973, with the institution of the "Detroit Battery" written examination, that pass rates on the written exam were equal for blacks and whites.

Plaintiffs argue that the Department's energetic 1968–1974 efforts to attract blacks and to make the Department's hiring procedures non-discriminatory demonstrates that no affirmative action program was needed for promotions. This claim will be analyzed later in this opinion. However, it is very clear that Commander Ferrebee and Lieutenant Broadnax were correct when they concluded that it was not until 1973–1974 that the Detroit Police Department stopped its discriminatory hiring practices.

### B. Promotional Practices

The Department's promotional practices have varied over the years. Promotional

ly, these posters show the officer in "helping" rather than "enforcement" situations). We have also had an extensive bumper sticker campaign that helped get the "more than just a gig" message out to the public. One of our most recent attempts in this area has been the advertising on benches used by the public in bus stops. Many of these benches are painted with the slogan, "Detroit Needs More Good Cops." Public busses are also used as an advertising medium.

The Department has recognized the fact that in some departments, reliance upon word-of-mouth recruitment has helped to perpetuate employment systems which have excluded minorities. To prevent this occurrence in Detroit, a referral program has been primarily directed toward minority officers who may be more aware of qualified minority persons in the community interested in a police career. Currently, one officer is assigned to coordinate referrals and the success of bringing in black applicants has been noteworthy."

27. The record is unclear on when this took place. Although defendants state that it was in 1974, plaintiffs properly point out in their reply brief that the date is not given in the Department Report which noted that this change had been made.

requirements are complex; they consist of 1) standards for determining who may compete for promotions (eligibility standards); 2) standards for determining who will be promoted (eligibility for promotion); and 3) standards for determining the order in which those who compete will be promoted (promotional model weights and their application). Complicating any analysis is that these requirements have shifted in relative weights from year to year and that for some periods, the Department had two classifications for the lieutenants rank with separate lines of progression leading to each classification.

### 1. The Racial Make-up of the Department's Supervisory Ranks 1967–1974

In 1967, blacks represented 2.1% of the Department's supervisory workforce. 9 (2.6%) of the 348 Sergeants and 2 (1.3%) of the 158 Lieutenants were black. The ratio of black sergeants to black police officers was 1:25. The ratio for whites was 1:12. The ratio of black lieutenants to black police officers was 1:114. For whites the ratio was 1:26.

By June of 1974, these numbers had multiplied; there were 61 black sergeants and 11 black lieutenants. However, when expressed as a percentage of the overall pool, the numbers were still minuscule. The reason is that the number of white sergeants and lieutenants had mushroomed. The number of white sergeants increased from 339 in 1967 to 1124 in 1974. The number of white Lieutenants increased from 156 in 1967 to 219 in 1974. Thus, despite the significant numerical increase, the Department in 1974 was 5.1% black at the sergeant's level and 4.8% black at the lieutenant's level.

The significant increase in the number of supervisory officers was not paralleled by a corresponding increase in the numbers of patrolmen and patrolwomen.[28] Between 1967 and 1974, the increase in their numbers was moderate—from 3757 to 4006.

The Department thus became top-heavy with supervisory officers. The overall ratio of sergeants to police officers was reduced from 1:10.8 to 1:3.4. The ratio of lieutenants to police officers was reduced from 1:23.8 to 1:17.4. White officers benefited greatly from the numerical increase in the supervisory ranks. The ratio of white sergeants to white police officers was reduced from 1:10.4 to 1:2.8. The ratio of black seargeants to black police officers was reduced from 1:24 to 1:14.3. Similarly, the ratio of white lieutenants to white officers was reduced from 1:22.7 to 1:14.3. The ratio of black lieutenants to black officers was reduced from 1:107.5 to 1:79.3.

Undoubtedly, one reason for the disparity in the ratio of black lieutenants to black officers was discrimination against blacks in hiring. The Detroit Police Department, like most police departments, only promoted from within. In other words, only patrolmen who had served in the Department were considered for promotion to the rank of sergeant and only sergeants in the Department were considered for promotion to the rank of lieutenant. No outsiders were brought in at the supervisory levels. Discrimination in the hiring of blacks meant that there were few black patrolmen. And few black patrolmen meant that there were few black candidates available to become sergeants and lieutenants. Defendants, however, allege that in addition, the promotional process was itself discriminatory and thus operated to further reduce the number of blacks who "made it" to the sergeant's and lieutenant's ranks. They also claim that the examination was not job-related. It is these issues which the following sections of this court's opinion address.

### 2. Promotional Lines of Progression

Until 1964, there were two lieutenant's ranks, with separate promotional job sequences leading to them. "Uniform" sergeants and "uniform" lieutenants functioned on the patrol side; they generally

---

28. Sex-segregation of all ranks of the Department ended in December, 1973, as a result of a suit filed against the Department. See Schae-fer v. Tannian, 394 F.Supp. 1128 (E.D.Mich. 1974). No issues of sex discrimination are present in this case.

supervised patrolmen at the various precincts. Detectives, detective sergeants, and detective lieutenants functioned on the investigative side.[29] All sergeants and lieutenants functioned as supervisors.[30]

A diagram of the promotional sequences involved follows:

| PATROL SIDE | INVESTIGATIVE SIDE |
|---|---|
| Uniform Lieutenant | Detective Lieutenant |
| Uniform Sergeant | Detective Sergeant |
| | Detective |
| Patrolman | Patrolman |

Between 1965 and 1967/68, the two sergeants and two lieutenant's ranks were merged. However, by the time of the 1969 promotional examination, the patrol side and investigative side distinctions were re-established. All distinctions between patrol side and investigative side were abolished in 1970 when the two promotional lines were merged and the rank of detective was eliminated. Following the merger, all detectives were upgraded to the rank of sergeant.[31] Since 1970, the job sequence has been: Patrolman (now called police officer)—Sergeant—Lieutenant.

Prior to the merger, there existed separate eligibility standards for promotion to uniform lieutenant and detective lieutenant. However, the written examination was essentially the same for all ranks.

### 3. The Promotional Process

As indicated *supra*, the promotional model consists of 1) certain minimum eligibility requirements to sit for a written examination, 2) several factors which are scored and combined on the basis of a predetermined formula to produce a final composite score,

and 3) eligibility requirements to be promoted. Each of the promotional model's components have varied over the years. In any event, after a final composite score was calculated, the Department created a numerical, rank-ordered "eligibility register" of all candidates eligible for promotion. Promotions to the rank of sergeant were made from the register of ranked, eligible patrolmen. Promotions to the rank of lieutenant were made from the register of ranked, eligible sergeants. The following is a synopsis of the requirements for promotion and the means by which promotional candidates were ranked.

### (a) Minimum Eligibility Requirements to Sit for the Examination

The first element of the promotional process established the criteria which defined that class of officers who were entitled to compete for promotion. This first requirement is expressed in terms of the minimum number of years of service required to sit for the written examination.

In 1939, candidates for the Detective examination were required to have a minimum of two (2) years of service.[32]

From 1948 to 1964 the minimum was five (5) years. In 1965 it was reduced to four (4) years and in 1967 to three (3) years.[33] At the rank of Detective Sergeant two (2) years of service in rank of Detective was required.[34]

In 1939, candidates competing for the Uniform Sergeant examination were required to have four and one-half (4½) years

---

**29.** There also existed a separate command structure for women which was not abandoned until December, 1973. As noted in n. 28, however, this litigation only concerns promotion of male police officers.

**30.** As this Court has previously noted, however, black supervisors were only allowed to supervise black officers until the early-to-mid 1960s.

**31.** Although the former Detectives held the same rank and received the same salary as other sergeants, their investigative role continued. The former Uniform and Detective Sergeants continued to perform as supervisors in

the precincts and bureaus respectively; they were informally called "executive detective sergeants."

**32.** Officers with more than eight years of service were not eligible to sit for the exam.

**33.** Beginning in 1969 the minimum could be reduced to 2½ years if the candidate had completed two years of college. If he possessed a college degree, the minimum was 2 years.

**34.** In 1969 the in-grade minimum could be reduced to one year if the candidate had completed two years of college.

of service. Between 1948 and 1962 the minimum was seven (7) years of service. In 1965 the minimum was reduced to six (6) years, and in 1969 to three (3) years.[35] Since the merger of the two sergeant's ranks following the 1969 examinations, candidates for the new Sergeant rank are required to have three (3) years of service.[36]

In virtually all years since 1939, candidates for promotion to the rank of Detective Lieutenant or Uniform Lieutenant were required to have a minimum of two years of service in the rank of Detective Sergeant or Uniform Sergeant respectively.[37]

### (b) The Components of the Promotional Model

The factors and weights used to produce the composite score have varied substantially over the years. The major elements [38] of the model and the relative weight assigned to each are set forth in the margin.[39]

### (1) Service Ratings

Service Ratings are the performance evaluations that are prepared semi-annually by supervisory officers. They contain the supervisors' written appraisal of the subordinate's job performance during the preceding six months.

Since 1962 service ratings have been assigned a value of 20% of the officer's score on the Lieutenant's promotional model. Until 1967 an average of the last four service ratings were used to derive the score that was applied to the model. Thereafter, an average of the last two was used.

### (2) Promotional Ratings

Between 1969 and 1973, promotional ratings accounted for twenty percent of the

---

35. See n. 33, supra.

36. See n. 33, supra.

37. Beginning in 1965 the in-grade requirement could be satisfied in either the Detective Sergeant or Uniform rank and the in-grade minimum could be reduced to 1½ years if the candidate had completed two years of college.

38. Credit was also given for military service. In addition, beginning in 1969 up to two percentage points were awarded for college education.

39.

**DETECTIVE**

| Exam. | Written Exam | Service Rating | Oral Interview | Seniority |
|---|---|---|---|---|
| 1939 a | 50 | 12 | 8 | 6 |
| 1940 | 50 | 15 | 15 | 6 |
| 1942 | 60 | 20 | 20 | 6 |
| 1947 | 60 | 20 | 20 | 10 |
| 1948 | 50 | 35 | 15 b | 9 |
| 1950 | 45 | 35 | 20 | 9 |
| 1955 | 50 | 30 | 20 | 9 |
| 1960 | 50 | 40 | — | 10 |
| 1964 | 55 | 30 | — | 15 |
| 1965 | 50 | 35 | — | 15 |
| 1967 | 55 | 35 | — | 10 |
| 1969 | 60 | 30 | — | 10 |

**DETECTIVE AND UNIFORM SERGEANT c**

| Exam. | Written Exam | Service Rating | Oral Interview | Seniority |
|---|---|---|---|---|
| 1939–40 | 50 | 15 | 15 | 6 |
| 1943 | 60 | 20 | 20 | 6 |
| 1945–47 | 60 | 20 | 20 | 10 |
| 1948 | 50 | 35 | 15 d | 10 |
| 1950 | 45 | 35 | 20 | 9 |
| 1955 | 50 | 30 | 20 | 9 |

**DETECTIVE AND UNIFORM SERGEANT c—Continued**

| Exam. | Written Exam | Service Rating | Oral Interview | Seniority |
|---|---|---|---|---|
| 1957–60 | 50 | 40 | — | 10 |
| 1962–64 | 55 | 30 | — | 15 |
| 1969 | 55 | 30 | — | 10 |
| 1970–73 | 60 | 30 | — | 8 |

**DETECTIVE AND UNIFORM LIEUTENANT**

| Exam. | Written Exam | Service Rating e | Oral Interview Prom. Rtng. f | Seniority |
|---|---|---|---|---|
| 1940 | 50 | 15 | 15 | 6 |
| 1943 | 55 | 20 | 25 | 6 |
| 1945–47 | 55 | 20 | 25 | 10 |
| 1948 | 50 | 35 | 15 g | 10 |
| 1950 | 45 | 35 | 20 | 9 |
| 1955 | 45 | 30 | 25 | 9 |
| 1957–60 | 40 | 30 | 20 | 10 |
| 1962–65 | 45 | 20 | 20 | 15 |
| 1967 | 45 | 20 | 25 | 10 |
| 1969 | 50 | 20 | 20 | 10 |
| 1970–73 | 50 | 20 | 20 | 8 |

a In 1939 and 1940 up to 20 percentage points were awarded for "training and experience."

b In 1948 a "qualification and merit review test" was substituted for the oral interview.

c In 1939 the weights applicable to these ranks were not identical.

d See n. b, supra.

e Before 1969, the service rating component was determined by taking an average of the candidate's last four service ratings. Beginning in 1969 the average of the last two service ratings was used.

f An "oral interview" was conducted by Department supervisory was used until 1957 when it was replaced by a "promotional rating."

g See n. b, supra.

composite score on the lieutenants', but not the sergeants', promotional model. Lieutenants' promotional ratings were given by superior officers within the Department and they tended to mirror service ratings. They were eliminated from the promotional model in 1974 because it was determined that these ratings did not contribute to an evaluation of an officer's potential for success as a lieutenant.

#### (3) Seniority

In 1965, seniority accounted for 15 percent of the final composite score on both the sergeant and lieutenant promotional models.[40] In 1967 it was reduced to the 1960 level of 10 percent.[41] The Department determined that after 5 or 6 years of service, additional time on the job did not contribute materially to improved job performance and that the seniority component of the model had an adverse impact on the promotional opportunities of minorities. For these reasons, in 1970 the weight accorded the seniority factor was reduced to eight percent.[42]

#### (4) The Written Promotional Examination

The written promotional examination is the single most important component of the promotional model. It has been the subject of extensive argument and commentary in this litigation. This Court will fully discuss the claims which have been made by each side concerning the written examination later in this opinion.

**40.** In 1940 seniority was weighted at only 6 percent of the promotional models for both ranks. Its weight was raised to 10 percent in 1942 and remained at approximately that level until 1962.

**41.** In 1967 and 1969, seniority points could be accumulated at the rate of one-half a percent for each year of service.

**42.** The Department also changed the way seniority was computed to ½ of one percent per year for the first through the 10th year of service, ¼ of one percent per year for the 11th through 20th year of service and ⅛ of one

#### (5) Veterans Preference and College Credits

The City Charter mandated a veterans' preference. A promotional candidate's composite score was increased by ½ a percentage point for each year of wartime military service up to a maximum of 2 percentage points. In order to encourage police officers to obtain a college education, a promotional candidate's composite score was increased by one half of a percentage point for each year of college up to a maximum of two points. This college credit bonus was first added in 1969.

#### (c) Additional Eligibility Requirements for Promotion

In 1973, the Department began to impose educational requirements to be eligible for promotion. In 1973, 10 semester hours of college credit were required. This minimum was raised in succeeding years, but a grandfather clause exempted officers who had 12½ years of service with the Department as of December 31, 1973.

#### (d) The Mechanics of the Promotional System

The process leading to the publication of the 1973 sergeants' and lieutenants' eligibility register[43] illustrates how the system worked.[44] The notice of examination was published on November 1, 1973. It announced the time and place of the examination, the factors and weights to be applied to create the eligibility register, the duties encompassed by the job, and the knowledge, skills and abilities an incumbent was expected to possess. Prior to the date of the

percent for the 21st through the 24th year of service. This method of calculation slightly favored officers with long tenure in the department.

**43.** The first set of affirmative action promotions under challenge in this litigation were made from this register.

**44.** As is discussed below, the model was substantially changed in 1974. However, the 1973 model is representative of how the promotional procedure worked pre-1974.

examination, the Department conducted a promotional class which all officers were encouraged to attend.[45] Candidates wishing to claim veterans' preference points or college credit points [46] were required to submit appropriate proof by a certain date. The written examination was administered on December 16, 1973 and, as in other years, was graded anonymously.

Since 1972 candidates have been permitted to challenge test items they believed to be faulty. If the item is found to be faulty, it is omitted for all candidates. In addition each candidate is permitted to review his scored examination and may question it.[47] An adjusted written examination score of 70 is assigned to candidates whose raw score is at the fiftieth percentile of all officers sitting for the examination. Thus, candidates falling below the fiftieth percentile received test scores below 70 and were ranked along with those who scored above 70.

Service ratings are calculated by taking an average of the last two performance evaluations (also called service ratings) received by the candidate prior to sitting for the written examination. As for candidates competing for promotion to the rank of lieutenant, separate promotional ratings were also made by the candidates' direct supervising officers. Both the service ratings and promotional ratings were completed prior to the time examination results were available.

The candidates' adjusted written examination score, service ratings, promotional rating, seniority credit, college credit and veterans preference points were then weighted and combined on the basis of the pre-assigned values given each of these components to produce a final composite score. Candidates were then listed on an "Eligibility Register" in rank order on the basis of the final composite score. The assigned weights for the 1973 lieutenant's promotional model were: written test, 50%; service ratings, 20%; promotional rating 20%; seniority, 8%, college and veterans preference, 2% each.

No candidate was required to attain any minimum score on any component part of the promotional model in order to be placed on the Register. Rather, the Department simply estimated the number of promotions it expected to make during the life of the Register and placed a sufficient number of names on the list to satisfy those needs. Thus for example, the Department ultimately placed the first 233 of the 518 candidates that sat for the 1973 Lieutenant's written examination on the Eligible Register.

4. Discrimination within the Promotional Model

Prior to 1973, the Department did not maintain statistics by race of applicants for promotion to sergeant or lieutenant. However, as noted earlier in this opinion, the number of black sergeants and lieutenants was minuscule, even when compared with the small number of black officers. In 1967, for example, the Department was approximately 6% black, yet only 2.5% of the sergeants and 1.3% of the lieutenants were black.

Before the Department was eventually integrated, discriminatory job assignments took their toll as blacks were generally excluded from desirable positions such as scout car and cruiser assignments, supervisory functions and desk clerk assignments. Each of these positions generated high service ratings and was eagerly sought after by upwardly-mobile white officers.

Black officers complain that their white supervisors gave them deliberately low ser-

---

**45.** Almost every candidate attended these classes.

**46.** In that year (1973), the Department began phasing in college education as an eligibility requirement to sit for the written examination. Officers with over 12½ years of service were exempted from the requirement. In addition to this, college credit would increase a promotional candidate's composite score by one half of a percentage point for each year of college.

**47.** Candidates were also allowed to question a score received on any other component of the promotional model.

vice ratings, promotional ratings and oral interview scores. Determining the truth of this claim is difficult, although there is no question that the black officers thought it was true. This Court has referred above to the documented discriminatory effect of subjective decisions made in the police hiring process. Given the inferior status of blacks within the Department until at least the mid-1960s, it is reasonable to infer that similar discrimination took place in subjective evaluations within the department.

The most discriminatory aspect of the promotional model, however, was clearly the heavily weighted written examination. Before 1969, the same written examination was given for promotion to all ranks between detective and lieutenant. Every promotional examination up to that time included as an essential component a standardized I.Q. test such as the Otis, Otis-Lennon, the Hinden-Nelson, the California Short Form Maturity Test. In addition, each section of the test was rigidly timed.

In 1968, Commander Richard Caretti was assigned to the personnel examiner's office.[48] He started out by working closely with the Vickery Committee, composed of seven industrial psychologists and personnel officers, which was studying the written examination used at the hiring level. Mr. Caretti observed the administration of the 1969 promotional examination, but had no part in developing its content.[49] It featured rigid time limitations and, in place of the I.Q. test, a verbal inventory test and a Reading Comprehension test. Both tests proved unsatisfactory for many reasons and were not used again.

Thereafter, Commander Caretti assumed increasing responsibility for the promotional exams. He convinced his superiors to drop both intelligence testing and rigid time tolerances on the 1970 exam. However, the Department did retain various general vocabulary and aptitude tests which were administered in the 1970 and future testings. In 1972, aptitude tests using general vocabulary and word analogy formats were administered, although their weight was reduced. In 1973 the Department abandoned these tests and adopted a new vocabulary test which was also used on the 1974 and 1976 examinations. In both 1972 and 1973, the Department also used the Watson-Glaser Critical Thinking Appraisal which is designed to measure general intelligence.

As the Department downgraded aptitude and I.Q. testing on the promotional exam starting in 1970, it expanded testing in the areas of police administration and supervision and police-community relations. The trend is apparent from the following table of the approximate weights accorded the verbal abilities, intelligence, and general knowledge and supervisory principles' sections of the lieutenants' examination:

| Yr. of Lt. Examination | Verbal Abilities | Intelligence | General Knowledge |
|---|---|---|---|
| 1966 | 20 % | 33.3% | 6.7% |
| 1967 | 26.2% | 32.8% | 6.6% |
| 1969 | 31.6% | | 15.8% |
| 1970 | | | |
| 1972 | 11.4% | 11.4% | 45.7% |
| 1973 | 11.1% | 11.1% | 22.2% |
| 1974 | 14.8% | | 33.3% |
| 1976 | 12.8% | | 26.3% |

As Commander Caretti noted at trial, both general aptitude tests and I.Q. tests have long been recognized as having an adverse impact on minorities.[50] There was no doubt in his mind that the promotional exam prior to 1970 was discriminatory. Nor is there any doubt that the exam was not job-related. Indeed, the Uniform Guidelines,[51] 29 C.F.R. § 1607.14C(1) prohibit the use of intelligence or aptitude tests in

---

48. He was then a lieutenant.

49. That examination was developed by a Pennsylvania State University psychologist.

50. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 430 n. 6, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *James v. Stockham Valves & Fitting Co.,* 559 F.2d 310, 335–38 (5th Cir. 1977), *cert. denied,*

434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978).

51. The Uniform Guidelines on Employee Selection procedures were adopted by the EEOC, the Civil Service Commission and the Departments of Labor and Justice on August 25, 1978. 43 Fed.Reg. 38290 *et seq., reprinted at* 29 C.F.R. § 1607 *et seq.*

any selection procedure which claims to be content job related.[52]

## III. DEFENDANTS' PAST DISCRIMINATION MODEL—AN ANALYSIS

The defendants, as part of their showing of past discrimination, introduced an analysis of the relevant labor market to be applied here and presented a concomitant estimate of the number of blacks one would expect to be lieutenants today had the Department not discriminated against blacks for so many years. Any attempt to reconstruct the past is inexact and open to question. The plaintiffs have launched a massive attack on the analysis presented. Because of the difficulties involved, this Court will deal with this issue in this separate section of this opinion.

### A. Relevant Labor Market

■ As this Court indicated in its earlier opinion granting defendants' motion for partial summary judgment, 483 F.Supp. 919, relevant labor market analysis is a difficult factual question. Probative evidence of race discrimination exists if the number of blacks hired or employed is disproportionate to the number of blacks who apply or who are available in the local job market. See Hazelwood School District v. United States, 433 U.S. 229, 310–13, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); Intern'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 339–40 n. 20, 342 n. 23, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The relevant labor market, or "labor pool" is composed of the group of qualified people from whom an employer draws applicants. Thus, in the case of teachers, the relevant labor market might be the number of qualified teachers in the metropolitan area. See Hazelwood, supra.

Two distinct elements make up the relevant market: qualifications and geographic location. In this case, the entry-level qualifications for police officers in Detroit from 1945 to the present were not strict. The principal requirements were age (21–30, later 18–32) and education (high school level). It is true that other requirements existed such as no credit problems, no police record, vision and height, etc., but they were minor in comparison. Absent discrimination, it would be reasonable to expect that proportionate numbers of black and white males in Detroit between the ages of 21 and 30 who had high school diplomas would apply to the Department and that proportionate numbers would be hired.

The relevant geographic area from which applicants would ordinarily come is the second labor market factor. In 1974, the City of Detroit instituted a residency requirement—all City employees were required to live in the City. From 1974 to the present, it is clear that the relevant labor market area is the City of Detroit.

For previous years, however, there was no residency requirement. The City hired police officers from surrounding suburban areas as well. From this, plaintiffs argue that the relevant labor market is the Detroit Standard Metropolitan Statistical Area (SMSA), composed of Wayne, Oakland and Macomb counties. In contrast, the comparison which Chiefs Tannian and Hart made during their presentations to the Board of Police Commissioners was the racial composition of the Department and the racial composition of the City of Detroit. As the expert testimony at trial showed, the precise figure is somewhere in between these two figures. It is true that some applicants to the Department came from the surrounding Detroit suburbs, but very few relative to the number of applicants who came from the City of Detroit itself.[53]

---

**52.** This prohibition is based on the recognition that there is no inherent correlation between test behavior and work behavior. For example, one can infer that doing well on a vocabulary test means that a person can also communicate well, but the uniform guidelines mandate stronger evidence than this to support the assumption.

In the case of intelligence or aptitude testing, there is simply no evidence that persons who do well on these tests are better workers in any job than those who do not perform as well.

**53.** In 1973, a year the expert found was somewhat typical of long-range patterns, the distribution of applicants was:

The expert witness testified that this was in accord with general labor market theory that a person is more likely to apply for a job the closer he/she lives to that job.

### B. Defendants' Expert's Analysis

■ Applying the above principles, the expert witness, Mr. Alan Fechter, estimated the relevant market and its racial composition for each of the years 1945 to 1978. The 1950, 1960 and 1970 census provided the needed data as to the race and qualifications of members of the "labor pool." Mr. Fechter noted the number of black and white male high school graduates in the relevant age ranges.[54] He then adjusted these figures by an "undercount factor" to account for persons missed by the census. Next, he multiplied these figures by the labor force participation rate, which is the percentage of the population actually working or looking for work. These calculations approximated the number of qualified potential applicants in the area by excluding the uneducated, those too old or young and those unable to work.

Additional adjustments needed to be made. The most important was for geographic location. Since many more persons applied to the Department from the City of Detroit than from the suburbs, much greater weight was given to the number of qualified applicants living in the City. Similarly, the figures in earlier years had to be adjusted because in those years, a greater percentage of people in the SMSA lived in the City of Detroit. Finally, Mr. Fechter made a final adjustment of 6 percentage points because blacks had a higher propensity to apply to the Department than whites.[55]

Mr. Fechter conducted this analysis for each of the years for which census data was available—1950, 1960, 1970. He then used straightline interpolation and extrapolation to determine the black-white share of the relevant labor market for all other years between 1945 and 1973. One would expect that the hiring of blacks for the years 1945 to 1973 would approximate the percentage of blacks in the above-defined relevant market for each of the years in question. In reality, for each of the years in question except one, Department hiring had a statistically significant impact against blacks. The following table summarizes Mr. Fechter's overall findings:

Comparison, Racial Composition of Hires and Labor Pool, 1945–1973

| Year | Labor Pool (% nonwhite) | Total Hires | Black Hires Estimated | Actual | Difference |
|------|------|------|------|------|------|
| 1945 | 13.8 | 301 | 42 | 5 | 37* |
| 1945 | 14.4 | 304 | 44 | 7 | 37* |
| 1947 | 15.1 | 577 | 87 | 17 | 70* |
| 1948 | 15.7 | 288 | 45 | 9 | 36* |
| 1949 | 16.3 | 414 | 67 | 7 | 60* |
| 1950 | 17.0 | 313 | 53 | 3 | 50* |
| 1951 | 17.7 | 268 | 47 | 28 | 19* |
| 1952 | 18.3 | 328 | 60 | 27 | 33* |
| 1953 | 18.9 | 189 | 36 | 10 | 26* |
| 1954 | 19.6 | 369 | 72 | 7 | 65* |

| | |
|---|---|
| Detroit City: | 74.65% |
| Balance of Detroit SMSA: | 20.48% |
| Balance of Michigan: | 4.87% |

**54.** From 1950 to 1968, the Department's age requirement was 21 to 30. In 1968, the age requirement was changed to 21 to 32 and still later to 18 to 32. To approximate these figures, Mr. Fechter examined the 20–29 age range on the 1950 and 1960 census and the 18–34 age range on the 1970 census.

**55.** This does not contradict testimony that the Department's racial practices deterred blacks from applying to the Department. The evidence is clear that large numbers of blacks applied to the Department year in and year out. This is logical given discrimination against blacks in private industry. The conclusion is inescapable that even larger numbers would have applied absent discrimination.

| Year | (% nonwhite) | Labor Pool Total Hires | Black Hires Estimated | Actual | Difference |
|---|---|---|---|---|---|
| 1955 | 20.2 | 327 | 66 | 11 | 55* |
| 1956 | 20.9 | 187 | 39 | 11 | 28* |
| 1957 | 21.5 | 158 | 34 | 9 | 25* |
| 1958 | 22.2 | 14 | 3 | 3 | 0 |
| 1959 | 22.8 | 116 | 26 | 7 | 19* |
| 1960 | 23.5 | 90 | 21 | 3 | 18* |
| 1961 | 25.1 | 192 | 48 | 7 | 41* |
| 1962 | 26.7 | 278 | 74 | 10 | 64* |
| 1963 | 28.3 | 179 | 51 | 9 | 36* |
| 1964 | 29.9 | 141 | 42 | 6 | 36* |
| 1965 | 31.5 | 171 | 54 | 16 | 36* |
| 1966 | 33.1 | 205 | 68 | 38 | 30* |
| 1967 | 34.8 | 323 | 112 | 71 | 51* |
| 1968 | 46.1 | 519 | 239 | 180 | 59* |
| 1969 | 42.9 | 561 | 241 | 127 | 114* |
| 1970 | 39.5 | 495 | 196 | 101 | 85* |
| 1971 | 40.5 | 656 | 266 | 170 | 96* |
| 1972 | 47.9 | 613 | 257 | 185 | 72* |
| 1973 | 43.0 | 491 | 211 | 149 | 62* |

\* Statistically significant from zero at .05 level of probability.

This analysis shows that had the Department hired blacks in proportion to their representation in the relevant labor market, 1,366 more blacks would have been hired than actually were hired. This finding fully corroborates this Court's previous analysis of the hiring model employed by the City, which featured subjective opinion and I.Q. testing which impacted sharply against minorities. This analysis also demonstrates that Chiefs Tannian and Hart were not far wrong when in their appearances before the Board of Police Commissioners they compared the racial composition of the Department with that of the general population of the City. Mr. Fechter's analysis estimates that the relevant labor market was 43% black in 1973. Chiefs Tannian and Hart cited a labor market figure of 50% from 1974 to 1977. As this Court noted in its order granting defendants' motion for partial summary judgment, 483 F.Supp. 919,

comparisons between employment statistics, and general population statistics, although sometimes imprecise, can be useful indications of discrimination.[56] That is evident here, especially since Mr. Fechter testified that his figures were understated.[57]

Mr. Fechter then went further and estimated the number of black lieutenants one might have expected, assuming a discrimination-free hiring and promotional model. He conducted an analysis for two years— 1974 and 1978. He took the actual list of lieutenants employed in each of these years and determined in what year each of them had been originally hired as patrolmen. The percentage of non-whites in the relevant labor market for each hiring year was then multiplied by the number of (future) lieutenants hired in each of the years to arrive at the hypothetical number of non-white officers who would have made it to lieutenant. Mr. Fechter's analysis reveals

**56.** See Afro-American Patrolman's League v. Duck, 503 F.2d 284, 299 (6th Cir. 1974); United States v. City of Buffalo, 457 F.Supp. 612, 621 (W.D.N.Y.1978); League of United Latin American Citizens v. City of Santa Ana, 410 F.Supp. 873, 896–98 (C.D.Cal.1976).

**57.** See note 58, infra.

that there would have been 43 black male lieutenants in June, 1974. In fact there were 9. For 1978, Mr. Fechter's analysis reveals that there would have been 49 black male lieutenants. By then, however, the affirmative action plan had been in effect for several years. As a result, there were 41 black male lieutenants in the Department in 1978.

Plaintiffs seize upon this latter figure and urge that at minimum, it justifies an injunction against any further affirmative action promotions since Mr. Fechter testified that the difference between 49 and 41 was not statistically significant. This ignores Mr. Fechter's testimony that his analysis understates the number of black lieutenants one would expect to find in a discrimination free hiring and promotional environment.[58] This also fails to take into account the City's operational need defense, discussed below. Finally, Mr. Fechter testified that it is currently impossible to quantify the number of blacks who should be lieutenants in future years.

Any analysis like Mr. Fechter's can be attacked as inaccurate on a variety of grounds. There is simply no way to reconstruct the past with pinpoint accuracy. The plaintiffs have launched a wholesale assault on Mr. Fechter's analysis and findings. This Court disagrees; it finds his analysis to be creditable and entirely consistent with this Court's previous findings of discrimination. Instead of burdening these pages with a discussion of plaintiffs' attacks on the analysis, this Court will discuss them in a lengthy footnote reproduced at the margin.[59]

**58.** Mr. Fechter cited two reasons for this view. First, he assumed that equal numbers of black and white officers stayed on with the Department. However, in the military, black retention rates are far higher than white retention rates. (i. e. 50.6% versus 34.5% in 1978). Mr. Fechter stated that because military and police work is similar, he would expect retention rates to be similar as well.

Second, Mr. Fechter underestimated the propensity of blacks to apply to the Department. He adjusted the racial composition of the labor pool upward by 6% to account for the greater black propensity to apply. In reality, the figures are much higher. In 1967 and 1968, for example, there was a 15% difference in application rates. Out of caution, Mr. Fechter took an average of the low 1970–1973 application rate figures.

**59.** 1. Plaintiffs claim that Mr. Fechter's analysis is flawed because it is based on data concerning applicants to the Department from 1971 to 1973 which was inflated by special recruitment efforts directed to minorities. Mr. Fechter increased the percentage of blacks by 6 percentage points to account for the increased propensity of blacks to apply. Plaintiffs contend that this adjustment is erroneous because in the years in which this propensity was determined—1971 to 1973, large scale minority recruiting efforts were artificially increasing the number of black applicants. This Court cannot agree. First, this Court has previously found that minority recruiting efforts did not begin to take effect until 1973–1974. Second, Mr. Fechter's analysis of propensity to apply was not based on inflated figures. He examined *qualified* applicants who were eligible to take the written examination in each year from 1967 to 1973. His 6% adjustment was conservative

in light of the 15 percentage point difference in black vs. white propensity to apply which existed in 1967 and 1968—years in which even the plaintiffs concede no significant minority recruiting occurred.

It is true that Mr. Fechter analyzed 1971 applicant data from the Department's preliminary application files and that this data also showed that blacks had a much higher propensity to apply. Had excessive minority recruiting occurred, this data could have been distorted. However, all that it was used for was to corroborate his basic premise that blacks had a much higher propensity to apply than whites.

As a final corollary argument, plaintiffs claim that Mr. Fechter's analyses failed to account for voluntary withdrawals, in violation of EEOC guidelines. See "Interpretation and Clarification of Uniform Employee Selection Guidelines." ¶ 4175, C.C.H.Emp.Prac. (March 1979). They argue that inclusion of voluntary withdrawals inflated Mr. Fechter's analysis of black's propensity to apply since more blacks than whites voluntarily withdrew from the hiring process. The EEOC standard reads as follows:

"A person who voluntarily withdraws formally or informally at any stage of the selection process is no longer an applicant or candidate for purposes of computing adverse impact. Employment standards imposed by the user which discourage disproportionately applicants of a race, sex or ethnic group may, however, require justification."

There is testimony in the record that for a number of years, disproportionate members of blacks withdrew from the hiring process. It was in response to this problem that the Department instituted a follow-up program to find

out why black applicants had dropped out and to encourage them to go through the procedures. The reason why blacks became discouraged, however, was the Department's discriminatory image which, until late 1973–1974, was buttressed by written examinations and other components which screened out disproportionate numbers of blacks. Under these circumstances, Mr. Fechter did not err in including voluntary withdrawals and did not violate the EEOC guidelines.

2. Plaintiffs urge that other factors could account for the disparities in black hiring revealed by Mr. Fechter's analysis. Plaintiffs claim that factors such as different arrest records or the fact that minorities did not like police work could account for the disparities found. This Court disagrees. Mr. Fechter closely approximated the relevant labor market for each of the years in question by controlling for age, education and "membership" in the labor market. It is inconceivable that factors such as height, arrest record or personal preference could account for the disparities. Throughout the years in question, the Department used discriminatory hiring and promotion tests. The Department also discriminated against blacks within the Department at least through the early 1960s. The conclusion is inescapable that factors other than race could not account for the awesome disparities found.

Plaintiffs also argue that it is possible that only the hiring process was discriminatory for the years in question and that the promotional model was racially neutral throughout. This is a theoretical possibility, but ignores the evidence in the record that the promotional model was also discriminatory for many years, notably because it employed I.Q. tests on the written examination.

3. Mr. Fechter conducted a separate analysis for the years 1971–1973. Racial application data was available for these years. Mr. Fechter took this data and omitted all applicants who had been rejected preliminarily because of age, residence, no drivers license, etc. He then compared the numbers of black and white applicants qualified to take the written examination with the numbers hired. He found a statistically significant difference in each year which gradually narrowed down from 1971 to 1973. In 1971, 36.2% of qualified applicants were black, but only 22.3% of the men hired were black. In 1972, 41.9% of qualified applicants were black but only 25.2% of the men who were hired were black. In 1973 the differential was much smaller—43% black applicants and 39.8% blacks hired. However, many of the applicants who applied in 1973 were hired in later years. Comparison of black applicants with blacks actually hired in 1973 revealed a statistically significant racial disparity.

Plaintiffs fault Mr. Fechter for not directly testifying that the statistical discrepancies showed discrimination in hiring. Mr. Fechter refrained from drawing conclusions, leaving any final assessment to be made by this Court. Such professional restraint is commendable in an expert witness—and unfortunately is all too rare.

Plaintiffs question Mr. Fechter's analysis on various grounds. First, they fault him for failing to analyze the various components of the hiring process for racial impact, citing § 4C of the Uniform Guidelines, 29 C.F.R. § 1607.4c. As defendants point out, such an analysis is only useful in determining the source of *present* discrimination. It makes no difference in this case which parts of the hiring model were discriminatory in 1971–73 so long as it is clear that the model did, overall, discriminate against blacks.

Second, plaintiffs state that large numbers of Mr. Fechter's "qualified applicants" failed to show up for the written examination and that this was especially true of the black applicants. Plaintiffs claim that these "non-candidates" inflate minority representation in the applicant pool and account for any disparity in hiring. A similar argument was made above where plaintiffs claim that large numbers of unqualified blacks flooded the ranks of applicants. This Court rejects it for the same reasons it previously rejected it. The record does not support Dr. Wollack's underlying theory that because of minority recruitment efforts, the Department was flooded with applications from unqualified blacks. More important, Mr. Fechter's analysis of applicants for the years 1971–1973 compared those who passed the Department's preliminary screening requirements and were thus qualified to take the written examination. For reasons mentioned above, it was proper to include voluntary withdrawals in the analysis.

Third, plaintiffs state that Mr. Fechter failed to account for reapplicants who may have applied an unknown number of times and that any racial disparity in hiring could be accounted for because the Department kept encouraging minorities to re-take the written examination which they kept failing. Mr. Fechter testified that reapplicants must be considered in analyzing applicant flow data. Dr. Wollack, the plaintiffs' expert, apparently agreed because he used reapplicants in his analysis of the promotional examination. As a check, Mr. Fechter studied the data for 1971 and found that including reapplicants had no statistically significant effect on the racial composition of the applicant pool. Plaintiffs are reduced to arguing that Mr. Fechter did not check on black applicants who reapplied *several times,*—a speculative argument. Dr. Wollack offered a hypothetical alternative explanation for the adverse impact on black officers. Dr. Wollack reasoned that the encouragement of minority reapplications and minority re-testing on the exam accounted for the disparity. In other words, a few minorities failing numerous times distorted the figures. Dr. Wollack wisely conceded the speculative nature of his hypothetical which among other things assumed

## IV. 1974—THE ADOPTION OF AFFIRMATIVE ACTION AND SUBSEQUENT OCCURRENCES

### A. The Board of Police Commissioners and the Adoption of Affirmative Action

Previous orders of this court, notably its order granting summary judgment on the issue of actual and punitive damages 483 F.Supp. 919, have outlined how the City's affirmative action plan operated. Although there is no dispute as to how or why the City instituted the affirmative action plan, this Court will sketch the pertinent facts and the setting in which they took place.

The continuing effect of past discrimination was apparent by June of 1974. The Department was, overall, 17.2% black but only 5.15% of the sergeants and 4.78% of the lieutenants were black. The 1973 eligibility registers from which promotions were to be made offered little hope of improvement in these bleak figures. On May 9, 1974, 30 patrolmen were promoted to sergeant in rank order from the top of the 1973 eligible register; 29 of those promoted were white. On May 23, 1974, 11 sergeants were promoted to the rank of lieutenant; all were white. The Department resolved to do something about the sparse numbers of blacks being promoted.

The development of the affirmative action plan and the race-conscious promotions

challenged in this litigation resulted from actions taken by the City's Board of Police Commissioners. The Michigan Constitution's Home Rule Provision art. 7 § 22 confers upon the City of Detroit the right of local self-government. The Board of Police Commissioners was provided for in Detroit's City Charter, newly approved by the voters in the 1973 election. Board members were appointed by the Mayor, Coleman A. Young, with the approval of the City Council. Their duties included establishing "policies, rules and regulations" for the Police Department in consultation with the Chief of Police and with the approval of the Mayor. In sum, the Board oversees how the Department is run. The City Charter also expressly provided that all promotions were to be made on the basis of competitive examinations, except that the Board could approve out-of-order promotions at the request of the Chief of Police.

The procedures by which the Board of Police Commissioners [60] approved the affirmative action plan in July of 1974 and by which it has continued to approve affirmative action promotions are undisputed. The procedures are fully outlined in this Court's order granting summary judgment on money damages claims other than backpay, 483 F.Supp. 919. There is no need to repeat all of the details here except to note that in each instance the Chief of Police, Philip Tannian (1974–1976) or William Hart

---

that no white applicants retested twice while 346 black applicants retested twice in the same year. The actual preliminary application card data demonstrates that Dr. Wollack's theory is meritless:

Applications by Frequency of Application

| Race | Year | Total Applications | Once | Twice | Three | Four |
|------|------|------|------|-------|-------|------|
| Black | 1971 | 2199 | 1655 | 227 | 26 | 3 |
| | 1972 | 2159 | 1744 | 188 | 13 | 0 |
| White | 1971 | 3623 | 2993 | 283 | 20 | 1 |
| | 1972 | 2344 | 2013 | 155 | 7 | 0 |

4. Finally, plaintiffs attack the entry-level statistics contained in exhibit 12 as fraught with problems because of large numbers of inconsistencies, computational errors and recording inaccuracies. Dr. Wollack concluded that the applicant flow records were intrinsically "unbelievable."

Unfortunately, it appears that the good doctor attacked a straw man. The defendants at trial did not rely on the data in exhibit 12 at trial and Dr. Fechter did not use this data in doing his analysis. The reports in exhibit 12 are not applicant flow reports in that they do not trace the progress of particular applicants through the system. Rather, they are status reports of the people in the hiring process at any given time. The figures were not relied upon by the defendants to show past discrimination and were not meant to be so used.

60. The original members who constituted the Board of Police Commissioners in 1974 were Douglas Fraser of the United Auto Workers Union, the Reverend Charles Butler, Ms. Susan Mills-Peak, Executive Director of the Concerned Citizens Council, Mr. Alexander E. Ritchie, a Detroit Attorney, Mr. Edward Littlejohn, Professor of Law at Wayne State University.

(1976–present) made presentations to the Board of Police Commissioners at public hearings in which the need for affirmative action in promotions was outlined. At each presentation, the Chief of Police urged the need to promote more blacks 1) to remedy prior discriminatory employment practices, 2) to overcome present barriers blacks faced in the promotional model; and 3) to meet the Department's perceived operational need for more black officers. In each instance, the Chief of Police presented statistical data showing historically the percentage of blacks as compared to whites at all levels in the Department and the percentage of blacks in the population of the City of Detroit.[61]

Pursuant to the Board's express findings of past discrimination and operational need, all promotions which have taken place from July of 1974 to the present have, with the Board's express concurrence in every case, been race-conscious. As previously indicated, instead of promoting in strict rank order from the eligibility lists, the Department promoted at an approximate 50-50 black-white ratio. Thus, if the Department had 20 openings for lieutenant, it promoted the top ten (10) white candidates off of the eligibility register and the top ten (10) black candidates off of the eligibility register.[62] These race-conscious promotions were made off of the 1973, 1974 and 1976 lieutenant's eligibility lists. As a practical matter, promotion of equal numbers of black and white candidates meant that the Department had to "dip down" on the eligibility register to promote blacks. White candidates who would have been promoted had strict rank order been followed, as was customary in the past, felt that they had been "passed over" solely because they were white. And, because they ranked higher on the eligibility list than the blacks who were promoted under the affirmative action plan, the white

officers who were "passed over" felt that they were better qualified than the affirmative action-promoted black officers.[63] The result was this lawsuit.

The Court notes that the Department did place a limit on how far it would "dip" to promote blacks under the affirmative action plan. No candidate was promoted who did not score at least at the 50th percentile on the written examination. Instead of reaching below this level, the Department would give a new written examination and draw up a new eligibility register. The Court also notes that no specific timetable has been established for the termination of the affirmative action plan. Instead, the Board has been periodically approving affirmative action promotions, concluding in each instance that although progress has been made, much remains to be done and affirmative action should continue. There is also evidence in the record that the Board deferred setting a cut-off date for affirmative action until this litigation is resolved.

Finally, this Court will repeat some of the observations made in its order granting summary judgment. There is no question that the Board acted in good faith and that it was well aware of the sensitive questions presented. The Board was well aware of the impact any affirmative action plan would have on white officers, and sought to balance the competing interests. The testimony at trial of Edward Littlejohn, former Chairperson of the Board and Professor of Law at Wayne State University illuminated this concern clearly:

> Q: And you also indicated, I believe, that the Board of Police Commissioners was aware at the time the affirmative action resolution was adopted in 1974 that this policy would have an adverse impact upon white males who placed higher on the list for promotion to lieutenant but were passed over by reason of that policy . . .

---

61. See n. 56, *supra* and accompanying text.

62. Some "dipping" had taken place in the past when the Chief of Police made individual preferential promotions of persons ranked lower on the eligibility list. Most such "dipping" occurred on promotional lists from patrolman to

sergeant, i. e. persons who had served as bodyguards and/or drivers to the Mayor.

63. The hotly-disputed question of the relative qualifications of the black officers vis-a-vis the "passed over" white officers is discussed below in section V.

THE WITNESS: . . . There certainly was existing injury and continuing injury, not only to black officers in the Police Department and in our view, the citizens of Detroit and the City as a whole, but in choosing between the adverse impact of existing conditions and the perpetuation of the injury to minority officers and the untenable situation that we considered to be existing in the community, so, on the horns of the dilemma, you choose, I suspect the less evil of the choices and the one that is going to cause the greater good; and from that kind of context, we recognize no matter which decision the commission made, there would be an adverse impact and certainly the affirmative action program would cause an impact adversely on individual white officers at the time the program was adopted and implemented.

But, again, I say that balance was struck between the other competing— what we felt were the more compelling interests than those you asked about.

### B. The Promotional Model 1974—Present; An Overview

The affirmative action promotions challenged in this litigation were made from three eligibility registers. These registers were compiled after the administration of written promotional examinations in 1973, 1974 and 1976, the scores of which were plugged into the appropriate promotional model. The 1973 promotional model has already been discussed at length. *See* Section IIB3(d), *supra.* The 1974 and 1976 promotional models were substantially different, although the written examinations, heavily weighed in each model, were substantially the same.[64] Another eligibility register was prepared following a promotional examination given in 1977. How-

ever, no promotions have been made off of this most recent register and the City has represented that none will be made pending the outcome of this litigation.

#### 1. Immediate Background

By mid-1974, the Department's efforts to improve its hiring procedures and remove all racially discriminatory aspects from them had just recently taken hold. In addition, Commander Caretti was in the midst of his efforts to improve the written promotional examination. Whether Commander Caretti had succeeded in making the examination job-related (i. e. whether doing well on the examination meant that a candidate would probably make a better lieutenant) is a hotly-disputed question which is discussed below.

There is no question, however, that the 1973 and 1974 promotional examinations were not themselves discriminatory. Plaintiff's expert witness, Dr. Stephen Wollack, performed a statistical analysis of the 1973 promotional model to determine whether the eligibility registers resulting from that model would have had an adverse impact on blacks absent affirmative action—i. e. whether a disproportionate number of whites would have been promoted if rank-order had been followed. He concluded that there was no statistically significant difference in selection rates between white and black candidates. In other words, the 1973 promotional model did not, by itself, impact against blacks under the criteria of § 4D of the Uniform Guidelines on Employee Selection Procedures.[65] Correspondingly, the heavily weighted written examination was similarly non-discriminatory. Dr. Wollack found that there were no statistically significant differences in the passing rates of white and black candidates in 1973.

Dr. Wollack made similar findings regarding the 1974 and 1976 promotional models. In fact, he found that these models

---

**64.** 1974 and subsequent promotional models differed from the 1973 promotional model in four significant areas: 1) An innovative oral board procedure was introduced; 2) the weight accorded seniority was reduced; 3) in-grade seniority was added to the model; 4) the weight given the veterans preference was further reduced so that a candidate could accumulate a maximum of two points.

**65.** § 4d, 29 C.F.R. § 1607.4d, provides that a test or selection device for hiring or promotion has an adverse impact if the difference in selection rates is less than 80% of the rate for the group with the highest selection rates. In addition, the difference must be statistically significant.

discriminated against white applicants because even absent affirmative action, 23% of the black candidates but only 11% of the white candidates would have been promoted. Consistent with this analysis, in 1976, 71% of the black candidates passed. To Dr. Wollack, this result was novel and inexplicable.

The explanation for this unusual situation was obvious to then-Chief of Police Philip Tannian.[66] Although blacks did as well as whites on the promotional model, there were very few black sergeants who were eligible for promotion to the rank of lieutenant. For example, only 26 and 35 black males, respectively, competed in the 1973 and 1974 lieutenants examinations respectively. These blacks were the "survivors" who had endured a discriminatory hiring system when they first applied to the Department and who had then endured a discriminatory promotional process when they advanced from patrolman to sergeant. These black officers competing in the 1973 and 1974 lieutenant's examination had thus managed to overcome two levels of screening which had a severe adverse impact on minorities. In the jargon of the expert witnesses, the black sergeants who were applying for promotion to lieutenant constituted an "atypical pool" of (super-achieving) applicants.[67]

Viewed from another perspective, there would have been many more blacks eligible for promotion and many more blacks promoted had discrimination at the application level not severely reduced the number of blacks available to be promoted. This is apparent from the testimony of black officers at trial. Inspector Melvin Williams testified that he failed the Department's written entrance exam many times over a five year period before finally passing it and being appointed to the department. Not only would he have been able to take the lieutenant's examination years earlier had he been appointed to the Department earlier, he also would have received additional years of seniority credit which would have assisted him in placing higher on any eligibility roster which he was on. There is similar evidence in the record regarding other black officers such as Joseph C. Brown who failed the written entrance examination in 1958 but passed it and was appointed more than eight years later. Similarly, McKinley Douglas first applied for a position with the Department in 1958 but failed the written examination four times before passing it and being appointed in October of 1966. Plaintiffs openly conceded that the Department intentionally discriminated against Vivian Edmond. There is no way to recreate the past and determine where any given individual would be today absent past discrimination.[68]

**66.** It was also obvious to the Equal Employment Opportunity Commission in its report finding no cause for plaintiff Bratton's Title VII complaint.

**67.** Yet another conceptual view is that the promotional structure is pyramidal. However one characterizes it, it is clear that where all promotions to lieutenant derive from a pool of sergeants who in turn come from a pool of patrolmen, the selection of lieutenants reflects discrimination in the previous selection of sergeants and in the hiring of patrolmen.

**68.** The case of Lieutenant Kenneth Johnson illustrates well the continuing effects of the Department's discrimination. Lt. Johnson first applied with the Department in July of 1962, but failed the written examination. He reapplied and failed the examination again in September, 1962. He finally passed the written examination in December, 1962. However, a Department physician advised him that he could not be approved unless a hemorrhoidal condition was corrected. A private physician advised the Department in writing that Lt. Johnson's condition would not affect his performance, but the Department held its position. Lt. Johnson was eventually appointed to the Department on May 13, 1963, after having corrective surgery.

Lt. Johnson sat for the sergeant's exam in 1967 and 1969, but was not promoted. In April of 1972, he sat for the exam a third time. After some corrections on his ranking were made, he ended up ranked 470. A total of 450 promotions were made from the 1972 eligibility register. Had Lt. Johnson been appointed to the Department when he had first applied, his added seniority score would have placed him within the first 450 persons promoted.

On December 16, 1973, Lt. Johnson sat once again for promotion to sergeant. He ended up

The conclusion is inescapable, however, that when viewed as a class, many more blacks would have been present in all ranks, including that of lieutenant, had discriminatory practices not been followed.

The plaintiffs concede that the above explanation, fully outlined in the testimony of defendants' expert witness, Dr. Richard Barrett, is "reasonable." Plaintiffs attempt to rebut the apparent fact that a highly select, atypical pool of black candidates competed for promotion to lieutenant by focusing on the results of the 1976 lieutenants examination. Plaintiffs argue that the pool of black sergeants available for promotion to the rank of lieutenant in 1976 had been artificially increased by affirmative action promotions of blacks from patrolman to sergeant in 1974, 1975 and 1976 and that there was thus no discriminatory screening effect at the lower sergeant's promotional level. Plaintiffs' expert, Dr. Wollack, did an analysis of the 226 black and 965 white patrolmen who sat for the 1973 sergeants' examination. Because of affirmative action promotions of blacks from the rank of patrolman to the rank of sergeant, large numbers of these black sergeants were eligible to sit for the 1976 exam for promotion to the rank of lieutenant. Dr. Wollack calculated that of the 226 black and 965 white patrolmen who sat for the 1973 sergeants' examination, 14 of the blacks (6.19%), but only 7 of the whites (.07%) would have been promoted to the rank of lieutenant absent

affirmative action at that level. According to Dr. Wollack, this analysis disproves defendants' "double screening" theory.

This Court cannot agree. First, this analysis deals only with promotions made from the 1976 eligibility register; plaintiffs implicitly concede that the 1973 and 1974 lieutenants' examinations perpetuated past discrimination against blacks. More importantly, plaintiffs analysis is incomplete for a variety of reasons. Plaintiffs' analysis is based on a small fragment of what would otherwise, in the absence of discrimination, be a typical pool of black applicants. Absent from plaintiffs' analysis are blacks who were discriminatorily screened out for years at the entry level and those similarly screened out at the sergeants' level. Simply stated, Dr. Wollack's analysis did not include the whole picture.

Dr. Wollack's own testimony demonstrates that even with the impact of affirmative action at the sergeants' level, there still existed an atypical pool of black candidates competing for promotion to the rank of lieutenant. Dr. Wollack found that there was a statistically significant impact against white male officers on both the 1976 lieutenants' written examination as well as the overall 1976 promotional model. In fact, the pass rate on the written exam for black male officers was 71% while that of white male officers was only 49%.

Dr. Wollack could not account for this discrepancy. He claimed to have never

---

being ranked 86, but only after successfully appealing a service rating on the grounds of intentional racial discrimination by the supervisor who rated him. In addition, of the six sections on the examination, Lt. Johnson performed least well on the verbal inventory section and Watson-Glaser critical think section, ranking in the 45th and 50th percentile, respectively, of those who sat for the exam. This is unsurprising because such non-job related tests have traditionally impacted against minorities. What Lt. Johnson's ranking would have been absent these sections is unknown.

Lt. Johnson was promoted to the rank of Sergeant on August 1, 1974; one of the first beneficiaries of the Department's Affirmative Action plan. Since 150 persons were ultimately promoted from the 1973 sergeant's eligibility list, he would have been promoted anyway; but at a later date.

On May 31, 1976, Lt. Johnson sat for the written exam for promotion to lieutenant and

ranked 96 on the eligibility register. Correction of an error in his service rating results in a ranking of 90. Had Lt. Johnson been promoted in 1972 instead of 1974, he would have obtained the 3.0 maximum seniority credit for time-in-grade at the sergeant's rank. He would have ranked 86 on the eligibility roster. Since 88 promotions were made from this roster, he would have been promoted had the "regular" promotional scheme been in effect. Instead, Lt. Johnson was promoted to the rank of Lieutenant under the Department's affirmative action plan in August of 1977.

Lt. Johnson's case demonstrates the effect of "double screening" at the lieutenant's rank. Absent discriminatory testing, Lt. Johnson would probably have made it to the rank of Lieutenant by 1977. The affirmative action promotions which Lt. Johnson benefitted from, in a very real sense, only made up for past discrimination against him.

seen such a discrepancy in favor of blacks. Normally, adverse impact on written cognitive tests was against blacks, not whites. Further, such adverse impact against blacks is generally maximized by a high cut-off score and rank ordering which rewards high scores as opposed to passing scores. All of these factors were present on the written examination. Dr. Wollack conceded the above, but still would not provide an explanation for the pro-black, anti-white impact of the examination. Dr. Barrett's analysis provides such an explanation.[69]

## 2. Efforts to Improve the Promotional Model

Shortly after the adoption of the Affirmative Action Program, in July of 1974, the Department made additional efforts to improve the promotional model.

On August 16, 1974, then Chief of Police Tannian made a preliminary announcement to the Board that the Department had revamped its promotional model for lieutenants. Before obtaining Board approval of the new model, Chief Tannian reviewed it with the then president of the Lieutenants and Sergeant's Association (LSA), Joseph Clark. After making some changes to suit the LSA, Tannian obtained Board approval of a similar, though less job related model on August 30, 1974. The model that was approved and implemented included the following changes:

1. A minimum written examination passing score of 70 percent was imposed;

2. The weight accorded the written examination was increased from 50 to 55 percent of the model;

3. An oral promotional evaluation board with a weight of twelve (12) percent was introduced in place of the promotional rating;

4. Regular seniority was accorded a weight of 6 percent of the model and was to be earned at the rate of 1¼ percent per year of service for the first four years and one (1) percent for the fifth year;

5. A new "ingrade" seniority factor was established and was to be earned at the rate of one (1) percent per year from the date of appointment to the rank of sergeant up to a maximum of three (3) percent of the model.

The new promotional model was in several respects a substantial improvement over the prior model. Seniority had been effectively downgraded. Only the in-grade seniority component affected an officer's position on the lieutenants' eligibility register.[70] The promotional rating, which in the opinion of Commander Caretti had an adverse impact on minorities[71], and which was otherwise of little demonstrated value, had been eliminated. In addition, some improvements were made on the written examination. Most importantly, an oral board, which for the first time sought to measure intangible leadership and personality qualities that are regarded as essential for lieutenants, was introduced.

### a. Oral Boards

The oral board procedure was developed by two outside psychologists hired by the Department. It was introduced because the Department wished to measure certain abilities which it thought were not being

**69.** Dr. Wollack did state that a "double screening" effect could reduce the number of blacks available for promotion, but maintained that this would not account for the startling percentage disparity in black vs. white performance on the written examination. It appears intuitively obvious to this Court that since only the very best blacks survived the double screening which took place, that it is unsurprising that a group of them might do better on a written examination than whites. The Court also notes that a statistically significant disparity favoring blacks only occurred on the 1976 examination. At the very least, this type of unexplained fluctuation indicates that an atypical pool of black applicants is present at the lieutenants level.

**70.** The Department's experience with the three examinations administered since the adoption of the new model revealed that virtually every officer who achieved a position on the lieutenants eligibility register was awarded the maximum regular seniority credit.

**71.** The reason for this was that minorities had less seniority and promotional ratings, like service ratings, tend to correlate with seniority.

measured by the other components of the promotional model. Commander Caretti described the purpose of the oral board as follows:

> There were a number of purposes. We felt that it might enhance our ability to measure dimensions that weren't being probed anyplace else in the promotional process. Since this is a City with a large minority population, we felt that certain aspects of attitudes should be measured— attitudes toward minorities, attitudes towards the whole police-community relation process, excessive force and its application, ethics in Police Work, poise, judgment, logical thinking. We thought these factors that weren't being measured anyplace else in our process were very important in terms of their presence or absence in our supervisors.

In the past, the Department had used an oral interview as part of the promotional model. It was one of the devices which now Deputy Chief James Bannon testified was used to exclude black officers from the higher ranks in the 40's and 50's. Recognizing that an oral interview procedure could be abused, the Department built safeguard procedures into the system to assure objectivity and fairness. The members of the oral board are drawn from the supervisory ranks of major law enforcement agencies other than the Detroit Police Department. Each candidate for promotion who scores above the fiftieth percentile on the written examination is interviewed by a panel consisting of one black and two white officers. The interviewers are given special training by professional psychologists before any candidates are interviewed.

Each panel member is required to make an independent evaluation without prior discussion of the candidate with other panel members. Conformity with this requirement is assured by the presence of Department and union representatives to witness the scoring process. Generally the interview lasts 30 to 45 minutes.[72]

Commander Caretti, who has overseen the process since its inception in 1974, testified that it is one of the more effective parts of the promotional model for predicting the potential of candidates to perform effectively as lieutenants. He based this conclusion on his personal observation that the officers he knew to be good performers received high ratings and those who he knew to be poor performers got low ratings. Chief Hart agreed with Commander Caretti's assessment. Former Chief Patrick Murphy was in agreement as to the importance of gauging the skills and abilities measured by the oral board.

Plaintiffs' position on the oral board procedure is curious. They appear to applaud the institution of the oral board and commend the attempt to measure the qualities which the oral board is designed to measure. However, they complain because the affirmative action plan allowed most blacks who passed the written exam alone to be promoted. Thus, they argue, blacks were promoted regardless of their oral board scores while whites' oral board scores directly affected their ranking. Whatever force this argument has is dissipated by the fact that the blacks who were promoted had oral board scores equal to whites who were promoted.[73]

### b. The Written Examination

This Court has already commented on some of the changes made on the written

---

72. Just prior to the interview the candidates must draw a card which determines the panel by which he will be interviewed. By a similar random method he then selects a series of hypothetical fact situations for which supervisory action should be taken. Before the panel he must rank the relative seriousness of each of the situations and then outline how he would deal with two of them. He must defend his judgments and respond to questions from the panel members until they are satisfied that they know enough about the candidate to rate

him or her in each of the ten (10) designated areas.

73. Dr. Wollack did testify that the oral board is discriminatory against white officers "in its content and result." The reason was that the oral board was concerned with "attitudes toward minorities," which is one of the 10 rating scales, and that many of the fact situations dealt with racially-oriented subject matter. Dr. Wollack emphasized that no similar ratings were made regarding black officer's attitudes

examination. Basically, the Department, through Commander Caretti, tried to improve the exam from 1970 through 1974, the last year in which changes were made. In that year, Commander Caretti dropped the general aptitude Watson-Glaser Critical Thinking Appraisal Test and attempted to redesign the verbal inventory section of the exam to make it more job-related. After the 1974 examination, Commander Caretti wanted to make additional changes, but was told not to because the City was locked in a labor dispute with the Lieutenants and Sergeant's Association and the examination was, to an unspecified degree, in issue.[74]

#### c. Eligibility for Promotion

The Department continued its policy of increasing the educational requirements for promotions. In 1974, officers were required to have 30 quarter or 20 semester hours of college credit to be promoted to lieutenant. In 1976, 45 quarter or 30 semester hours were required. In 1977, the requirement was raised to 70 quarter or 40 semester hours.

toward whites. Further, Dr. Wollack's statistical analysis revealed that black candidates had an 80% chance of obtaining an above-average score on the oral board while white candidates only had a 43% chance.

This Court sees nothing wrong with the oral board's concern with anti-black attitudes. The reason is that anti-black attitudes within the Department have been a serious problem for many years. As this Court will discuss later in this opinion regarding the defendants' operational need defense, tensions between the black community and the still predominantly white police department have been a serious problem in Detroit. The need to change anti-black attitudes and practices has been recognized by responsible City officials since at least the 1967 Riot, which the National Advisory Commission on Civil Disorders found was caused in large measure by discriminatory police practices.

There is nothing in the record which suggests that anti-white attitudes by blacks currently present a problem which requires similar attention.

If anti-white attitudes develop or prove to be a problem in the Department, there is nothing to prevent the City from moving to combat them. Indeed, the City has every incentive to do so since, as it emphasized at trial, effective police work depends on cooperation with all citizens.

## V. THE MATTER OF RELATIVE QUALIFICATIONS

The Equal Employment Opportunity Coordinating Council's "Policy Statement on Affirmative Action Programs and Local Government Agencies," 41 Fed.Reg. 38, 814 (Sept. 13, 1976) endorses the adoption and implementation of affirmative action programs, including the use of goals and timetables. The guidelines outline the desirability of affirmative action which emphasizes relative qualifications:

Under a system of goals, therefore, an employer is never required to hire a person who does not have qualifications needed to perform the job successfully; and an employer is never required to hire such an unqualified person in preference to another applicant who is qualified; nor is an employer required to hire a less qualified person in preference to a better qualified person, provided that the qualifications used to make such relative judgments realistically measure the person's ability to do the job in question, or other

In equating the need to check for anti-black attitudes with the need to check for anti-white attitudes, Dr. Wollack ignored the sad history of police-community relations in Detroit which appears clearly in the record. Given this history, the City cannot be faulted for emphasizing the problem of anti-black attitudes at the oral boards.

Dr. Wollack, however, did provide a probable explanation for why blacks did better at the oral boards than whites—blacks are more sensitive to the problem of racial prejudice, especially anti-black prejudice. The oral board procedure which Dr. Wollack regarded as discriminatory to whites, in reality, operated to test for an important trait.

74. Defendants attempted to present testimony regarding the labor dispute and why all exam changes were frozen in 1974, but plaintiffs strongly objected, claiming that to do so would damage the confidentiality of the pending labor negotiations. The parties eventually presented a vague stipulation regarding what occurred. In their brief, however, plaintiffs attempted to blame the City for not improving the examination more. Given the unsettled state of the record, the only reasonable conclusion to draw is that the City's moratorium on further improvements on the written examination was bona-fide.

jobs to which he is likely to progress. The terms "less qualified" and "better qualified" as used in this memorandum are not intended to distinguish among persons who are substantially equally well qualified in terms of being able to perform the job successfully. Unlike quotas, therefore, which may call for a preference for the unqualified over the qualified, or of the less qualified over the better qualified to meet the numerical requirement, a goal recognizes, that persons are to be judged on individual ability, and therefore is consistent with the principles of merit hiring.

A key theme which runs throughout plaintiffs' case is that the black officers who were promoted "ahead" of the white officers were not as qualified.[75] They point out that the City "dipped" down on the eligibility register to promote blacks. Thus, as a group, the black officers ranked lower on the eligibility register than white officers who would have been promoted absent affirmative action.

## A. The Written Exam

█ In order to "make it" onto the promotional eligibility roster in any given year, a candidate had to score above the 50th percentile on the written examination. Where that candidate ranked on the list, however, depended on a variety of factors and the weight accorded each factor in a given year. *See* section IV, *supra.* The most important factor in any given year was a candidate's score on the written examination, which was always in excess of 50% of the final composite score which is used to rank candidates. Given the heavy weight that has always been accorded the candidate's written exam score, those with the highest test scores have placed highest on the eligibility register. This is apparent from a review of the 1973, 1974 and 1976 lieutenant's eligibility registers. Those candidates who scored highest on the written exam dominate the top of the registers. The principal issue, then, is whether the officers who were better test-takers were necessarily those with the best potential to be lieutenants.

Put another way, it is important to assess whether the written examination, and/or the promotional model was "job related." By definition, a job-related examination or selection procedure is one which can be demonstrated to have a manifest relationship to the job. In the ordinary case, when a hiring or promotional procedure is found to discriminate against minorities, the employer has a heavy burden of showing that the selection procedure is job-related. The recently promulgated Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607 *et seq.* outline in detail how this must be done. Basically, an employer must show that an examination was either "content valid," [76] "criterion valid," [77] or "construct valid." [78] *See e. g. Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *United States v. City of Chicago,* 573 F.2d 416, 425–27 (7th Cir. 1978). Demonstrating this is not easy. *See e. g. Firefighters Institute For Racial Equality v. United States,* 549 F.2d 506 (8th Cir. 1977) (Fireman's promotional exam did measure many necessary skills, but was not content valid because it did not measure supervisory skills). A properly conducted job validation study is both costly and time-consuming.

It is undisputed that neither the written exam nor the overall promotional model in this case has been proven to be job-related.

---

**75.** Plaintiffs are careful not to argue, however, that the affirmative action promotees are unqualified. Rather, they argue that the out-of-order promotees were less qualified than the white officers who were passed over.

**76.** This requires a thorough, individual task analysis of the job to be performed. All or nearly all important parts of the job must be covered on the test and the test's content must clearly approximate the job.

**77.** This requires that test scores correlate with proven criteria of successful job performance.

**78.** This requires that the test measure certain characteristics in job applicants and that these same characteristics be proven to be important to job performance.

The City never performed a proper job-validation study.[79] Of course, a hiring or promotional system could still be job-related in fact but not be proven to be job-related for failure to perform the proper validation study. This is precisely what plaintiffs claim has happened in this case. They point to Commander Caretti's diligent efforts over the years to eliminate discredited I.Q. testing and to make the written exam reflect what a lieutenant needed to know. They emphasize that Commander Caretti was earnest and energetic in his efforts to put together a valid examination. He used incumbent lieutenants, including black lieutenants, to draw up questions. He attended professional seminars and kept up with the literature. Plaintiffs conclude by endorsing Commander Caretti's conclusion that the exam was job-related.

The Commander's good faith and diligence are not in dispute. However, good faith and diligence do not always a job-related exam make. It is understandable why Commander Caretti would testify that the examinations he worked so hard to perfect were job-related. However, defend-

ants' expert, Dr. Richard S. Barrett, testified that based on his review of the written examinations, he had no reason to conclude that any of the sergeant's or lieutenant's examinations from 1966 through 1976 were content-valid.[80] Plaintiffs' psychometrician, Dr. Wollack testified that he could not tell whether or not the Department's promotional examinations were job-related.

At trial and in their brief, the defendants attacked the job-validity of the examination. They claimed: 1) that the written examination placed heavy emphasis on intelligence and aptitude tests, 2) that the test items call for memorization of unessential, detailed information which can and is easily looked up by lieutenants on the job, 3) that the Department used inappropriate measures of reading comprehension, 4) that many of the test items are poorly constructed, and 5) that the exam does not approximate the work behavior of a lieutenant.

An examination of each of the examination sections raises serious doubts as to the job-validity of the examination: This Court's section-by-section analysis is reproduced in the margin.[81]

---

**79.** Plaintiffs claim that the defendants should be estopped from arguing this issue because they were derelict in not performing a job-validation study. This Court disagrees. The City undoubtedly acted in good faith at all times and tried to improve both its hiring and its promotional tests. Preliminary validation studies were done by Andres Inn and John Furcon on the promotional examination which indicated that the Department was on the right track. Finally, as is discussed below, to accept plaintiffs' argument is to wreck all voluntary affirmative action efforts.

The plaintiffs also argue that it is irrelevant whether the promotional model and/or the written promotional exam were job-related. They point out that under Title VII, as interpreted in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), an employer need show that its written examination or selection device is job-related only when the exam or selection device is discriminatory. If a written examination or selection device does not have adverse effects on blacks or other minorities, the employer does not have to show that it is job-related. *See EEOC v. Navajo Refining Co.*, 593 F.2d 988 (10th Cir. 1979); *Smith v. Troyan*, 520 F.2d 492 (6th Cir. 1975), *cert. denied*, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976).

As a general statement of the law, plaintiffs are correct. However, in this case, the promotional model perpetuated past discrimination. Moreover, the issue of relative qualifications is a factor which is useful in determining the reasonableness of the voluntary affirmative action program here in question. *See* Section VI C4, *infra*.

**80.** Although the sergeant's and lieutenant's examinations were not identical from 1973 to 1976, they were substantially similar.

**81.** 1. Departmental Rules and Procedures Sections of the Written Examination

This section of the exam is undoubtedly job-related. In order to do his job properly, a lieutenant must have a "thorough knowledge" of departmental organization, rules, regulations and procedures. Even here, an appropriate study would distinguish between the need to know certain fundamental rules and procedures and the need to memorize trivia which an actual lieutenant would simply look up in department manuals. The problem is that this section of the exam has never been weighed very heavily. In 1973, this section was 16.7% of the exam; in 1974, 22.2%; in 1976, 19.2%.[a]

[a] The following chart reveals the exam's weight over the years:

| Year of Lt. Examination | Weight of Department General Orders Section |
|---|---|
| 1966 | 10.0% |
| 1967 | 9.8% |
| 1969 | 16.2% |
| 1970 | |
| 1972 | 8.5% |
| 1973 | 16.7% |
| 1974 | 22.2% |
| 1976 | 19.2% |

This table was computed by the defendants and presented in their very good brief to this Court. The percentages were derived by dividing the value of the section on General Orders and Training Information Bulletins by the sum of the relative value of each section of the examination times the number of items in the section. The plaintiffs have not challenged defendants' mathematical computations.

2. Laws and Criminal Procedures Sections of the Examination

This section of the exam is undoubtedly also job-related—at least in theory. It is vital for a lieutenant to have knowledge of the laws which he and his men (or women) enforce and of the limitations which the law imposes on police practices. Lieutenants well-versed in the law are a must, both to guide the officers below them and to oversee the handling of a variety of arrest and search situations.

As defendants point out, however, the knowledge which should be tested for is that which is needed in emergency situations, or at least those situations where the lieutenant cannot easily look up the answer. Unfortunately, the examination in 1976 and earlier tested for details which a lieutenant need not have memorized, but could always look up.[b] In addition, many of the questions dealt with areas of the law which only a prosecutor would need to know.[c] Dr. Barrett's testimony illustrated this problem:

[b] For example, the 1976 examination required knowing that in Michigan manslaughter carries a maximum sentence of 15 years, that the crime of burglary with explosives carries a minimum 15 year penalty, what are the elements of the crime of embezzlement, and whether a set of facts constitutes first or second degree murder. So long as an officer—or lieutenant—knows whether a particular set of facts is illegal activity, what specific crime is involved or what the possible sentence may be is not critical knowledge. The lieutenant could easily look up this additional information or consult with a prosecutor.

[c] For example, the 1976 examination required knowledge that the best evidence rule applies to documentary evidence and of some of the exceptions to the hearsay rule.

Q. You are looking at the 1976 lieutenants exam?

A. Yes. Section 4, which is on page 44, has to do with criminal law fundamentals of criminal investigation.

Now, I will just read some of these in order: Number one is—they are true and false items in this section—although the United States Constitution is referred to as the supreme law of the land, where it is in conflict with the Michigan constitution, the Michigan constitution prevails.

Now, I don't see anything in the description of the job which says that the police lieutenants make decisions on that level.

Number 6 says, "The Tenth Amendment to the United States Constitution as interpreted by the United States Supreme Court governs the conduct of a search by a private person as well as a search by a peace officer."

Now, that's not what the lieutenant needs to know. He needs to know what searches can be conducted by a private person and what searches can be conducted by peace officers. This question doesn't get at that issue. It gets at a general issue, which is really not related to his performance on the job.

Questions of this kind that are not related to the behavior of the police officer . . .

Some of these questions have to do with the admissibility of evidence, which is the business of lawyers and judges, not of police lieutenants, and so forth.

3. Verbal Skills Section of the Examination

This Court has previously noted in discussing the pre-1973 Lieutenant's examinations that they included verbal abilities sections which were not job-related and had an adverse impact on minorities. These were general vocabulary and word analogy aptitude tests. In 1974 and 1976 verbal skills tests were also used, although Commander Caretti made valiant efforts to relate the vocabulary to police work. It is true that good reading and writing skills are highly desirable in a lieutenant, as are good oral communication skills. Unfortunately, despite Commander Caretti's best efforts, the written test was inadequate to measure these skills.[d]

[d] Apparently there exists no written test which satisfactorily measures reading and writing ability well enough to satisfy the uniform guidelines.

As Dr. Barrett testified at trial the verbal inventory tests used in 1974 and 1976 were specifically prohibited by the Uniform Guidelines.

4. Intelligence and General Knowledge Sections of the Examination

A police lieutenant ideally possesses a number of important personal qualities: Initiative, resourcefulness, ability to lead, sensitivity, even temperament, common sense. These abilities go to the core of being a good lieutenant. Over the years the Department has tried to measure these abilities on its written examinations. Before 1970, various I.Q. tests were used. Recently, the Department has presented candidates with a massive bibliography of police-related source materials and has asked

In sum, the written exam is not job-related. It has not been validated, as required by the Uniform Guidelines. Although Commander Caretti thought that the exam was job-related, he is not qualified to make that judgment. Of those who were qualified, Dr. Wollack, plaintiffs' expert, would not say that it was job-related while Dr. Barrett, defendants' expert testified that the exam could clearly not meet the validation guidelines. This Court's review of the examination confirms Dr. Barrett's analysis.

Plaintiffs argue that the City cannot have it both ways. It cannot argue that the written examination is not job-related but at the same time argue that the black officers promoted under the affirmative action program were qualified by virtue of their having attained a minimum score on the exam. The reason is that virtually every black officer who made it onto the eligibility roster was promoted. And the sole criterion for making it onto the eligibility list was to score above the 50th percentile on the written examination. The plaintiffs argue that if the written examination is not job-related, then there is no assurance that the black officers promoted out of sequence are competent since all they had to do to get promoted was score a passing grade on the written exam.

This argument has much force. Defendants partially refute it by emphasizing that there are *degrees* of job-relatedness. This

is unquestionably true. An I.Q. test has very little relationship to job performance. An examination which tests knowledge of bibliographic material relating to police work, such as the general knowledge section on the 1974 and 1976 Lieutenant's exam discussed above at n.81, is much more job-related. As this Court has indicated, such a test section is not job-related under the stringent requirements of the Uniform Guidelines. However, it undoubtedly possesses *some* degree of job-relatedness, especially when compared to an I.Q. test.

Defendants bolster their argument by noting that what has the most impact in terms of job-relatedness is the effect of the examination on *rank order*. Thus, they argue that the exam is sufficiently job-related that the high cut-off score insures that all candidates on the list have the minimum knowledge to be lieutenants. However, the exam is not sufficiently job-related to differentiate among the candidates who make the list. This Court is in full agreement with the latter proposition. The former proposition is more difficult. Courts have recognized that a test may be valid as a means of rejecting the basically unqualified but not valid to determine the best qualified applicants among a large pool. *See Ass'n Against Discrimination v. City of Bridgeport*, 454 F.Supp. 751, 756–57 (D.Conn.1978); *Stamps v. Detroit Edison*,

---

questions from these materials on the examination. The difficulty throughout has been that the qualities which the Department has sought to measure are not amenable to testing on a written examination. It was in partial recognition of this fact that the Department instituted the oral board procedure in 1974.

In practice, the general knowledge section is clearly not job-related because the questions asked are not from "that body of learned information which is used in and is a necessary prerequisite for observable aspects of work behavior." 29 C.F.R. 1607.15(c)(4). Dr. Barrett testified that the questions asked placed: "a high premium on the ability to read and memorize material from books without any indication that this material is ever applied by the individual." For example, on the 1976 lieutenant's examination, there were 30 questions testing the candidate's recall of material contained in a book entitled "Supervision of

Police Personnel."[e] In the words of Dr. Barrett:

[e] 22 questions from this same book were asked on the 1974 examination.

I think most psychologists will agree that one does not learn how to supervise by reading a book and one is not a better supervisor by having remembered what some authority said about the supervision process.

This part of the written examination placed a high premium on the ability to read and memorize that which is contained within the bibliographic materials. Those who are good crammers get the highest score. However, the best crammers are not necessarily the best lieutenants.[f]

[f] Although Commander Caretti thought that the examination was job-related, he admitted that he would expect incumbent lieutenants to do poorly on the written examination unless they too crammed.

365 F.Supp. 87, 118 (E.D.Mich.1973); 29 C.F.R. § 1607.15(c)(9). However, there is no credible evidence in the record that the exam cut-off score by itself, was adequate to insure minimal qualifications for promotion.[82]

The discussion which follows, however, demonstrates that the former proposition is true and that the black officers who were promoted out of sequence were as substantially equally qualified as the white officers promoted in strict rank order.

### B. Service Ratings

Plaintiffs do not seriously press their argument that the written examination is job-related or that the white candidates promoted were more qualified than the black candidates promoted because the former performed better on the written exam than the latter. Instead, the plaintiffs claim that the white officers who were "passed over" for promotion in favor of the black officers were better qualified because the white officers received significantly better service ratings as sergeants.

Dr. Wollack's analysis demonstrated that the white police officers who were "passed over" received significantly higher service ratings than the black officers who were promoted under the affirmative action plan. Dr. Wollack also concluded that the service ratings were racially neutral: first, because there was no correlation between the race of the officer receiving service ratings and the race of the members of the ratings teams, and secondly, because the differences in service ratings were accountable by differences in tenure or job experience. On the 1974 and 1976 lieutenant's eligibility roster, approximately three-quarters of the black candidates had less than 3 years time-in-grade (as sergeants); approximately three-quarters of the white candidates had more than 3 years time-in-grade. Commander Caretti agreed that when job tenure is taken into account, the service ratings are racially neutral.

Both sides agree that service ratings correlate with job experience. Those promotional candidates who were sergeants for the most years got the highest service ratings. The parties differ in their interpretation of this fact. Plaintiffs argue that job experience as sergeant is a valid measure of a candidate's ability to successfully perform the job of lieutenant. Simply stated, they claim that the white officers who got the better service ratings were better qualified because they had more experience. They point to testimony by Chief Hart and former Chief Patrick Murphy that good performance as a sergeant is an essential prerequisite for promotion to lieutenant.[83]

---

**82.** Although Commander Caretti testified that the written exam cut-off score assures that all on the eligibility list are qualified, on cross-examination, he modified this stance and testified that only through application of the entire model could adequate qualification be assured. Thus, Commander Caretti would presumably not find qualified a candidate who had barely passed the written examination but who had scored very low on both service ratings and the oral board. However, no minority promotional candidate appears to have come close to this extreme example. Commander Caretti testified that the candidates promoted out of order were qualified to be lieutenants.

**83.** The Fourth Circuit in *Freind v. Leidinger*, 588 F.2d 61 (4th Cir. 1978) reached similar conclusions regarding service ratings given to black and white firemen with different experience on the job:

The lower court was not persuaded by appellant's statistical showing that blacks received lower fitness ratings from their supervisors than whites. It was bothered by the fact that most blacks receiving such ratings were new recruits and were being compared with whites, who were experienced firemen . . . In fire fighting, experience is very important, and, as pointed out by the trial judge, a rookie fireman may be outstanding in comparison with other rookies but merely acceptable when measured against the job standards and an experienced fireman may be outstanding when measured against the job standard, but only average when measured against his peers on the force. In using figures that compared firemen with the same amount of seniority the court found that blacks receiving "more than acceptable" or better ratings was 94.5% of the rate of whites receiving the same ratings and, therefore, there was no adverse impact for the group for which reliable and comparable statistics were available. *id.* at 66–67.

The Fourth Circuit may have been correct regarding rookie firemen, but in this case each candidate for promotion to lieutenant had

An equally plausible explanation for the better service ratings given the white officers is advanced by the defendants. They argue that the raters tend to give longer-tenured officers higher service ratings merely because they are longer-tenured. Defendants emphasize that as a general rule, raters give out high service ratings to all officers. The natural tendency is to give even higher service ratings to the longer-tenured officers. In effect, defendants claim that those who give out service ratings are biased not in favor of whites, but in favor of officers who were sergeants longer. For reasons outlined in the following section, this Court accepts defendant's explanation.

### C. Confirmation Service Ratings and Officer Candidate School Scores

Thus far, the issue of relative qualifications is muddled. The black officers who benefitted from affirmative action received oral board scores comparable to the white officers who would otherwise have been promoted. The black officers did not do as well on the written examination, but that exam was clearly not a proper ranking device. Finally, it is true that the white officers received superior service ratings as sergeants compared with the black officers. However, it is not clear whether this was because the white officers were in fact better or because the raters favored officers with more tenure.

The definitive answer to the relative qualifications question is provided by defendant's analysis of confirmation service ratings. As indicated above, Dr. Wollack, on behalf of the plaintiffs, analyzed the candidates' service ratings as *sergeants* and found that those promoted out of sequence, under the affirmative action plan, were significantly inferior performers than the white candidates who would otherwise have been promoted. However, Dr. Robert Dugan, an expert witness for the defendants, performed several analyses of how the affirmative action promotees were rated as *lieutenants*. All lieutenants receive "confirmation" service ratings approximately one year after they have served in that rank. Dr. Dugan examined the lieutenant's service ratings of "out-of-sequence" black officers (including women) and "in sequence" white officers (including women). Off of the 1973 eligibility list, Dr. Dugan had the service ratings of 8 officers promoted out of sequence and 20 officers promoted in sequence. He found no statistically significant difference in the mean scores of both groups. Off of the 1974 lieutenants eligibility register, he had the service ratings of 9 officers promoted out of sequence and 27 officers promoted in sequence. The mean scores of the two groups were not significantly different. Off of the 1976 lieutenants eligibility register, he had scores for 19 officers promoted out of sequence and 40 officers promoted in sequence. The mean scores of the two groups were not significantly different. Nor is the result any different if one omits females and compares the rating of black male officers promoted out of sequence with white male officers promoted in sequence. The results are reproduced in the following table:

#### Confirmation Service Ratings (Male Officers)

| Year | Group | Number of Cases | Mean Score | Difference |
|------|-------|-----------------|------------|------------|
| 1973 | Out of Sequence | 7 | 82.4 | .4 |
| | In Sequence | 20 | 82.0 | |
| 1974 | Out of Sequence | 7 | 83.2 | 2.8 |
| | In Sequence | 27 | 80.4 | |
| 1976 | Out of Sequence | 16 | 79.5 | 3.1 |
| | In Sequence | 40 | 82.6 | |

served for years at both the patrolman and sergeant's level. It is not obvious that many years of experience at the sergeant's level necessarily make one a better lieutenant.

The differences are not statistically significant for any of the years in which affirmative-action promotions were made.

In addition, Dr. Dugan conducted an analysis comparing the two groups of officers' performance on written examinations taken at Officer Candidate School. (OCS). All officers selected for promotion attend OCS classes for six weeks and must successfully complete the course before being assigned to the rank of lieutenant. Each candidate takes a written test at the beginning and at the end of OCS. Dr. Dugan compared mean scores received on these examinations by black officers promoted out of sequence with scores received by white officers promoted in sequence. He found no statistically significant differences. The following tables outline his findings.

#### OCS Test Scores (Equal Sample Sizes)

| Year | Group | Number of Cases | Mean Pre-test Score | Mean Post-test Score |
|------|-------|-----------------|---------------------|----------------------|
| 1973 | Out of Sequence | 11 | 66.73 | 93.27 |
| 1973 | In Sequence | 11 | 62.82 | 96.18 |
| | 1973 Difference | | 3.95 | 2.91 |
| 1976 | Out of Sequence | 22 | 64.82 | 85.17 |
| 1976 | In Sequence | 22 | 65.59 | 84.91 |

#### Male OCS Test Scores

| Year | Group | Number of Cases | Mean Pre-test Score | Mean Post-test Score |
|------|-------|-----------------|---------------------|----------------------|
| 1973 | Out of Sequence | 11 | 67.30 | 93.50 |
| 1973 | In Sequence | 12 | 63.42 | 96.50 |
| | 1973 Difference | | 3.88 | 3.00 |
| 1976 | Out of Sequence | 20 | 64.30 | 85.80 |
| 1976 | In Sequence | 19/49 | 65.48(N=19) | 85.82(N=49) |
| | 1976 Difference | | 1.54 | .02 |

Plaintiffs attack Dr. Dugan's analysis on two grounds.[84] None of these attacks are convincing. First, plaintiffs point to a number of computational errors.[85] Able counsel for the plaintiffs examined Dr. Dugan in detail concerning these errors, but in the final analysis, this Court finds them insignificant and credits Dr. Dugan's assurance that "there are no errors in any table I have presented that will have any significant difference in any matters before this Court."

Second, the plaintiffs accuse Dr. Dugan of "significance shopping." As indicated above, Dr. Dugan's comparison of OCS scores is based on equal sample sizes. That is to say, Dr. Dugan compared OCS scores of those promoted out of sequence with a *sample* of white officers promoted in sequence. Plaintiffs claim that Dr. Dugan hand-picked the samples to achieve the desired results and that Dr. Dugan should have compared the scores of officers promoted out of sequence with all officers promoted in sequence. This Court finds no basis to these allegations. Only officers who are promoted to the rank of lieutenant receive OCS scores and confirmation service

**84.** They also attack Dr. Dugan's analysis of the oral board scores of black officers promoted out of sequence and the officers "passed over" for promotion. As indicated above, Dr. Dugan had concluded that there was no statistically significant difference in the mean oral board scores of the two groups of candidates.

**85.** There were some errors which Dr. Dugan caught and corrected before testifying. Also, an error cropped up on two exhibits. An error in addition occurred in exhibit 164–H which was carried over to exhibit 194 table B. The latter exhibit indicates that a total of 1172 officers sat for the 1974 sergeants examination, of whom 852 were white. In fact there were 1173 officers who sat, of whom 853 were white.

ratings. Thus, there is no way to directly compare the OCS scores and confirmation service ratings of the black officers promoted out of sequence with those of the white officers who would have been otherwise promoted, but who were "passed over." Instead, Dr. Dugan did the next best thing and compared the confirmation service ratings of the black officers with those of the white officers promoted in sequence who had headed the eligibility list. On direct examination, Dr. Dugan compared equal sample sizes of confirmation ratings for members of the two groups. For 1973, for example, he compared the confirmation ratings for eight of the officers promoted out of sequence and those for eight of the officers promoted in sequence. On cross-examination, counsel for the plaintiffs questioned the manner in which Dr. Dugan chose his sample of white officers. Similar questions were raised regarding the samples Dr. Dugan selected for 1974 and 1976. In response, on redirect examination, Dr. Dugan compared all confirmation service rating scores which were available for officers promoted in sequence as well as out of sequence. As indicated above, there were no statistically significant differences between them.

Dr. Dugan did take even sample sizes in his analysis of OCS scores. However, he testified, without contradiction, that it was appropriate to do so given the small numbers involved. More importantly, there is no indication that in taking a sample of the OCS scores of the white officers, Dr. Dugan deliberately distorted his results by selecting atypical scores for the white officers. Significantly, the plaintiffs did not present expert testimony which either questioned his methodology or the accuracy of his results.[86]

### D. Summary

Defendant's analysis of confirmation service ratings demonstrates that the black officers promoted out of sequence were as qualified as the white officers promoted in sequence. This conclusion is also supported by the fact that both groups received similar oral board scores—a crucial indicator of good performance as a lieutenant, according to Commander Caretti.

Finally, there is the trial testimony of various officials, including Chief Hart, that the officers promoted out of order were performing as well as lieutenants as those officers promoted in order. It is true that Chief Hart is a strong proponent of the affirmative action plan. He is also a professional police officer with a distinguished record of service. There are currently slightly more than 200 lieutenants in the Detroit Police Department who help supervise approximately 1,100 sergeants and 4,000 police officers. Lieutenants hold vital command positions in the Department. If affirmative action resulted in the promotion of less than well qualified officers, the effect on the Department could be severe. Chief Hart and the Board of Police Commissioners have every incentive to promote

---

**86.** In their brief, plaintiffs point to exhibit 195 as an example of Dr. Dugan's alleged data manipulation. That exhibit, however, deals with the completely separate question of the appropriate weight which the various components of the promotional model in fact had on the candidates' position on the eligibility list. Dr. Dugan basically concluded that the written examination, which had a weight of 50% in 1973 and 55% in 1974 and 1976, in fact had a true weight of 82% and 84% respectively. The reason is because of the effect of rank ordering. A higher written examination score was much more important to one's ultimate rank on the list than anything else. The technique Dr. Dugan used to determine true weight is known as "multiple regression." On cross-examination, Dr. Dugan conceded that the result would differ depending on how one inserted the various promotional variables into the equation. Because of this concession, plaintiffs claim that improper data manipulation took place. This Court disagrees. Dr. Dugan stated that the differences would be "slight." On redirect examination, Dr. Dugan confirmed his judgment that the calculations in exhibit 195 accurately represented the true weight of the various components of the promotional model. Plaintiffs offered no countervailing testimony on this issue. Indeed, Dr. Wollack, plaintiffs' expert, on cross-examination conceded that rank ordering on the basis of a cognitive test generally maximizes the adverse impact on minorities who do not do well on such tests.

the most competent candidates, especially to the rank of lieutenant. Thus, there is good reason to credit Chief Hart's testimony that the officers promoted out of order were equally qualified and have performed well.

The above findings indicate that the exam cut-off score was, by itself, adequate to ensure that only well-qualified blacks were promoted under the affirmative action plan.[87] These findings also confirm that the difference in the service ratings received at the sergeant's level by the members of each group promoted can be attributed solely to raters favoring senior officers because they were senior.

**87.** The Court notes once again that the black officers involved here are the "survivors" who remained after a discriminatory hiring process and a discriminatory promotion process to sergeant. As more and more black officers become eligible for promotion, the exam cut-off score may become inadequate to assure high quality, by itself. Thus far, however, it appears that the written exam was sufficiently job-related to assure that all who passed were qualified.

**88.** Title VI provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

**89.** In relevant part, Title VII provides:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

**90.** § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of per-

## VI. THE LEGAL STANDARD FOR VOLUNTARY AFFIRMATIVE ACTION

Plaintiffs in this case have brought suit under Title VI and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d[88] and 2000e;[89] the post-civil war civil rights acts, 42 U.S.C. §§ 1981;[90] 1983;[91] the United States Constitution,[92] as well as Michigan State law.[93] All of the above provisions outlaw discrimination because of race.

It is undisputed that the City's affirmative action plan promoted officers on the basis of their race and that absent affirmative action, white officers would have been promoted where black officers were in fact

sons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**91.** § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The *Bratton* plaintiffs alleged a violation of 42 U.S.C. § 1985(3) in their initial complaint, but dropped this claim in their amended complaint. The Baker plaintiffs, however, have alleged a 1985(3) cause of action throughout.

§ 1985 provides that persons who conspire to deprive others of their civil rights are liable for resulting injuries. § 1985 is broader than § 1983 in that it reaches some private action. *See Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). However, to the extent that state action is involved, as in this case, § 1983 and § 1985 are coextensive.

**92.** The Equal Protection Clause of the Fourteenth Amendment provides in relevant part:

" . . . [N]or shall any state . . . deny to any person within its jurisdiction the equal protection of the laws."

**93.** Plaintiffs claim a violation of Art. 1, Section 2 of the Michigan Constitution; the Michigan Fair Employment Practices Act, M.C.L.A. § 423.301 *et seq.,* M.S.A. § 17.458(301) *et seq.;* the Elliot-Larson Civil Rights Act, M.C.L.A. § 37.2201 *et seq.,* M.S.A. § 3.548(201) *et seq.*

promoted. By choosing equal numbers of white and black officers according to their rank on the promotional eligibility list, the Department effectively bypassed a group of white officers.

Plaintiffs claim that this was blatant discrimination against them as whites which is illegal under the abovementioned statutes and the Constitution. A theme which they embrace is that there should be no difference between discrimination against whites and discrimination against blacks. In a perfect world, plaintiffs would be correct. The world has been far from perfect for blacks, however. It has been especially far from perfect for blacks in the Department and blacks who applied to the Department. The City did not act to favor blacks out of malice toward whites, or even capriciousness. It acted to favor blacks because as a class, they had been subject to debilitating discrimination for years on end. The affirmative action program is unquestionably a racial preference and it unquestionably impacts against white officers. It is also an admittedly imperfect remedy which seeks to offset past discrimination undergone by blacks, specifically black officers. Reconciling the rights of white and black officers is not easy. Whether the City acted reasonably when it adopted its affirmative action plan is the principal question for this Court.

### A. The Legal Claims

■ As a threshold matter, there is no question that Title VII jurisdictional requirements have been met. The plaintiff class representatives filed timely complaints with the Equal Employment Opportunity Commission and then brought this suit. *See* 42 U.S.C. § 2000e *et seq.* Similarly, this Court has jurisdiction over the §§ 1981, 1983 and 1985(3) claims under 28 U.S.C. § 1343(3) and (4).[94] The Court doubts that it has jurisdiction to hear the Title VI claims because that act limits enforcement actions such as this to cases "where a primary objective of the Federal financial assistance is to provide employment." 42

94. This act confers jurisdiction on federal district courts to hear claims alleging deprivation under color of state law of any right "secured by the Constitution of the United States or by

U.S.C. § 2000d–3. In any event, it appears from *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) that Title VI's mandate tracks that of the constitution's equal protection clause. *See id.* at 287, 98 S.Ct. 2733 (opinion of Powell); *id.* at 325, 98 S.Ct. 2733 (opinion of Brennan, J.). Thus, this Court's analysis of the constitutional claim will be dispositive of any Title VI claim. The same is true of the § 1983 claim. That statute merely provides a cause of action in federal court for either statutory or constitutional violations. Thus the § 1983 claim restates the constitutional claim.

■ Similarly, plaintiffs' Title VII claim should be regarded as coextensive with the § 1981 claim. As the Supreme Court noted in *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47 and n. 7, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974), "legislative enactments in [the civil rights] area have long evinced a general intent to accord parallel or overlapping remedies against discrimination." Title VII and § 1981 are distinct and have distinct origins. *See Johnson v. Railway Express Agency,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). However, "[i]n fashioning a substantive body of law under § 1981 the courts should, in an effort to avoid undesirable substantive law conflicts, look to the principles of law created under Title VII for direction." *Patterson v. American Tobacco Co.,* 535 F.2d 257, 270 (4th Cir. 1976) *quoting Waters v. Wisconsin Steel Works of Int'l Harvester Co.,* 502 F.2d 1309, 1316 (7th Cir. 1974). *See also Johnson v. Ryder Truck Lines, Inc.,* 575 F.2d 471 (4th Cir. 1978); *EEOC v. Detroit Edison,* 515 F.2d 301, 309 (6th Cir. 1975), *vacated and remanded on other grounds,* 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977); *Long v. Ford Motor Co.,* 496 F.2d 500, 504–06 (6th Cir. 1974).

In sum, plaintiffs' claims should be examined in three distinct areas: 1) Title VII

any Act of Congress Providing for equal rights of citizens . . . " or of rights "under any Act of Congress providing for the protection of civil rights."

and § 1981; 2) the constitutional claim, also present in the § 1983 and Title VI claim; 3) state law claims.

B. The Title VII and § 1981 claim

Plaintiffs have contended throughout that Title VII "prohibits an employer from granting preferential treatment in the name of affirmative action in order to correct a racial imbalance between the community and the workforce." Plaintiffs concede that a federal court has authority under Title VII and/or § 1981 to order preferential hiring and promotions of blacks or members of other groups, provided there is a clear showing of past discrimination and the court finds that affirmative action relief is warranted. This is true in the Sixth Circuit [95] as well as virtually every other Circuit which has considered the question.[96]

Plaintiffs claim, however, that the authority to impose a quota is unique to a court—an employer has no right to voluntarily initiate affirmative action. In the alternative, plaintiffs urge that race-conscious affirmative action is an extraordinary remedy which can only be used in unique circumstances. Plaintiffs claim that for a variety of reasons, affirmative action was not warranted in this case. Finally, plaintiffs claim that even if affirmative action may have been warranted here, they should

not be victimized by it. At the very least, the City should be required to pay them "front pay" and other damages, even if black officers end up with the promotions. Each of these contentions deserves careful analysis. As this Court noted in its opinion granting defendants' motion for partial summary judgment, 483 F.Supp. 919, the issue of voluntary affirmative action is difficult and unsettled. However, the Supreme Court's recent opinion in *United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) has done much to resolve difficulties in this area.

(1) The *Weber* Decision

*Weber* presented a situation somewhat similar to the one here. The Kaiser Aluminum and Chemical Corporation opened a plant in the town of Gramercy, Louisiana in 1958. The minority population of the "parishes" (counties) surrounding the plant, in the mid-1970s, was 43% black. The workforce in the area was estimated at 39% black. In the mid-1970's, 14.8% of the plant's employees were black. The only reason the plant's workforce had even that many blacks was because Kaiser had begun an affirmative action hiring plan in 1969, under pressure from the federal government to increase its minority hiring. In

---

**95.** *See EEOC v. Detroit Edison*, 515 F.2d 301, 317 (6th Cir. 1975), *vacated and remanded on other grounds*, 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977); *United States v. Masonry Contractors Ass'n of Memphis, Inc.*, 497 F.2d 871, 877 (6th Cir. 1974); *Sims v. Sheet Metal Workers, Local 65*, 489 F.2d 1023, 1027 (6th Cir. 1973); *United States v. IBEW Local 212*, 472 F.2d 634, 636 (6th Cir. 1973); *United States v. IBEW Local 38*, 428 F.2d 144, 149–51 (6th Cir. 1970). *But cf. Mitchell v. Mid-Continent Spring Co.*, 583 F.2d 275 (6th Cir. 1978), *cert. denied* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 396 (1979).

**96.** *See, e. g., Morgan v. Kerrigan*, 509 F.2d 599 (1st Cir. 1975); *Boston Chapter, NAACP v. Beecher*, 504 F.2d 1017, 1026–1028 (1st Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); *Patterson v. Newspaper Deliverers' Union*, 514 F.2d 767, 773–775 (2d Cir. 1975), *cert. denied*, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976); *Rios v. Steamfitters, Local 638*, 501 F.2d 622, 628–633 (2d Cir. 1974); *EEOC v. A.T. & T. Co.*, 556 F.2d 167 (3d Cir. 1977), *cert. denied*, 438 U.S. 915, 98 S.Ct.

3145, 57 L.Ed.2d 1161 (1978); *United States v. Elevator Constructors, Local 5*, 538 F.2d 1012 (3d Cir. 1976); *Patterson v. American Tobacco Co.*, 535 F.2d 257, 273–275 (4th Cir. 1976), *cert. denied*, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976); *Watkins v. Scott Paper Co.*, 530 F.2d 1159, 1194 (5th Cir. 1976), *cert. denied*, 419 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139 (1976); *NAACP v. Allen*, 493 F.2d 614 (5th Cir. 1974); *Morrow v. Crisler*, 491 F.2d 1093 (5th Cir.) (en banc), *cert. denied*, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974); *United States v. City of Chicago*, 549 F.2d 415 (7th Cir. 1977), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); *Crockett v. Green*, 534 F.2d 715, 718–719 (7th Cir. 1976); *United States v. N.L. Industries*, 479 F.2d 354, 377 (8th Cir. 1973); *Carter v. Gallagher*, 452 F.2d 315, 327 (8th Cir. 1971), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); *United States v. Ironworkers, Local 86*, 443 F.2d 544 (9th Cir. 1971), *cert. denied*, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971).

spite of the company's efforts to increase the overall number of black employees at the plant, there remained a severe shortage of blacks among its skilled workers. Less than 2% of the craftsmen at the plant were black and the company simply could not find skilled black craftsmen who wanted to work at the plant.

The company was under pressure from the Office of Federal Contracts Compliance, to increase the number of black craftsmen or forego lucrative federal contracts.[97] In addition, both sides, management and labor, feared Title VII suits by black workers. The company and the union agreed to open up new opportunities for blacks to become craftsmen. They did this by establishing new eligibility criteria for enrollment in the job training programs for skilled trade positions. Formerly, there was a requirement of previous craft experience. In the new agreement, the on-the-job training programs were opened up to all workers; selection was based only on seniority. To ensure that blacks would be included in large numbers, the company and the union agreed that equal numbers of whites and blacks would enter the training programs. Thus, the most senior blacks and most senior whites were eligible to take part, on a 50–50 black-white basis. The affirmative action plan would continue until black craftsmen in the plant approximated the percentage of blacks in the local workforce (39%). A white worker who otherwise would have been eligible for the training program, but who was "bypassed" by blacks with less seniority, brought suit alleging a violation of his Title VII rights.

The district court agreed with the plaintiff, advancing two rationales for its decision: 1) "quotas" could never be imposed voluntarily by an employer, only a court had such power; 2) even if an employer could impose a "quota," a) the facts did not warrant it because the preferred (black) workers were not themselves identifiable victims of past discrimination and b) there

was no proof of past discrimination by the employer. *See Weber v. Kaiser Aluminum & Chem. Co.*, 415 F.Supp. 761 (E.D.La.1976).

The Fifth Circuit affirmed, but only on the second ground advanced by the district court. The panel majority would allow voluntary affirmative action, but only on a specific showing of past discrimination. General societal discrimination was not enough, nor was past discrimination against blacks in the skilled trades enough. Nor would it suffice if other Kaiser plants had discriminated against blacks. It had to be shown that the Kaiser Gramercy plant itself had discriminated against blacks in the past. *See Weber v. Kaiser Aluminum & Chem. Co.*, 563 F.2d 216, 224–226 (5th Cir. 1977).

Judge Wisdom, in dissent, stated that the majority position would doom all voluntary affirmative action efforts because it would force an employer to prove or admit that it had engaged in past discrimination against black workers in order to justify preferential treatment for them. If a court found that an employer went too far with affirmative action, it could be sued by whites. If an employer did not go far enough, it could be sued by blacks. Judge Wisdom suggested that an employer be given a "zone of reasonableness" in voluntarily adopting an affirmative action plan to encourage such voluntary action. "If an affirmative action plan, adopted in a collective bargaining agreement, is a reasonable remedy for an arguable violation of Title VII, it should be upheld." *Id.* at 230. Applying this standard, Judge Wisdom would have upheld Kaiser's affirmative action plan. Kaiser's Gramercy plant had "arguably" violated Title VII in light of the disparate workforce data and indications that some of Kaiser's training requirements were discriminatory and not job-related. The affirmative action plan was reasonable because 1) the plan was negotiated between the company and the union, 2) the plan was new and created new rights and expectations for whites and

---

**97.** *See Weber v. Kaiser Aluminum & Chem. Co.*, 563 F.2d 216, 218–19 and n.3 (5th Cir. 1977).

blacks alike, and 3) the plan allowed significant white participation.

The Supreme Court upheld the affirmative action plan. The Court did not adopt Judge Wisdom's proposed standard; instead it took an even broader position. Under Title VII, there exists an "area of discretion" for "the private sector voluntarily to adopt affirmative action plans designed to eliminate conspicuous racial imbalance in traditionally segregated job categories." *United Steelworkers v. Weber*, 443 U.S. 209, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480 (1979). The Court looked to the imbalance between the racial composition of the plant's craft workers (1.83% black) and of the surrounding area (39% black) and took judicial notice of blacks' traditional exclusion from crafts. *Id.* at 2725 and n.1. This was enough to justify voluntary affirmative action.

The Court next examined whether the challenged Kaiser plan was a permissible one. The Court did not lay down any standards, but upheld the plan before it for several reasons. The plan did not "unnecessarily trammel" the interests of white employees, because it did not cause any whites to be dismissed and did not absolutely bar whites from advancement. In addition the plan was temporary—it would end when the plant's percentage of skilled black craftsmen approximated the percentage of blacks in the workforce.

2. *Weber* and the Detroit Affirmative Action Plan

■ *Weber* stands for the general proposition that voluntary affirmative action is proper if it is reasonable under all of the circumstances.[98] Further, the Court, in creating an "area of discretion" for an employer to conduct a voluntary affirmative program took a broad view. This is apparent from Mr. Justice Blackmun's concurring

opinion which examines the Court's standard and contrasts it with the standard advanced in Judge Wisdom's dissent in the Fifth Circuit. Justice Blackmun explained that a traditionally segregated job category exists "when there has been a societal history of purposeful exclusion of blacks from the job category, resulting in a persistent disparity between the proportion of blacks in the labor force and the proportion of blacks among those who hold jobs within that category." *Id.* at 2732. He went on to note that under the Court's test, the individual employer need not have discriminated against blacks. So long as the requisite statistical disparity existed, that is enough. In addition, the Court's test allows an employer to redress past discrimination which is outside the scope of Title VII's effective coverage.

The plaintiffs in this case have taken the position adopted by the District Court in *Weber*—that "quotas" are so pernicious that only a court should be allowed to impose such relief and even then only in the narrowest of circumstances. The Supreme Court, however, rejected this view. It has chosen to give an employer extraordinarily broad leeway in remedying past discrimination via voluntary affirmative action. In fact, under *Weber*, a private employer may adopt an affirmative action plan even if a court could not force him to do so.

This case is unlike *Weber*, where the employer was unwilling to admit past discrimination; the City of Detroit has presented extensive evidence of its own past misconduct. This evidence, outlined above, goes far beyond *Weber's* minimal requirements to justify an affirmative action program. Under *Weber*, voluntary affirmative action would be allowable on a showing of past exclusion of blacks from police departments [99] and a statistical disparity between

---

98. Judge Wisdom's opinion also stood for the general proposition that voluntary affirmative action is legal if it is reasonable. The specific standard which he advanced to test reasonableness, however, is different from the standard adopted by the Supreme Court.

99. There have been many court cases finding discrimination by police departments against blacks. *See United States v. City of Chicago*, 549 F.2d 415 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); *Mims v. Wilson*, 514 F.2d 106 (5th Cir. 1975); *Afro American Patrolmens League v. Duck*, 503 F.2d

blacks in the Department and blacks in the City of Detroit. It cannot be questioned that such a showing was made here.

It is indeed ironic that the plaintiffs have vehemently argued that the presentations of Police Chiefs Tannian and Hart to the Board of Police Commissioners were incomplete and misleading because it is improper to compare the percentage of black lieutenants with the percentage of blacks in the City of Detroit. The Supreme Court's comparison of the percentage of black craftsmen at the Kaiser Gramercy plant with the local labor force was very similar to the Chiefs' comparison.[100]

■ Plaintiffs, in a supplemental brief, argue that a significant difference between *Weber* and the instant case is that the affirmative action plan in *Weber* was voluntarily negotiated between the company and the union. That way, the union was able to protect the rights of the predominantly white workers it represented. In this case, the police unions have been fiercely opposed to affirmative action and with one exception,[101] have fought it bitterly in the courts and at the bargaining table.[102] It is true, as indicated above that Judge Wisdom, in his dissent in the Court of Appeals case, cited the negotiated aspect of the affirmative action plan as a significant consideration. However, the Supreme Court specifically avoided such a limitation in its opinion. This omission is significant and nullifies whatever force there may have been to plaintiffs' argument. In any event, this court can see no reason why an affirmative action plan should rise or fall on whether a union agrees to it. The fact that a union agrees to such a plan is a factor demonstrating that the plan is reasonable, but a union's obstinate refusal to agree to affirmative action should not be deemed significant.

Plaintiffs urge that unlike the affirmative action plan in *Weber* which created new opportunities for both whites and

294 (6th Cir. 1974); *Erie Human Relations Commission v. Tullio,* 493 F.2d 371 (3d Cir. 1974); *NAACP v. Allen,* 493 F.2d 614 (5th Cir. 1974); *Morrow v. Crisler,* 491 F.2d 1053 (5th Cir.) (en banc), *cert. denied,* 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974), *Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission,* 482 F.2d 1333 (2d Cir. 1973), *cert. denied,* 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975); *United States v. City of Buffalo,* 457 F.Supp. 612 (W.D.N.Y.1978); *League of Latin American Citizens v. City of Santa Ana,* 410 F.Supp. 873 (C.D.Cal.1976); *Officers for Justice v. Civil Services Commission,* 371 F.Supp. 1328 (N.D.Cal.1973).

In *Weber,* 99 S.Ct. at 2725 n.1, the Supreme Court took judicial notice of exclusion of blacks from crafts on racial grounds. This Court takes judicial notice of similar exclusion of blacks from police departments.

**100.** The Supreme Court compared the percentage of black craft workers with the percentage of blacks in the general labor market in the two counties (parishes) surrounding the plant. The labor market was 39% black while the general population was 43% black. Chiefs Tannian and Hart compared the percentage of blacks in the Department with the percentage of blacks in the general population of Detroit. According to the 1970 census, 43.7% of the City of Detroit was black. Similarly, the 1970 census reported that 43.6% of the relevant male labor force in Detroit in 1970 was black (males in the work force, 18–34 with 12 or more years of school completed). The City of Detroit's plan-

ning department estimates that Detroit's black population has increased since then. There is no reason to think that the labor market has not increased correspondingly. As previously indicated, these figures are very close to defendants' expert testimony that in 1970 the relevant labor pool was 39.5% black. *See* section III, *supra.*

**101.** The very first set of promotions in 1974 were discussed by the City and the police unions and approved by the Lieutenants and Sergeants Association. *See* n.5, *supra.*

**102.** Plaintiffs argue that as a matter of state law, the City has unlawfully refused to bargain with the union about the affirmative action plan in promotions. It may be that the City is required to bargain about the affirmative action plan as part of the criteria for promotions. *See Detroit Police Officers Assoc. v. City of Detroit,* 61 Mich.App. 487, 233 N.W.2d 49 (1975). Whether or not the City bargained in good faith concerning affirmative action is of no relevance to these proceedings. That is strictly a subject of state law and is subject to proceedings in state court. Further, the only evidence in the record of refusal to bargain over affirmative action related to discussions between the union and Chief Tannian in 1974. It appears from the *DPOA* case, *supra* that it was unsettled in 1974 whether the City was required to bargain about such matters.

blacks, the City's affirmative action plan destroyed the hopes and expectations of white officers under an established merit system, and thus, was unreasonable.

This distinction is one which the plaintiffs have drawn throughout this litigation. Where an affirmative action program exists at the hiring level, its impact is diffused because it is not clear that any given minority applicant was hired instead of any given white applicant. Where an affirmative action program exists at the promotions level, however, the opposite is true. White workers can specifically see that they were passed over in favor of minorities. The impact on identifiable white workers is thus very direct.

This argument has found favor in the Second Circuit. As a result, that court has been hostile to promotional "quotas". *See Kirkland v. New York Dept. of Correctional Services,* 520 F.2d 420, *reh. en banc denied,* 531 F.2d 5 (2d Cir. 1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976); *Bridgeport Guardians, Inc. v. Bridgeport Civil Service Comm.,* 482 F.2d 1333 (2d Cir. 1973), *cert. denied,* 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975). *See also White v. Carolina Paperboard Corp.,* 564 F.2d 1073 (4th Cir. 1977). *Cf. Chance v. Board of Examiners,* 534 F.2d 993 (2d Cir. 1976), *cert. denied,* 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977) (quota in lay-offs would have required white workers to lose their jobs instead of blacks who had less seniority).

Other courts, however, have not taken a jaundiced view to affirmative action in promotions. *See EEOC v. A. T. & T. Co.,* 556 F.2d 167 (3d Cir. 1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978); *United States v. City of Chicago,* 549 F.2d 415 (7th Cir.) *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); *Watkins v. Scott Paper Co.,* 530 F.2d 1159, 1194 (5th Cir. 1976); *United States v. N. L. Industries,* 479 F.2d 354, 377 (8th Cir. 1973). In *Stamps v. Detroit Edison,* 365 F.Supp. 87, 122–23 (E.D.Mich.1973), this Court ordered Detroit Edison to hire at a ratio of three blacks for every two whites and to promote at a ratio of one black for every white. The Court of Appeals for the Sixth Circuit affirmed those orders. *See E.E.O.C. v. Detroit Edison,* 515 F.2d 301, 317 (6th Cir. 1975).

■ As a threshold matter, this Court does not find the plaintiffs' authorities persuasive. In this Court's view, the difference between the impact on whites of a promotional quota as opposed to a hiring quota is not so great so as to justify a harsher standard of review. All affirmative action programs have an adverse effect on whites and to one extent or another upset settled expectations. Where past discrimination against blacks has been shown, courts have reasoned that making up for past discrimination justifies upsetting the expectations of white workers. *See Franks v. Bowman Trans. Co.,* 424 U.S. 747, 772–78, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *EEOC v. A. T. & T. Co.,* 556 F.2d 167 (3d Cir. 1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978). This reasoning should be equally applicable to affirmative action at the hiring level as well as the promotional level. *See Kirkland v. New York Dept. of Correctional Services,* 531 F.2d 5 (2d Cir. 1975) (Mansfield, J., dissenting from denial of rehearing en banc).

The facts of *Weber* support this position and undermine the view of the Second Circuit. *Weber,* in reality, involved a promotional quota. The plaintiff, Brian Weber, was passed over for entry into a job training program which would lead to a higher-paying job as a skilled craft worker. He and other white workers who had greater seniority than many of the blacks accepted under the affirmative action plan were identifiable "victims" of the affirmative action plan. The Supreme Court did not discuss this fact; instead it pointed out that no white workers lost their job and that whites as well as blacks were allowed access to the craft training program.

■ Plaintiffs argue that the affirmative action program in *Weber* was newly created and offered new advancement opportunities to both whites and blacks. This feature of the program was cited by Judge

Wisdom in his dissenting opinion in the Fifth Circuit. The Supreme Court, however, failed to mention this fact in its opinion when it assessed the reasonableness of the program. Further, the fact that the plan created new expectations instead of upsetting settled expectations does not significantly alter the effect on white workers. The white workers in *Weber* were still being identifiably passed over in favor of less-senior black workers. That is similar to what has occurred to the white police officers in this case.

The issue of relative qualifications was not present in *Weber* because both the white and black workers involved were unskilled. However, that issue is present in this case and has been the subject of fierce dispute. It is clear to this Court, as indicated above, that the black officers promoted under the affirmative action plan were equally qualified with the white officers. Moreover, even if the white officers were slightly more qualified than the black officers, affirmative action promotions would still be permissible given the broad deference *Weber* gives to employers. This defer-

ence to the employer's judgment is well placed, given the slippery nature of any judgment on relative qualifications.[103]

In sum, for Title VII purposes this case is indistinguishable from *Weber*. The City's affirmative action plan was, like the plan in *Weber*, a "temporary measure . . . not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance" in the supervisory ranks of the Department.[104] The additional factors cited in *Weber* are also met here. No white police officer lost his job and whites were promoted along with blacks. *Weber* compels this Court to uphold the City's affirmative action plan under Title VII.[105] *See also Maehren v. City of Seattle*, 92 Wash.2d 480, 599 P.2d 1255 (1979).

### 3. The City's Past Violation of Title VII

■ Although Title VII was originally enacted in 1964 as part of the Civil Rights Act, it was not extended to public entities such as the City of Detroit until 1972. Plaintiffs argue from this that if the City of Detroit did use unvalidated, discriminatory tests prior to 1972,[106] that should be

---

**103.** When a Court imposes an affirmative action plan on an employer, there exists the theoretical danger that the employer will be forced to hire or promote unqualified persons. In the case of a voluntary affirmative action plan, no such danger exists since an employer will presumably be careful to hire or promote only qualified workers. That was true in this case, where the Board of Police Commissioners was careful to promote only blacks who had passed the written promotional examination.

**104.** It is true that the Board of Police Commissioners has yet to set a date for when the affirmative action program will end. However, it is clear that the Program is slated to end at some point. The reasonableness of the termination point is an issue discussed at the end of this opinion.

**105.** As previously indicated, Title VII should be construed coextensively with § 1981 in this case. Thus, the plan must be held lawful under § 1981 as well. Any other holding on the § 1981 issue would allow *Weber* to be circumvented every time by simply filing suit under that statute instead of Title VII.

Plaintiffs make the interesting argument that *Weber* does not apply at all in a case such as this which arose in the public sector. The reason is that Title VII was not extended to

public sector employers until 1972. Plaintiffs argue that Congress extended Title VII solely on the basis of its power to legislate under the Fourteenth Amendment and that thus Title VII as applied in the public sector should be construed coextensively with Title VI and the Fourteenth Amendment.

This Court fails to see the significance of plaintiffs' argument. Title VII as applied to the public sector in 1972 is the same statute which the Court interpreted in *Weber* as not barring voluntary affirmative action. And, unlike the uncertain 1964 legislative history reviewed by the Court in *Weber*, the 1972 legislative history clearly demonstrates Congress' approval of race—conscious remedies for past discrimination. *See Univ. of Calif. Regents v. Bakke*, 438 U.S. 265, 353–54 n. 28, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (opinion of Brennan, White, Marshall & Blackmun, JJ.).

**106.** As this Court has already noted, Title VII imposes much more exacting requirements on an employer than the fourteenth amendment. If a hiring or promotional test or other selection device acts to screen out disproportionate numbers of members of a protected class, then Title VII requires that device to be shown to be job related. Thus one does not need to show intent to discriminate to establish liability under Title

irrelevant so far as Title VII is concerned.[107] Additionally, plaintiffs argue that since the City was acting in good faith, through Commander Caretti, to improve the hiring and promotional models, it could not be liable under Title VII to black plaintiffs for any disparate impact on blacks from these tests for the years 1972–1973.

■ The record is clear that the City used unvalidated and discriminatory hiring—and promotional—tests until 1974. It is equally clear that since Title VII was made applicable to the City in March of 1972, the City was guilty of discriminating against blacks under Title VII from that date until 1974.[108]

Plaintiffs dispute the evidence of disparity and argue that if anything, blacks were preferred in hiring in 1972 and 1973. This Court has already discussed this contention. This Court credits Mr. Fechter's analysis finding adverse impact against blacks in 1972–73 and finds it consistent with the City's use of aptitude tests which have historically discriminated against blacks.

The plaintiffs' good faith argument is interesting, but it is established that good faith is not a defense to Title VII. *See Albemarle Paper Co. v. Moody*, 422 U.S.

405, 422–23, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The fact that the City was earnestly working to obtain validated, non-discriminatory hiring tests throughout the early 1970s is no solace to black applicants who were screened out by the unvalidated, discriminatory temporary tests the Department used until the fall of 1973. The plaintiffs' good-faith, temporary business necessity argument, based on *Blake v. City of Los Angeles*, 435 F.Supp. 55 (C.D.Cal.1977) is unavailing for the reasons given by Judge Hufstedler in her opinion for the Ninth Circuit reversing *Blake*. *See* 595 F.2d 1367, 1375–82 (9th Cir. 1979). Thus, *Weber* aside, the affirmative action plan is justifiable to remedy clear violations of Title VII which continued into 1972 and 1973. The effect of the Department's promotional model was to perpetuate this and other past discrimination against blacks. Under these circumstances, the Department had a clear duty to remedy the discrimination.[109]

### C. The Constitutional Claim

On its facts, *Weber* dealt only with a private business. This case deals with a public employer which, unlike a private employer, is subject to the command of the 14th Amendment's equal protection clause. Accordingly, this Court must assess wheth-

---

VII, one need only show disparate impact, i. e. that blacks fail more often than whites. The employer then has the burden of proving that the job selection device he is using is job-related. *See e. g. Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

**107.** Plaintiffs also argue that the City did not violate any § 1981 rights of black employees before 1972 because § 1981 requires proof of intent to discriminate, like § 1983 and the constitution. Thus, according to plaintiffs, any § 1981 rights of Black Plaintiffs were coextensive with their constitutional claim. This Court has already indicated that § 1981 and Title VII should be read coextensively whenever possible. However, there is much authority that § 1981, like § 1983 requires proof of intent to discriminate. *See e. g. Mescall v. Burrus*, 603 F.2d 1266 (7th Cir. 1979); *Williams v. DeKalb County*, 582 F.2d 2 (5th Cir. 1978). *Contra Davis v. County of Los Angeles*, 566 F.2d 1334 (9th Cir. 1977), *vacated as moot*, 440 U.S. 625,

99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). Since this Court has determined that the City's conduct through at least 1967–68 showed intentional discrimination against blacks, it is unnecessary to enter the controversy. This Court will assume that § 1981 requires proof of intent to discriminate.

**108.** Plaintiffs argue that Title VII, as applied to municipalities, incorporates the intent-to-discriminate requirement of the Constitution because Congress had no authority to impose Title VII's disparate-impact standard on the states. This Court rejects this argument for the reasons given in *Blake v. City of Los Angeles*, 595 F.2d 1367, 1372–74 (9th Cir. 1979). *Accord Scott v. City of Anniston*, 597 F.2d 897 (5th Cir. 1979), *petition for cert. filed* 47 U.S. L.W. —— (1979); *United States v. City of Chicago*, 573 F.2d 416, 423–24 (7th Cir. 1978).

**109.** This alone would appear to satisfy the test advanced by the majority opinion in the Fifth Circuit's *Weber* decision.

er the City's affirmative action plan passes constitutional muster.[110]

When a state has been guilty of racial discrimination, the Constitution commands that the discrimination and any effects from it be corrected. A state has an affirmative duty to "eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965). An illustrative area where this affirmative duty comes into play is school desegregation. In *Dayton Bd. of Ed. v. Brinkman*, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) and *Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979), the Supreme Court spoke strongly of the affirmative duty which school boards have to dismantle school systems which were segregated in 1954 when *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed.2d 873 (1954) was decided. The Court ruled that the existence of intentionally segregated schools in 1954 creates a continuing duty on a school board to eradicate the effects of that system and that the continued existence of segregated schools establishes a prima facie case that the school board has failed in carrying out that duty. *See Columbus supra*, 99 S.Ct. at 2947–49; *Dayton, supra*, 99 S.Ct. at 2979.

Massive litigation and controversial court orders have resulted because school boards have chosen to ignore their duty and wait until a court forced them to act. Yet it is clear that voluntary compliance has always been preferred. The public agency involved has the "primary responsibility" for undoing the effects of past discrimination and courts should intervene only when the public agency shirks its responsibility. *See Milliken v. Bradley*, 433 U.S. 267, 281, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *McDaniel v. Barresi*, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971).

The validity of race-conscious remedies for past discrimination was a central theme of *Univ. of Calif. Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). The University of California at Davis Medical School operated a special admissions program which set aside a fixed number of places for minority students. However, the Medical School, unlike the defendants here, did not attempt to justify the program as a remedy for past unlawful discrimination and was not itself guilty of past discrimination. Four Justices (in an opinion authored by Justice Stevens) expressed no view on the propriety of a remedial affirmative action program, but found the University's program violative of Title VI. Four other Justices (in an opinion authored by Justice Brennan) would have sustained the program as an appropriate response to general societal discrimination against minorities. Mr. Justice Powell rejected the societal discrimination justification, but would have allowed the use of race as a factor in admissions in order to achieve diversity in a student body. According to Justice Powell, the program was invalid because it set up a rigid quota for minorities and insulated them from overall consideration with whites.

*Bakke* stands for the proposition that general past societal discrimination against blacks or other minorities, by itself, will not justify race-conscious numerical preferences, at least in professional school admissions. The opinion of Mr. Justice Stevens expressly declined to comment on the use of race in a remedial affirmative action program designed to remedy more specific past discrimination. The opinion of Mr. Justice Brennan thought that past societal discrimination, by itself, did justify numerical racial preferences; Justice Brennan would have upheld numerical racial preferences as a remedy for past discrimination, whether judicially imposed or voluntarily adopted. The "swing" opinion of Mr. Justice Powell conceded that the state has "a legitimate and substantial interest in ameliorating, or eliminating where feasible, the disabling effects of identified discrimina-

---

**110.** As previously indicated, this also controls the Title VI and § 1983 claims.

tion." 438 U.S. at 307, 98 S.Ct. at 2757. Justice Powell distinguished the school desegregation cases as instances where wrongs were "worked by specific instances of racial discrimination," a "far more focused" goal than the "amorphous concept" of "remedying the effects of 'societal discrimination.'" *id.* He would approve affirmative action on "judicial, legislative or administrative findings of constitutional or statutory violations." *id.*

The opinion of Justices Brennan, White, Marshall and Blackmun summarized the meaning of the Court's opinion in *Bakke*:

"Government may take race into account when it acts not to demean or insult any racial group, but to remedy disadvantages cast on minorities by past racial prejudice, at least when appropriate findings have been made by judicial, legislative, or administrative bodies with competence to act in this area." [111] 438 U.S. at 325, 98 S.Ct. at 2766.

The plaintiffs have advanced a number of arguments as to why the affirmative action plan instituted by the Police Department is impermissible under the fourteenth amendment, as construed in *Bakke*. Plaintiffs correctly note that racial classifications such as the one here must withstand "strict scrutiny" under the Constitution. It is clear from *Bakke* that undoing the present effects of past discrimination, under some circumstances, withstands strict Constitutional scrutiny. The question is whether this case presents such circumstances.

### 1. The Board of Police Commissioners' Findings of Past Discrimination

█ It is unclear from Mr. Justice Powell's opinion what administrative body would be appropriate to find past discrimination. In *Bakke*, the question never arose because no defense of past discrimination was raised. However, Mr. Justice Powell favorably cited, *inter alia, United Jewish Organizations v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977); *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *McDaniel v. Barresi*, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971); *Contractors Assoc. of Eastern Pa. v. Sec'y of Labor*, 441 F.2d 159 (3d Cir.), *cert. denied*, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971). In *United Jewish Organizations, supra,* the Department of Justice objected under § 5 of the Voting Rights Act to the drawing of certain voting district boundaries because they diluted black voting strength. The boundaries were redrawn, but the result was dilution of the voting strength of orthodox Jews. The Court sustained the redrawn boundaries. In *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1979), the relevant agency was the Department of Health, Education and Welfare which had promulgated regulations requiring remedial instruction to children of foreign ancestry who spoke no English. In *McDaniel v. Barressi, supra,* a school board attempted to voluntarily disestablish its dual school system, albeit under pressure from the Department of Health, Education and Welfare. The Georgia Supreme Court struck down the board's race-conscious assigning of students. The United States Supreme Court reversed, upholding the board's voluntary efforts.

In *Contractor's Ass'n, supra,* the Third Circuit upheld the Secretary of Labor's establishment pursuant to executive order 11246, of goals for minority hiring by contractors in the Philadelphia area. The Secretary had determined that there was a need for such a remedy because of the severe underrepresentation of blacks in the craft trades in the Philadelphia area. The

---

111. Defendants properly point out that the opinion of Justice Stevens criticizes, 438 U.S. at 408 n. 1, 98 S.Ct. 2733, but Justice Powell does not disavow this statement.

Post-Bakke courts have realized that Bakke does not affect race-conscious action to remedy past discrimination. *See Maehren v. City of Seattle*, 92 Wash.2d 480, 599 P.2d 1255 (1979);

*Firefighters Inst. for Racial Equality v. City of St. Louis*, 588 F.2d 235, 239 (8th Cir. 1978), *cert. denied*, 443 U.S. 904, 99 S.Ct. 3096, 61 L.Ed. 872 (1979); *Morrow v. Dillard*, 580 F.2d 1284 (5th Cir. 1978); *Livingston v. Ewing*, 601 F.2d 1110 (10th Cir. 1979); *Minnick v. Calif. Dept. of Corrections*, 95 Cal.App.3d 506, 157 Cal.Rptr. 260 (1st App.Dist.) (1979).

Secretary ascribed this underrepresentation to exclusionary union practices.[112]

It is clear from the above authorities that Justice Powell's concern was directed to the reliability of the finding of past discrimination and to the nature of the finding of past discrimination. In each of the above cases there was good reason to credit the findings of specific past discrimination made by each administrative body in question.

Plaintiffs argue that Chiefs Tannian and Hart misrepresented to the Board of Police Commissioners the need for the 50/50 black-white promotion ratio as being mandated by the Law Enforcement Assistance Administration (LEAA); that the Chiefs withheld the existence of the 50/50 ratio from the LEAA and that the Board acted improperly in refusing to investigate further, call additional witnesses and take testimony under oath.

This Court sees no basis to these claims. The LEAA guidelines distinguish between impermissible racial quotas to redress mere racial imbalance and such quotas to offset past discrimination. Indeed, 28 C.F.R. § 42.203(i)(L) provides that where a "recipient has previously discriminated against persons on the ground of race [or] color . . ., the recipient must take affirmative action to overcome the effects of prior discrimination." The Equal Employment Opportunity Coordinating Council has adopted a policy statement to the same effect. See 41 Fed.Reg. 38814 (Sept. 13, 1976). In addition, the Equal Employment Opportunity Commission has issued broad

guidelines which strongly encourage voluntary affirmative action pursuant to self-assessment.[113]

It is true that Chiefs Tannian and Hart urged the Board to adopt affirmative action to avoid the possible loss of federal funds, but at no time did they represent that a fund cut-off was imminent. Further, contrary to plaintiff's claims, the testimony of government analyst Jacqueline DeYoung of the Department's special projects section demonstrates that the LEAA knew of the affirmative action program and how it functioned.

It is clear that the Board of Police Commissioners was well aware of enough relevant facts to make the findings that it made. The statistical evidence of disparity was before the Board—evidence that, contrary to plaintiff's claim, was highly probative of past discrimination. Further, the issues were fully aired at public hearings. The sad history of the Detroit Police Department which is outlined in this opinion is not a secret. The Board of Police Commissioners, whose members are all residents of Detroit, was well aware of the Department's past and of the Department's relationship with the black community. One need only examine the Report of the National Advisory Commission on Civil Disorders and the Task Force on the Police Report of the President's Commission on Law Enforcement and Administration of Justice to realize that intentional discrimination in the hiring of police officers and within po-

---

**112.** Other Courts have upheld preferential hiring under the executive order, e. g. Contractors of Massachusetts, Inc. v. Altshuler, 490 F.2d 9 (1st Cir. 1973), cert. denied, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974); Southern Illinois Builders Ass'n v. Ogilvie, 471 F.2d 680 (7th Cir. 1972).

**113.** See 29 C.F.R. § 1608. Under these guidelines, employers are encouraged to conduct a self-assessment and take voluntary affirmative action, including goals and timetables. Such action may be taken where an employer reasonably believes it necessary to correct the effects of past discrimination or past disparate treatment of minorities. An employer does not have to openly admit past discrimination, does not have to establish a past title VII violation

and may take affirmative action without regard for affirmative defenses (such as statutes of limitations) which might bar relief from a court.

While conceding that ordinarily EEOC guidelines are "entitled to great deference," Albemarle Paper Co. v. Moody, 422 U.S. 405, 431, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), plaintiffs argue that these guidelines are not, basically because they were hastily brought out in response to the Fifth Circuits decision in Weber. See General Electric v. Gilbert, 429 U.S. 125, 142, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). Whatever force there may have been to this argument is gone after the Supreme Court's decision in Weber.

lice departments was a problem nationwide and in Detroit in 1967–1968. There was good reason for the Board to credit Chiefs Tannian and Hart's testimony that discriminatory effects were still present. The Board of Police Commissioners' finding that it had an affirmative duty to remedy years of pervasive discrimination against blacks was not only reasonable, but long overdue.[114]

Because the Supreme Court has spoken so strongly of the need for voluntary efforts to eliminate the blight of past discrimination, it is this Court's view that *Weber* should apply with full force to employers in the public sector. In other words, a voluntary affirmative action plan which passes muster under *Weber* should also pass muster under the Constitution. *Weber's* factors of racial imbalance and traditionally segregated job categories provide a sound basis for an employer to act and for a reviewing Court to judge the necessity of affirmative action. A public employer which contemplates voluntary affirmative action faces the same dilemma which a private employer faced before *Weber*: risk of suit by one side or the other no matter what it does. The same zone of reasonableness should apply. Moreover, as the school desegregation cases demonstrate, lingering effects of past intentional discrimination can haunt a public employer many years after the intentional discrimination has ended. A finding by a public employer that racial

imbalance exists in a traditionally segregated job category should be equated with a finding that the employer had failed in his duty to remedy the present effects of past discrimination. This implicit or explicit finding of past discrimination would have the directness and reliability which Mr. Justice Powell, in *Bakke*, referred to when he spoke of "disabling effects of identified discrimination." 438 U.S. at 307, 98 S.Ct. at 2757–58 and "judicial, legislative, or administrative findings of constitutional or statutory violations." *Id.* which in his eyes would justify a preference.

Whether this view is accepted or not, this Court believes, on the facts of this case, that the Board of Police Commissioners' findings were adequate to sustain some form of affirmative action relief. The correctness of their conclusion is supported by the record in this case, which demonstrates beyond doubt that affirmative action was required to undo the present effects of years of systemic discrimination.

2. Intentional Past Discrimination

Plaintiffs argue that at worst the record shows some segregated squad cars and discriminatory job assignments up through the early 1960s, but that no intentional discrimination existed in hiring or promotions.[115] At worst plaintiffs argue, blacks were kept out of the Department by facially neutral I.Q. tests which blacks failed more often than whites.

**114.** Plaintiffs argue that the Board of Police Commissioner's actions were premised on a showing of past "de facto" discrimination which is insufficient to establish a constitutional violation. The phrase "de facto" as opposed to "de jure" is not significant. Commissioner Littlejohn believed that past discrimination against blacks had been intentional and the Board of Police Commissioner's affirmative action resolutions spoke of undoing constitutional violations.

**115.** Plaintiffs argue that the lieutenants' promotional system was and is a bona-fide merit system, protected under § 703(h) of Title VII. They argue that just as seniority systems which are bona-fide are protected by § 703, even if they perpetuate the effects of past discrimination, so should a bona-fide merit system be protected.

In *Int'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Court did rule that bona-fide seniority systems are immune from attack under Title VII. That ruling, however, applied only to seniority systems and not to anything else. In fact, the Court in *Teamsters,* noted the anomaly of its holding, but felt compelled to so rule by the express language of § 703(h). *See* 431 U.S. at 349–50, 97 S.Ct. 1843.

It is clear that promotional or merit systems which perpetuate past discrimination are violations of Title VII. *See United States v. Trucking Employees, Inc.,* 182 U.S.App.D.C. 315, 321, 561 F.2d 313, 319 (D.C. Cir. 1977); *Chavez v. Temple High School Dist. No. 213,* 565 F.2d 1087, 1093 n. 8 (9th Cir. 1977).

The plaintiffs draw this distinction because under the Supreme Court's decision in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), proof of discriminatory intent is required to establish a violation of the equal protection clause. Plaintiffs argue that there is no proof in the record from which the Board of Police Commissioners or anyone else could have concluded that the City intentionally discriminated against blacks. Plaintiffs conclude that since at worse the City used facially neutral tests which blacks happened to fail a lot, the City was never guilty of violating the Constitution regarding black officers and thus was never under a duty to remedy its past discrimination.

Plaintiffs overstate the standard of *Washington v. Davis, supra.* As the Court stated in *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977), "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." In this case, the evidence shows intentional discrimination against blacks through at least 1967–1968, when the Detroit Riot caused people to sit up and take notice.

First, the Department used subjective criteria in hiring such as oral boards and background checks which excluded large numbers of blacks. The record is clear that this subjective decisionmaking operated to deliberately exclude large numbers of blacks.

Second, the Department used I.Q. tests for years on end which it knew had nothing to do with whether an applicant would make a good police officer but which screened out large numbers of black applicants. Plaintiffs acknowledge that this may have occurred, but argue that use of neutral tests which blacks happen to fail disproportionately is not intentional discrimination under *Washington v. Davis, supra.* This Court disagrees. It is established in the Sixth Circuit that one intends the natural and foreseeable consequences of one's actions and where the natural and foreseeable results are discriminatory, a presumption of discriminatory intent arises. *Oliver v. Michigan State Board of Education,* 508 F.2d 178, 182 (6th Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975), *reaffirmed in NAACP v. Lansing Board of Education,* 559 F.2d 1042 (6th Cir.), *cert. denied,* 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977). *Accord Arthur v. Nyquist,* 573 F.2d 134, 142–43 (2d Cir.), *cert. denied,* 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978); *United States v. School Dist. of Omaha,* 565 F.2d 127 (8th Cir.) (en banc), *cert. denied,* 434 U.S. 1065, 98 S.Ct. 1240, 55 L.Ed.2d 765 (1977).

In the recent *Columbus* and *Dayton* cases, the Supreme Court did not approve the above test insofar as it created a presumption of intentional discrimination. *Dayton, supra,* 99 S.Ct. at 2978 n. 9. However, the Court made it clear that "proof of foreseeable consequences is one type of quite relevant evidence of racially discriminatory purpose . . ." *id.* Further, the Court allowed the finder of fact to draw an inference of segregative intent from acts which are foreseeably discriminatory, *Columbus, supra,* 99 S.Ct. at 2950. Such an inference is inescapable here where the Department continued its I.Q. tests for years and was content to hire minuscule numbers of black officers. Further, the evidence in the record of blatantly discriminatory treatment of black citizens—winked at by the Department—as well as blatant discrimination against black officers in the Department provides additional compelling evidence that the Department was deliberately keeping blacks out. This factual situation distinguishes *United States v. City of Chicago,* 549 F.2d 415, 435 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977), relied on by plaintiffs.

Finally, there is the compelling statistical evidence. The Supreme Court has ruled that "significant proof" of intentional discrimination can be found in statistical comparisons of workforce and population data. *Int'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 337 n. 17, 339–40 n. 20, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). This

Court has outlined the statistically significant employment data in this case. It well demonstrates the severity of the discrimination undergone by blacks. *See also Maehren v. City of Seattle*, 92 Wash.2d 480, 599 P.2d 1255 (1979).

### 3. Summary

In sum, this Court believes that *Weber's* allowance of voluntary affirmative action by private employers subject to Title VII should be extended to public employers subject to Title VII and the Constitution. If anything, the policy arguments are more compelling to allow such affirmative action by public employers than private ones.

There were clear findings by a duly constituted public body, the Board of Police Commissioners, that affirmative action was needed to offset the present effects of past discrimination. The evidence in the record overwhelmingly supports these findings.

### 4. Was the City's Affirmative Action Plan Reasonable?

The *Weber* analysis applied to the question of whether a remedial program of racial preference is warranted should also be applied to determine the reasonableness of the program instituted. A direct comparison of *Weber's* facts with the facts of this case, *supra,* demonstrates the reasonableness of the City's program here.

In addition to the standards set out in *Weber,* reasonableness standards are provided by Justice Brennan's opinion in *Bakke*: " . . . whether the . . . program stigmatizes any discrete group or individual and whether race is reasonably used in light of the program's objectives . . . " 438 U.S. at 373–74, 98 S.Ct. at 2791.

It is true that identified whites were passed over by the affirmative action plan. That, however, is not "stigmatizing" in the sense that Justice Brennan used that word in *Bakke. See* 438 U.S. at 374–76, 98 S.Ct. 2733. The white officers were not stamped inferior; rather the black officers were compensated for the past discrimination they had undergone.

The plaintiffs make many arguments for why the City's affirmative action plan was unreasonable. A key theme which runs through all of the plaintiffs' arguments is that the City's Affirmative Action Plan does not help identified black victims of past discrimination, but merely helps blacks who happened to be on the promotional eligibility lists.

As Justice Brennan's opinion, in *Bakke* noted, *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) and *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) make clear that preferential relief for members of a class which has been subject to past discrimination can be awarded on a group basis in the expectation that members of the preferred group were likely to have been subject to discrimination. *See* 438 U.S. at 362–69, 98 S.Ct. 2733. Testimony in the record from black officers who entered the case as intervening defendants established that this likelihood was true in many cases.[116]

But the rationale is broader than that. The societal interest in eliminating employment discrimination is "sufficient in itself to justify relief directed at classes rather than individual victims of discrimination . . . " *EEOC v. A. T. & T. Co.,* 556 F.2d 167, 175–77 (3d Cir. 1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978). Congress has taken a similar view in 42 U.S.C. § 6705(f)(2) which allocates 10% of certain federal projects' funds to minority business enterprises without regard to whether the beneficiaries had themselves suffered discrimination. The courts have upheld this provision. *Fullilove v. Kreps,* 584 F.2d 600 (2d Cir. 1978), *cert. granted* 444 U.S. 960, 99 S.Ct. 2403, 60 L.Ed.2d 1064 (1979); *Ohio Contractors Assoc. v. Economic Development Admin.,* 580 F.2d 213 (6th Cir. 1978). The EEOC guidelines on affirmative action specifically state that voluntary affirmative action can benefit persons not

---

**116.** See n. 68, *supra,* and accompanying text.

shown to have been victimized by past discrimination. *See* 29 C.F.R. § 1608.4(c). The Supreme Court's opinion in *Weber* is only the latest confirmation of this view. None of the black workers assisted by the craft-training preference could be said to be identifiable victims of past discrimination. *See also Maehren v. City of Seattle,* 92 Wash.2d 480, 599 P.2d 1255 (1979).

Unlike *Mitchell v. Mid-Continental Spring Co.,* 583 F.2d 275 (6th Cir. 1978), *cert. denied,* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 396 (1979), the underlying discrimination in this case cannot be said to be fully remedied where the most recent department figures show a city whose population is over 50% black, 21% of the lieutenants are black and almost 40% of the police officers are black. Moreover, in this case there has been a showing of harsh, intentional past discrimination.

Plaintiffs tread heavily on the notion that the affirmative action plan was unreasonable because it isolated blacks from competing with whites for promotions, just as the Davis Medical School's quota did. *See* 438 U.S. at 319–20, 98 S.Ct. 2733 (opinion of Powell, J). This argument ignores the specific, remedial nature of the City's racial preference. Unlike the general societal discrimination addressed in *Bakke,* the past discrimination in this case was direct and still had ongoing effects. The City's affirmative action program in this case no more isolates whites and blacks from competition than the affirmative action program in *Weber* or the program ordered by this Court in *Stamps v. Detroit Edison,* 365 F.Supp. 87 (E.D.Mich.1973).

On balance, the 50/50 ratio is reasonable. It allows large numbers of white officers to be promoted as well as needed black officers. The officers are equally qualified. Race-conscious promotions help to remedy present effects of past discrimination and also ensure that the City's operational need for black officers is met.[117] The affirmative action program was necessary to ensure the rapid eradication of past discriminatory effects; nothing less than race-conscious promotions could do this.

### D. State Law Claims

█ Plaintiffs assert that their rights under the Michigan Fair Employment Practices Act, M.C.L.A. § 423.301 *et seq.,* M.S.A. § 17.458(301) *et seq.,* the Elliot-Larson Civil Rights Act, M.C.L.A. § 37.2201 *et seq.,* M.S.A. § 3.548(201) *et seq.* and Article 1, Section 2 of the Michigan Constitution were violated.

Each of these Acts prohibit racial discrimination much as Title VII does. State judges interpreting these state provisions look to federal case law for guidance. *See e. g., Civil Rights Comm. v. Chrysler,* 80 Mich.App. 368, 375 n. 4, 263 N.W.2d 376 (1977). There is no reason to believe that the Michigan Courts would not follow the Supreme Court's reasoning in *Weber* in interpreting their own law.

This conclusion is reinforced by the Michigan Civil Rights Act of 1977, M.C.L.A. § 37.2210, which permits a "plan to eliminate present effects of past discriminatory practices or assure equal opportunity with respect to . . . race . . ." if filed with the Michigan Civil Rights Commission. Thus, Michigan statutory law goes beyond the federal statutes in favor of voluntary remedial measures. The City of Detroit's affirmative action plan was initiated three years before this statute was enacted. However, after the statute's passage, the Department received a filing dispensation from the Michigan Civil Rights Commission.

█ *Rand v. Civil Service Comm.,* 71 Mich.App. 581, 248 N.W.2d 624 (1976), invalidating preferential promotions, is distinguishable because there was no finding of discrimination in that case which would authorize the Department of Civil Service to disregard the results of its own test as it did. In this case, findings of past discrimination were made and the record supports them. There is no reason to believe that the Michigan Courts would reach a different result on these facts. Further, because the Board of Police Commissioners was un-

117. *See* section VII, *infra.*

der an affirmative duty under the U.S. Constitution to eradicate the effects of past discrimination, even a state law forbidding voluntary affirmative action could not stand in the way. *See McDaniel v. Barresi,* 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971).

Plaintiffs also claim that the City refused to bargain over promotional criteria. There is no evidence of this in the record.[118] The affirmative action promotions were made from July 1974 to July 1977 and were made pursuant to the provisions of Chapter 11, section 7–1114 of the Detroit City Charter. As required by that provision, each time that the Chief of Police recommended that affirmative action promotions be done out of rank order, he submitted "written reasons" to the Board in the form of statistical information concerning Detroit's hiring and promotion practices.

■ Plaintiffs finally raise a due process question. The Michigan state cases concerning due process e. g. *Casad v. City of Jackson,* 79 Mich.App. 577, 263 N.W.2d 19 (1977) have looked to state law to see whether a property right has been created. This is the same approach that the federal cases take. *See e. g. Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). However it does not appear that public employment is a property right under Michigan state law. In this case, the City fully complied with the above-cited provisions of the City Charter which specifically allow the Board to promote candidates out of order. Plaintiffs point to no other source of state law for their "property right."

■ Plaintiffs do claim that the Board of Police Commissioners violated the City Charter by denying white officers their right to appeal a promotion if it was based on a protest to the affirmative action plan. There is nothing to this claim. The purpose of individual appeals is to hear individual grievances. The white officers who were bypassed by affirmative action were complaining about Board Policy, not an injus-

tice unique to them as individuals. Policy-making questions were handled by the Board at public meetings. That is where white officers could have made their case. It was unquestionably reasonable for the Board to dismiss summarily all appeals based on protests to the affirmative action plan.

## VII. THE CITY'S OPERATIONAL NEEDS DEFENSE

■ The City defendants argue as an independent justification for the promotion of black officers to the rank of lieutenant that effective law enforcement required that the Police Department at all ranks roughly reflect the population which it serves. They argue that the affirmative action program has 1) helped the police solve crime by fostering citizen support for the department, 2) improved the safety of police officers, 3) reduced riots, brutality, citizen complaints and demonstrations, 4) fostered equal treatment of citizens, 5) provided role models for young black officers, and 6) helped to accomplish necessary police duties such as undercover work or crowd control in black neighborhoods.

Plaintiffs argue that this defense stereotypes white lieutenants as being unable to effectively supervise black officers or to relate to black citizens and that there is no way to correlate crime reduction to the affirmative action program. The plaintiffs further argue that any need for black officers in undercover work in the black community is fully met by black patrolmen who currently constitute 40% of the force and that no similar need exists for black lieutenants. So far as the plaintiffs are concerned, the City's argument is simply that whites need to be policed by whites, and blacks by blacks, and that the City thus regards race as a bona fide occupational qualification.

For years, courts have heard arguments that an employer should not have to hire blacks because the employer's customers did not like blacks. For years the courts have rejected such "customer preference" argu-

**118.** *See* n. 102, *supra.*

ments. Yet, the City's operational needs defense sounds suspiciously like the discredited "customer preference" claim. Plaintiffs make no bones about their view that this is exactly what the City's argument amounts to. This Court disagrees.

The City's operational needs defense cannot be separated from the historical context in which it arose. In an ideal world there is no question that the operational needs defense would be untenable. However, we do not live in an ideal world, and the history of race relations in the City of Detroit is far from ideal. The history of the relationship between the Detroit Police Department and the black community is especially sad. In part II of this opinion, this Court has outlined many of the Department's practices vis-a-vis its own black officers. Unfortunately, the record reveals that the Department's attitude toward the black community was no better than its attitude toward its black officers.

A. The Black Community and Racial Discrimination by the Police Department

There is extensive evidence in the record which shows that the Police Department and the black community were at each other's throats at least until the early 1970's. A phrase which was constantly used at trial was that the Police Department was regarded as an "occupation army" in the black community and was treated as such. Precinct stations in the black community looked like armed fortresses; they were shot at by passing cars of black youths. Officers were afraid to venture into the community for fear of being harassed or worse.

This sad state of affairs had many causes. The primary cause was discriminatory practices. Racial criteria entered into the everyday judgments of police officers regarding who they stopped, searched or detained and how they did it. Racial slurs were common. Police brutality against black citizens was less common but still severe. Some of the testimony of Mr. Arthur Johnson before the Civil Rights Commission in 1960, previously quoted in this opinion,[119] vividly portrays the attitudes and practices of the Department—practices that Mr. Johnson testified were such that there wasn't a black citizen in the City of Detroit who had not been subject to them.

Witness after witness at trial testified that discriminatory police practices were common. Inspector Harold Johnson testified that officers would often stop black motorists for traffic offenses, search the car, take the seats of the car out, and then leave the seats on the street when they were finished. Deputy Chief of Police Reginald Turner, who commanded the tactical mobile unit starting in 1974, corroborated this testimony. He noted that disproportionately large numbers of black citizens were injured as a result of traffic stops. Chief Hart testified that "[i]t's a matter of public record that members of the black community have been beaten up by police unjustifiably and without cause; its a matter of record." Deputy Chief Bannon testified that informal police rules in the forties and fifties were that "all blacks west of Woodward Avenue after sundown would be investigated unless they were known to the police officer." This "pattern of systematic discrimination" continued against blacks in individual officer-on-citizen contacts.

Empirical proof of the ongoing crisis in relations between the Department and the black community is the fact that Detroit suffered major riots in 1943 and 1967 which required federal troops to subdue the violence. This Court has already discussed these riots and the major role that police-black community friction played in triggering each of them. This Court has also discussed the so-called "Kercheval incident" of 1966. In subsequent years the City underwent unrest triggered, in 1968, by the assassination of Martin Luther King, Jr. and, in the following years, by a special tactical police squad known as STRESS.

Vivid testimony was presented at trial regarding the New Bethel Church incident of 1969 by eyewitness police inspector Mack Douglas. Following reports that a white

119. *See* section IIA5, *supra.*

policeman had been shot near the New Bethel Church, twenty or thirty policemen converged on the building. The people inside the church were black and included women and children. The police went on an unprovoked rampage and began shooting and looting. The people in the church ducked for cover as best they could. The shooting was stopped by two black officers who physically removed the guns from the hands of the white officers. This incident is an extreme example of police practices which outraged the black community.[120]

The Department paid a heavy price for its discriminatory practices. The defendants have accurately characterized what resulted as a "cycle of violence" as the Department and the black community warred on each other. Six to eight police officers a year would die in the line of duty; no officer felt safe in the black community. The burden of the discriminatory police practices, however, was ultimately borne by the black and white citizens of Detroit.

The black community's response to Department practices was deep hatred and alienation.[121] Not only did the community hate the police, it had no confidence in the police's interest in investigating or solving black on black crime. This lack of confidence was justifiable.[122] The result was that the police got no cooperation from the black community in solving crime.

This is significant because citizen cooperation is essential to solve crime. Lack of support in the black community was devastating to the Department's efforts to police the City. This was the view of Police Chief Hart, and former Chiefs Tannian and Murphy. So substantial was the community's

alienation that at times there was active interference with officers performing their duty. Many times, crowds developed when the police arrived at the scene of a crime. These crowds were often hostile to the police and interfered with them. White officers who had responded to a radio run often had to get assistance for themselves. The police themselves—and ultimately the citizens of Detroit—were the real victims of discriminatory practices.

## B. Prevailing Attitudes in the Police Department

The underlying cause of the above problems was the Department's attitude toward blacks. As indicated in other sections of this opinion, the Department was overwhelmingly white through the mid 1970s, largely because of discriminatory hiring practices. The Department did not go out of its way to hire racist police officers or to breed racism; rather, the Department reflected the prejudices of the white society. These prejudices were aggravated because many neighborhoods—and criminal suspects—were black. The Department had constant contact with the black community, much of it involving the arrest of black offenders. Individual prejudice had many opportunities to manifest itself.

The predominantly white composition of the Department facilitated discrimination. White officers knew that their fellow white officers were tolerant of discrimination against blacks. As a result, discriminatory behavior flourished. The black community, in turn, came to hate most white officers. Those white officers who were not prejudiced felt the hostility of the black commu-

---

**120.** This event is illuminative because it demonstrates the impact which black officers can have on discrimination within the Department. Inspector Douglas was emphatic in concluding that had there been a black lieutenant on the scene, the misconduct would not have occurred in the first place. When viewed in light of this example, the City's operational need defense is reasonable, if not compelling.

**121.** Almost every witness at trial testified to this effect. The National Advisory Commission on Civil Disorders also found this to be true—nationwide and in Detroit. A 1973 opinion

survey by Market Opinion Research found statistically significant disparities in the perceptions of black and white residents toward the police. Unsurprisingly, the black citizens' responses were far more negative.

**122.** The testimony of Inspector Harold Johnson showed that there was sound basis for the community's feeling. He found that there were time delays in responding to calls from black neighborhoods, which were caused by the attitude of "let them kill themselves and we will go pick up the pieces."

nity and the hatred of the black crowds which gathered at the scene of crimes. They responded with resentment of the community's attitude. Thus, the prejudice of some white officers spawned a cycle of violence and alienation in which both the Department and the community was caught.

When understood in this light, the operational needs argument makes a great deal of sense. More black officers in the Department did not necessarily mean that prejudicial attitudes would go away, but it did mean that prejudicial practices would be reduced. Occupational solidarity among white officers was what facilitated discrimination in the first place. It is one thing to verbally or physically abuse a black citizen or prisoner in front of a group of fellow white officers. It is quite another to do the same thing in front of some black officers. Increasing the number of black officers broke the occupational solidarity which made discriminatory practices easy.

Correspondingly, increased numbers of black officers provided reassurance to the black community that the City was serious about eliminating discrimination. The presence of black officers was instrumental in breaking the cycle of alienation and violence. The presence of black officers was a critical factor in changing the black community's perception of the police and winning their cooperation in fighting crime.

Plaintiffs argue that what matters is not so much the presence of black *lieutenants* as the presence of black *patrolmen* who are the ones out on the street. The testimony at trial demonstrates that it is important to have blacks at all levels. The importance of black lieutenants in reducing discriminatory practices cannot be overstated. It is very difficult to mistreat blacks if one knows that the commanding officer is black. Inspector Douglas emphasized that the presence of a black lieutenant at police raids ensured that blacks on the scene would not be abused. He specifically cited the inci-

dent at New Bethel Church, which is described above, as an instance of police misconduct toward blacks which would not have occurred had there been a black lieutenant on the scene.

Similarly, a black lieutenant affects the perceptions of the black community. He is a commanding officer whose very presence confirms that blacks are no longer the second-class policemen which they used to be. Chief Hart put it this way:

"When [citizens] arrive at the precinct stations, they see some black lieutenants sitting behind the desk making decisions on their lives and they feel better about that. They will cooperate with us. They don't feel that we are an army of occupation."

The testimony at trial showed that black lieutenants have other beneficial effects. At the precinct, they directly oversee how persons under arrest are treated. They help ensure that laws are enforced equally and that an arrest was proper. Deputy Chief Reginald Turner gave an illustrative example of a common problem which a black lieutenant helps solve:

"All too often, [domestic relations assault] complaints in predominantly white precinct stations, where the staff inside the station is predominantly white, and the victims or complaining people are black, are quite often shunted aside. They are told there is no crime." [123]

Two other examples were mentioned at trial. Inspector Mack Douglas commented upon the leadership of black lieutenants in handling crowds and demonstrators. He testified concerning an incident where a white officer had gotten into an altercation with a black woman whom he had stopped for a traffic offense. A hostile crowd of 40–50 blacks had gathered and a cry of "officer in trouble" was put out over the radio. Then-lieutenant Douglas, who is black, rushed to the potentially-explosive scene. He was able to calm the crowd, assure them that he would personally look

---

**123.** This Court did sustain a motion to strike part of Deputy Chief Turner's testimony immediately afterward. However, it is clear from the transcript that the testimony quoted in the text was not part of that stricken.

into the incident, and persuade them to disperse.

Chief Hart testified concerning a barricaded gunman situation. When dealing with this crisis situation, the police have to handle both the gunman and the crowds which inevitably develop. In the past, the crowds were often hostile to white officers. With a black lieutenant in control, the crowds were not a problem.

Plaintiffs emphasize that race should not be an overriding factor. They fault the affirmative action plan for placing considerations of race ahead of considerations of individual merit. They correctly point out that there are some white officers who relate well to blacks because they grew up in the black community, etc. And some black officers might be unable to relate well to any citizens—white or black. This argument has force. In fact, it was considerations such as these which persuaded the Department to institute the oral board testing procedure as part of the promotional model.

Plaintiffs' argument is theoretically valid but does not work in the real world. Given the history of racial tensions in Detroit, black officers were far more likely to relate well to the black community. The white officer who had grown up in the black community and had the community's trust and confidence was the exception. Further, things had reached the point where such officers were engulfed in the cycle of alienation and violence between the Department and the community. It is clear that racial classifications were in order to change the perceptions of both white officers and the black community.

The empirical proof that racial classifications were needed is the testimony of witness after witness as to the results of affirmative action hiring and promotions. Chief Hart in particular noted the harmony which has gradually developed between the Department and the community. He testified that as a result of the affirmative action program, there was a significant decrease in discriminatory police practices and a concomitant increase in good feelings toward the Department. The affirmative action program gave the Department the credibility in the black community which had been absent previously. The Department had historically been all but off-limits to blacks. Now the community saw increasing numbers of their friends and neighbors in the Department, and at all levels.

The good feeling which developed was evident in many ways. A survey by Market Opinion Research found that while white attitudes toward the Department had stabilized, there was a "dramatic increase" in the number of blacks rating the relationship between the police and the community as "good." 22% of black citizens surveyed so characterized the relationship in 1973; 43% did so in 1978. Chief Hart testified that the "occupation army" mentality melted away as did problems of hostile crowds and sullen, uncooperative citizens.

Chief Hart and Deputy Chief Bannon directly linked the dramatic improvement in police-community relations to the affirmative action plan and its objective of having a police force reasonably representative of the community it policed. Former Police Commissioner Patrick Murphy testified that where white officers did not share the cultural values and backgrounds of black citizens, courses in black culture or sensitivity training in race relations for white officers did not work. In Commissioner Murphy's eyes, all the training in the world could not "substitute for the understanding, the deep perceptions of people who have come from the minority background and culture." The fact that other Departmental efforts to improve police-community relations were, in the words of Deputy Chief Bannon, "absolutely ineffective," demonstrates the truth in Commissioner Murphy's words, and confirm the need for more black officers at all ranks.

The testimony at trial additionally linked the affirmative action plan to less citizen complaints, less shootings of police officers, and ultimately a lowered crime rate. Chief Hart and Deputy Chief Bannon testified that the affirmative action plan dramatical-

ly reduced citizens' complaints filed against the Department. Chief Hart testified that the plan resulted in a reduction of the number of officers killed in the line of duty of from 6 to 8 each year to zero. Chief Hart testified at trial that no police officer has been killed in the line of duty since 1974, when the affirmative action plan was instituted. Chief Hart also testified that crime was reduced significantly because of police-citizen cooperation fostered by the affirmative action program. Former Chief Tannian corroborated these views:

"After we put substantial numbers of minorities in a supervisory capacity on the street, I found that the number of complaints from a racial standpoint went down and the level of cooperation in terms of information that witnesses at the scene just gratuitously offered improved, and the most significant example of fact that I can point to is the homicide area. When I took over the Police Department the homicide solution rate was between 50 and 60 percent and when I left the Police Department it was between 70 and 80 percent, and I am claiming that that is a direct result of citizen cooperation."

The plaintiffs question the conclusions drawn by the above-cited witnesses. They point out that cause and effect relationships between the affirmative action program and crime or citizens' complaints are very difficult to draw. Chief Hart and Deputy Chief Bannon both conceded that various factors in addition to the affirmative action program may have contributed to the reduction in crime. However, both adhered to their view that the program was a significant factor in causing crime reduction.

There is clear evidence in the record that before 1974 there existed enormous tension between the Department and the black community. There is clear evidence in the record that after the institution of the affirmative action program, police-community relations improved substantially, crime went down, complaints against the Department went down, and no police officers were killed in the line of duty. High ranking police officials attributed this change to the affirmative action program and its general aim of having the Department—at all levels—reflect the City's population. As plaintiffs' counsel has ably argued, there are many difficulties with drawing simple conclusions about difficult problems. However, upon careful review of the testimony, this Court believes that no reasonable person could fail to conclude that given the history of antagonism between the Department and the black community, the affirmative action plan was a necessary response to what had been an ongoing city crisis.

The plan's success in improving police-community relations and ultimately the quality of life in the City is clear on this record. The Court notes that numerous prestigious national commissions have cited the need to hire and promote black officers and to have the police department reflect the community it serves.[124] Detroit's experience, fully outlined at trial, confirms the wisdom of those recommendations.

## VIII. CONCLUSION

 The discriminatory treatment of black officers and black citizens outlined in

---

124. See Nat'l Advisory Comm. on Criminal Justice Standards and Goals, Police (1973); Nat'l Comm. on Causes and Prevention of Violence, Final Report: *To Establish Justice, To Insure Domestic Tranquility* (1969); Report of the Nat'l Advisory Comm. on Civil Disorders (1968); President's Commission on Law Enforcement and Administration of *Justice, Task Force Report*: The Police (1967); Report on the Causes of Crime 242, Nat'l Comm. on Law Observance and Enforcement (Vol. I, 1931) ("the Wickersham Commission.")

The need to have a police department reasonably reflect the city it serves has been commented upon by various courts:

"Perhaps the most critical consideration in our view is that this is not a private employer and not simply an exercise in providing minorities with equal employment opportunity. This is a police department and the visibility of the black patrolman is a decided advantage for all segments of the public at a time when racial divisiveness is plaguing law enforcement." *Bridgeport Guardians, Inc. v. Bridgeport Civil Service Comm.*, 482 F.2d 1333, 1341 (2d Cir. 1973), *cert. denied*, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975). *See also NAACP v. Allen*, 493 F.2d 614, 621 (5th Cir. 1974); *League of Latin American Citizens v. City of Santa Ana*, 410 F.Supp. 873, 896–7 (N.D.Cal.1976).

this record demonstrates well the truth in Mr. Justice Marshall's strong words in his dissenting opinion in *Bakke*:

> [F]or several hundred years Negroes have been discriminated against, not as individuals, but rather solely because of the color of their skins. It is unnecessary in 20th century America to have individual Negroes demonstrate that they have been victims of racial discrimination; the racism of our society has been so pervasive that none, regardless of wealth or position, has managed to escape its impact. The experience of Negroes in America has been different in kind, not just in degree, from that of other ethnic groups. It is not merely the history of slavery alone but also that a whole people were marked as inferior by the law. And that mark has endured. The dream of America as the great melting pot has not been realized for the Negro; because of his skin color he never even made it into the pot. 438 U.S. at 400–01, 98 S.Ct. at 2805.

These are the reasons why the City's affirmative action program is morally just and necessary.

It is unfortunate that affirmative action programs such as the one this case concerns are still needed. No one relishes making racial classifications. However, until our society progresses further, affirmative action will remain a necessity. As Mr. Justice Blackmun stated in his dissenting opinion in *Bakke*:

> I suspect that it would be impossible to arrange an affirmative action program in a racially neutral way and have it successful. To ask that this be so is to demand the impossible. In order to get beyond racism, we must first take account of race. There is no other way. And in order to treat some persons equally, we must treat them differently. 438 U.S. at 407, 98 S.Ct. at 2808.

Affirmative action is not pleasant for those members of the majority group who are directly affected by it. This Court can sympathize with the feelings of white officers who were passed over for promotion because of the affirmative action plan. They had studied long hours and this Court has no reason to question their oft-stated emotional hurt at being passed over for promotion. Of course, loss of pay and other emoluments is an ever-present and tangible harm as well.

At the same time, the impact should not be overstated. Although there was testimony that the affirmative action plan had caused divisiveness within the Department,[125] this Court finds it far more significant that affirmative action has substantially reduced the deep hostility between the black community and the police department. This has led to a safer, more pleasant city for officers and citizens alike. Moreover, plaintiffs themselves admit that of the 54 plaintiff class members, 40 have already been promoted to the rank of lieutenant. Thus, it appears that as a practical matter, the effect of the affirmative action program is to guarantee blacks access to the lieutenants' rank, but only to postpone access for some white officers who would otherwise have been promoted earlier.

A key theme throughout these proceedings is that the individual plaintiffs are the wholly innocent victims of the City of Detroit's affirmative action plan when it was the City itself which was guilty of the original discrimination to start with. At the very least, the plaintiffs want "front-pay" for the positions they say they should have gotten.

Variations on this theme have come up throughout these proceedings. Plaintiffs claim that the City should be estopped to argue that its own exam was not job-related. Plaintiffs claim that the City should bear a heavy burden of proof in proving the issues in this case because it has control over the evidence.

---

125. The source for this view was the plaintiffs themselves. A psychiatrist who held a mass session with 20 members of the class corroborated that plaintiffs felt alienated and hostile because they were "passed over." Plaintiffs' expert *testing* witness was quick to testify of his observations of racial hostility within the department. Whatever hostility is deemed to exist, it does not appear to have hurt the effectiveness of the Department.

However, acceptance of any of plaintiffs' arguments would destroy voluntary affirmative action by an employer by making its cost prohibitive. It is true that affirmative action upsets the expectations of white workers, but such expectations are indeed tainted when they are based on a legacy of discrimination.

No one has a right to be promoted, and how one receives a promotion in the Department has often been a matter of chance. Two examples of actual occurrences in Department history demonstrate this. First, in 1970, the Department gave two examinations for promotion to the rank of Sergeant. The first was the "regular" Sergeants examination. The second was a special examination which was given to all persons with the rank of Detective. The Department had decided to abolish the rank of Detective and made a "political" settlement with the Detective's Union. Every Detective who took the exam was given a passing score and was promoted to the rank of Sergeant.

Second, in 1970, the Department decided to increase the numbers of supervisory personnel. All 377 candidates who placed on the "regular" Sergeants list that year were ultimately promoted. As has been previously noted in this opinion, between 1967 and 1974 the ratio of sergeants to police officers was reduced from 1:10.8 to 1:3.4. The ratio of lieutenants to police officers was reduced from 1:23.8 to 1:17.4.

The beneficiaries of the above policy decisions were overwhelmingly white, since there were few black officers in the Department eligible for promotion in 1970. The Department's decision to flood the sergeant's rank is indeed curious since it came just before large numbers of black officers, hired after the 1967 riot, were eligible for promotion.

The City's affirmative action program should not be seen as depriving white officers of any right to a promotion. Instead, it should be seen as a program conferring a bonus on blacks who, as a group, have been subject to past discrimination. White officers in 1970 received an unexpected bonus when the Department decided to promote everyone on the Sergeant's eligibility list. White officers cannot reasonably complain when the Department, on a finding of past discrimination and operational need, decided to confer a "bonus" on blacks in 1974 and subsequent years.

Plaintiffs have also complained throughout these proceedings that the affirmative action plan is harsh and unjustifiable because it does not rest on individual considerations of merit. The Court feels that the opposite is true. The non-retributive, class-based nature of affirmative action is perhaps its strongest asset. Affirmative action is prospective, it seeks to remedy and not destroy. When done voluntarily, it accuses no individual of wrongdoing.

In this case, the individualized consideration plaintiffs demand invites individualized consideration of them. This would open up a Pandora's box of recriminations, which would be at best unhealthy. For years blacks in the police department were treated like second class citizens. It was not the City which did this, it was the white officers. It was the white officers who were guilty of mistreating black citizens. It was white officers who went on a ticket strike in 1959 when the City proposed integrating squad cars. It was white officers who fiercely resisted efforts to integrate the department throughout the 1960s.

This Court has no way of knowing if any of the members of the plaintiff class were guilty of such practices or of condoning such practices.[126] The Court hopes that

---

**126.** None of the plaintiffs who testified at trial admitted witnessing any discriminatory practices in the Department.

At trial, former Lieutenants and Sergeants Association president Joseph Clark, who had served in the Department since 1952, testified that he was unaware of any segregation within the police department during his 26-year ca-

reer. He was also unaware of any gulf between the black community and the police department. He also testified that he never gave much thought while he was in the department to whether there existed discrimination against blacks in hiring or promotions. When questioned about the 1959 ticket strike by white

none were. The City did not follow up opportunities to pursue such inquiries at trial; it did not seek retribution. The City did not ask what the plaintiffs and the Lieutenants and Sergeants Association were doing during the many years that white officers abused black officers in the department and black citizens on the street. This Court will not ask either.

Instead, this Court will uphold the City's affirmative action plan as proper under federal and state law.[127] It is proper because it undoes years of discrimination. It is proper because it serves vital City needs. It is proper because it looks to the future as a means of remedying a sorry past.

Plaintiffs are quite right that some form of terminating period needs to be placed on the affirmative action plan—either a date or a point at which the Department reaches a certain racial balance. The Board of Police Commissioners has held up on this pending the outcome of this litigation. The Court will request that the Board meet and establish such an end point, which will be reviewed by this Court for reasonableness. Thereafter, judgment will be entered for the defendants and the complaint dismissed.

officers opposing the integration of squad cars, Sergeant Clark responded as follows:

> The incident you are talking about occurred when the city fathers decided that we couldn't work with the people we picked out or that picked us, that were were going to split all these crews up and equally integrate them. That's when the trouble started.

Sergeant Clark later noted that squad cars were "not segregated," it was just a question of officers who "chose their partners."

127. Throughout these proceedings, plaintiffs have argued that findings of fact in *DPOA v. Young,* 446 F.Supp. 979 (E.D.Mich.1978), should collaterally estop defendants from relitigating many of the issues in this case. The Court has disagreed. *Weber* and *Bakke,* superseding and controlling decisions that they are, destroy any argument for applying collateral estoppel here.